The Honorable Ricardo S. Martinez

1

2

3

4

5

6           UNITED STATES DISTRICT COURT
          WESTERN DISTRICT OF WASHINGTON
7                    AT SEATTLE

8  | BRETT A. LYNCH and MARK C. VETURIS, | **Case No. 2:13-cv-01569-RSM** |

9              Plaintiffs,

10       v.

                                            SECOND AMENDED[1] COMPLAINT
11  THE BOEING COMPANY, MCDONNELL           FOR VIOLATIONS OF THE
    DOUGLAS CORPORATION, a wholly owned     EMPLOYEE RETIREMENT  INCOME
12  subsidiary of THE BOEING COMPANY,       SECURITY ACT ("ERISA")
    EMPLOYEE BENEFIT PLANS COMMITTEE
13  OF THE BOEING COMPANY, RICHARD D.
    STEPHENS, BRYAN H. BAUMEISTER,
14  DAVID A. DOHNALEK, R. PAUL
    KINSCHERFF, J. MICHAEL LUTTIG, ALAN
15  R. MAY, HARRY S. MCGEE, THE BOEING
    COMPANY BOARD OF DIRECTORS, JOHN
16  H. BIGGS, JOHN E. BRYSON, ARTHUR D.
    COLLINS, JR., LINDA Z. COOK, WILLIAM
17  M. DALEY, KENNETH M. DUBERSTEIN,
    JAMES L. JONES, EDWARD M. LIDDY,
18  JOHN F. MCDONNELL, W. JAMES
    MCNERNEY, JR., RICHARD D. NANULA,
19  ROZANNE L. RIDGWAY, MIKE S.
    ZAFIROVSKI, SCOTT M. BUCHANAN, and
20  MYRA ELLIOT,

21              Defendants.

22

23

24

25

26
    _____
    [1] Plaintiffs are filing this Second Amended Complaint pursuant to the Court's October 24, 2016 Order (ECF #118)
       granting Plaintiffs' Motion to Amend (ECF #97).

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

## I.   INTRODUCTION

1.      This is an action by Plaintiffs Brett A. Lynch and Mark C. Veturis[2] seeking to remedy fiduciary breaches by fiduciaries of the pension plans in which they are participants, pursuant to the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1001 *et seq.*  Plaintiffs seek appropriate equitable relief available under ERISA Section 502(a)(3), 29 U.S.C. § 1132(a)(3), and they also bring claims for co-fiduciary liability and failure to monitor, as well as for other relief provided for under ERISA.

2.      Plaintiffs are employees of The Boeing Company.  In 2007, they each were induced to transfer from their work locations in California to new positions in Washington. Plaintiffs each were told that their early retirement pension benefits would not be reduced, affected, or penalized if they moved, and they each were assured that they would continue to accrue benefits under the pension plan available to them in Long Beach, California.  This was not true.  Instead, because Plaintiffs relied on Defendants' false promises and transferred, the benefits to which they are entitled under the terms of one of their pension plans will be significantly reduced upon early retirement at age 55.

3.      Fiduciaries must speak truthfully when communicating about benefits, particularly when such promises are the basis of participants' decisions to materially change their positions.  Equity demands that Plaintiffs receive from Defendants the value of the benefits they were promised before they transferred to Washington, even though the terms of the relevant plans do not allow Plaintiffs to claim these benefits under the plans.

## II.   JURISDICTION AND VENUE

4.      **Subject Matter Jurisdiction.**  This action is brought by Plaintiffs pursuant to Section 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3).  This Court has subject matter jurisdiction

---

[2] After Plaintiffs filed their Motion to Amend, Plaintiff Gene R. Monper's claims were dismissed on October 17, 2016. Mr. Monper is no longer a party to this case. This Second Amended Complaint is substantially the same as the Proposed Second Amended Complaint that Plaintiffs filed with their Motion to Amend. Plaintiffs have removed Mr. Monper as a party, but other references to him and prior allegations regarding Mr. Monper remain in this document for ease of reference to facts specific to Mr. Monper that are also relevant to Plaintiffs Lynch and Veturis, to maintain cross referencing, and to minimize additional redlines to the Proposed Second Amended Complaint previously filed with the Court.

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT - 2

LAW OFFICES OF
KELLER ROHRBACK L.L.P.
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

pursuant to 28 U.S.C. § 1331 and ERISA Section 502(e)(1), 29 U.S.C. § 1132(e)(1).  Declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202 and Rules 58 and 65 of the Federal Rules of Civil Procedure.

5.     **Personal Jurisdiction.**  ERISA Section 502(e)(2), 29 U.S.C. § 1132(e)(2) provides for nationwide service of process.  All Defendants are residents of the United States and subject to service in the United States, and this Court therefore has personal jurisdiction over them.  This Court also has personal jurisdiction over them pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they would all be subject to the jurisdiction of a court of general jurisdiction in Washington.  Most Defendants also reside or may be found in this district.

6.     **Venue.**  Venue is proper in this district pursuant to ERISA Section 502(e)(2), 29 U.S.C. § 1132(e)(2), because most Defendants reside or may be found in this district and some or all of the fiduciary breaches or other violations for which relief is sought occurred in or originated in this district.  Venue is also proper in this district pursuant to 28 U.S.C. § 1391, because most Defendants are resident in this district and because part or all of the events or omissions giving rise to the claims occurred or originated within this district.

### III.   PARTIES

**A.     Plaintiffs.**

7.     **Plaintiff Gene R. Monper**[3] is a natural person who resides in the city of Bellevue, King County, Washington, within this district and division.  At all times relevant hereto, Monper has been and still is an employee, within the meaning of ERISA Section 3(6), 29 U.S.C. § 1002(6), of Defendant The Boeing Company and/or Defendant McDonnell Douglas Corporation, a wholly owned subsidiary of The Boeing Company.  At all times relevant hereto, Monper has been and still is a participant, within the meaning of ERISA Section 3(7), 29 U.S.C. § 1002(7), in both the Employee Retirement Income Plan—Hourly West, formerly known as the Employee Retirement Income Plan of McDonnell Douglas Corporation—Hourly West Plan

---

[3] As noted, *supra* note 2, references to Mr. Monper have been retained for continuity.

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

(Plan 002) (referred to herein also as the "Hourly West Plan"), and The Boeing Company Employee Retirement Plan (referred to herein also as the "BCERP").

8.     **Plaintiff Brett A. Lynch** is a natural person who resides in the city of Everett, Snohomish County, Washington, within this district and division.  At all times relevant hereto, Lynch has been and still is an employee, within the meaning of ERISA Section 3(6), 29 U.S.C. § 1002(6), of Defendant The Boeing Company and/or Defendant McDonnell Douglas Corporation, a wholly owned subsidiary of The Boeing Company.  At all times relevant hereto, Lynch has been and still is a participant, within the meaning of ERISA Section 3(7), 29 U.S.C. § 1002(7), in both the Hourly West Plan and the BCERP.

9.     **Plaintiff Mark C. Veturis** is a natural person who resides in the city of Everett, Snohomish County, Washington, within this district and division.  At all times relevant hereto, Veturis has been and still is an employee, within the meaning of ERISA Section 3(6), 29 U.S.C. § 1002(6), of Defendant The Boeing Company and/or Defendant McDonnell Douglas Corporation, a wholly owned subsidiary of The Boeing Company.  At all times relevant hereto, Veturis has been and still is a participant, within the meaning of ERISA Section 3(7), 29 U.S.C. § 1002(7), in both the Hourly West Plan and the BCERP.

**B.     Defendants.**[4]

**1.     The Boeing Company and McDonnell Douglas Corporation.**

10.     **Defendant The Boeing Company** is an employer, within the meaning of ERISA Section 3(5), 29 U.S.C. § 1002(5), and plan sponsor, within the meaning of ERISA Section 3(16)(B), 29 U.S.C. § 1002(16)(B), of both the Hourly West Plan and the BCERP.  The Boeing Company is also a functional fiduciary of these plans, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), as discussed in more detail *infra* part V.  Additionally,

---

[4] Plaintiffs formally dismiss all of the "Direct Communication Defendants" as well as Does 4-10 as parties, all of whom this Court dismissed from the case in its Order dated May 13, 2015. Plaintiffs reserve all rights as to claims against these dismissed Defendants for purposes of appeal. However, to simplify this amendment, prior allegations regarding the Direct Communication Defendants and Does 4-10 remain in this document for ease of reference to them as individuals relevant to the facts alleged on the whole, to maintain cross referencing and naming conventions, and to minimize the necessary redlines.

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE
RETIREMENT INCOME SECURITY ACT - 4

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

employees, executives, and officers of The Boeing Company are functional fiduciaries of these plans, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), as well as named fiduciaries and plan administrators, within the meaning of ERISA Section 3(16)(A), 29 U.S.C. § 1002(16)(A), as discussed in more detail below.  As a corporation, The Boeing Company can only act through human counterparts.  At all applicable times, The Boeing Company had effective control over the benefits-related activities of its own officers, directors, and employees, as well as officers and employees of Defendant McDonnell Douglas Corporation—including, without limitation: Defendants Richard D. Stephens, Bryan H. Baumeister, David A. Dohnalek, Pamela A. French, R. Paul Kinscherff, J. Michael Luttig, Alan R. May, Harry S. McGee, Gary Irons, Mike Query, Kim Martin, Tommy Small, Cindy Cuto, Jane Doe 1, Jane or John Doe 2, Jane or John Doe 3, John H. Biggs, John E. Bryson, Arthur D. Collins, Jr., Linda Z. Cook, William M. Daley, Kenneth M. Duberstein, James L. Jones, Edward M. Liddy, John F. McDonnell, W. James McNerney, Jr., Richard D. Nanula, Rozanne L. Ridgway, Mike S. Zafirovski, Jane or John Does 4-10, and Scott M. Buchanan.  As such, The Boeing Company is responsible for the activities of these individuals under *both* traditional principles of agency and the doctrine of *respondeat superior*.[5]  Further, under basic tenets of corporate law, The Boeing Company is imputed with the knowledge that its officers and employees (including other Defendants) had regarding the misconduct alleged herein, even if such knowledge is not communicated to The Boeing Company.  The Boeing Company is referred to herein also as **"Boeing."**

11.     **Defendant McDonnell Douglas Corporation, a wholly owned subsidiary of The Boeing Company**, is an employer, within the meaning of ERISA Section 3(5), 29 U.S.C. § 1002(5), and plan sponsor, within the meaning of ERISA Section 3(16)(B), 29 U.S.C. § 1002(16)(B), of the Hourly West Plan.  McDonnell Douglas Corporation is also a functional fiduciary of this plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A),

---

[5] Again, Plaintiffs leave references to *respondeat superior* for purposes of appeal, in light of the Court's May 13, 2015 Order.

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

as discussed in more detail *infra* part V.  Additionally, employees, executives, and officers of McDonnell Douglas Corporation are both functional fiduciaries of this plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), as well as named fiduciaries and plan administrators, within the meaning of ERISA Section 3(16)(A), 29 U.S.C. § 1002(16)(A), as discussed in more detail below.  As a corporation, McDonnell Douglas Corporation could only act through human counterparts.  At all applicable times, McDonnell Douglas Corporation had effective control over the benefits-related activities of its officers, directors, and employees— including, without limitation, all of the individual Defendants named herein who worked for McDonnell Douglas Corporation at the time the fiduciary breaches alleged herein occurred.  As such, McDonnell Douglas Corporation is responsible for the activities of these individuals under *both* traditional principles of agency and the doctrine of *respondeat superior*.  Further, under basic tenets of corporate law, McDonnell Douglas Corporation is imputed with the knowledge that its officers and employees (including other Defendants) had regarding the misconduct alleged herein, even if such knowledge is not communicated to McDonnell Douglas Corporation.  Finally, McDonnell Douglas Corporation, a wholly owned subsidiary of The Boeing Company, was merged with and into The Boeing Company as of December 31, 2009.  Accordingly, The Boeing Company is the successor in liability to McDonnell Douglas Corporation.  McDonnell Douglas Corporation is referred to herein also as **"MDC."**

### 2. Committee Defendants.

12.  **Defendant Employee Benefit Plans Committee of The Boeing Company** is a Plan Administrator, within the meaning of ERISA Section 3(16)(A), 29 U.S.C. § 1002(16)(A), of both the Hourly West Plan and the BCERP.  As such, the Employee Benefit Plans Committee is a fiduciary of these plans, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), as well as for the reasons discussed *infra* part V.  The Employee Benefit Plans Committee of The Boeing Company is referred to herein as the **"Employee Benefit Plans Committee"** or the **"Committee."**

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1    13.    **Defendants Richard D. Stephens, Bryan H. Baumeister, David A. Dohnalek,**

2    **Pamela A. French, R. Paul Kinscherff, J. Michael Luttig, Alan R. May, and Harry S.**

3    **McGee**, collectively the **"Committee Member Defendants,"** were, according to counsel for

4    Boeing,[6] members of the Employee Benefit Plans Committee of The Boeing Company for some

5    but not necessarily all of 2007 and 2008, which is the time period relevant to the fiduciary

6    breaches alleged herein.  As discussed in further detail *infra* part V, as members of the Employee

7    Benefit Plans Committee and as plan administrators, they are named fiduciaries, as well as

8    functional fiduciaries, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A),

9    of both the Hourly West Plan and the BCERP.  Further, as employees of Boeing and/or MDC

10   acting or speaking on behalf of their employer(s) and/or the Committee regarding entitlements to

11   future benefits, the fiduciary breaches by the Committee Member Defendants are also the

12   liability of their employer(s) and/or the Committee under *both* principles of agency and the

13   doctrine of *respondeat superior*.

14         A.    **Defendant Richard D. Stephens** was the Senior Vice-President of

15   Human Resources and Administration at Boeing, as well as a member of the Employee

16   Benefit Plans Committee, at the time the fiduciary breaches alleged herein occurred.  On

17   information and belief, Defendant Stephens, in his role at Boeing, was responsible for

18   employee programs and benefits, including pension benefits and fiduciary

19   communications.  In a December 2008 / January 2009 company newsletter, Defendant

20   Stephens was quoted as saying, "'It's all about people.  When employees have reliable

21   information to make sound, proactive decisions about their health and finances they enjoy

22   life more, are better able to contribute their time and talents back to their communities,

23   and are generally more productive at work and at home.  Lives are transformed in

24   positive ways,' [Stephens] said.  'And it's all about the long term—the more money you

25

26   _____
[6] Counsel for Boeing in this litigation provided these names by agreement of the parties on November 18, 2013.
Plaintiffs reserve the right to add additional Committee Member Defendants if their identities are later disclosed
by counsel or become known through discovery in this matter.

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE
RETIREMENT INCOME SECURITY ACT - 7

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

have in the piggy bank and the healthier you are as you age, the greater your ability to take advantage of future opportunities.'"  He is now retired.

B.     **Defendant Bryan H. Baumeister** was (and still is) an attorney in Boeing's legal department, as well as a member of the Employee Benefit Plans Committee, at the time the fiduciary breaches alleged herein occurred.  At some point, Defendant Baumeister became Chief Counsel for Boeing, where, on information and belief, he oversees all legal issues related to employee benefits and pensions, including compliance with ERISA and fiduciary communications.

C.     **Defendant David Dohnalek** was Boeing's Vice President of Investor Relations, the Vice President of Financial Planning and Analysis, and/or the Vice President of Finance and Treasurer, as well as a member of the Employee Benefit Plans Committee, at the time the fiduciary breaches alleged herein occurred.  On information and belief, he still holds the title Vice President of Finance & Treasurer.

D.     **Defendant Pamela A. French**[7] was the Director of Benefits, International Rewards and M&A Integration, as well as a member of the Employee Benefit Plans Committee, at the time the fiduciary breaches alleged herein occurred.  On information and belief, one of Defendant French's primary responsibilities at Boeing has been to disseminate information about employee benefit programs.  In a December 2008 / January 2009 company newsletter, she was quoted as describing new employee benefits information as the result of "the company's commitment to focus on the people behind our products—the 'who we are' as well as 'what we do'—in how we communicate about the company."  In her biography as a Member of the Quality Alliance Steering Committee, Defendant French highlights that at Boeing she is "responsible for company-wide employee benefit strategies, policies, compliance, communications, as well as

---

[7] Ms. French passed away on August 22, 2016. Plaintiffs dismissed claims against her on September 14, 2016, (ECF #116). Ms. French is no longer a party to this case. References to her remain in this document for ease of reference to the facts alleged on the whole and identifying relevant individuals, to maintain cross referencing and naming conventions, and to minimize the necessary redlines to the Proposed Second Amended Complaint previously filed with the Court.

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE
RETIREMENT INCOME SECURITY ACT - 8

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

integration of pay and benefit issues in M&A transactions, international sites and labor negotiations," and focuses on "stakeholder engagement in the health care and retirement areas."

E.    **Defendant R. Paul Kinscherff** was the Corporate Treasurer of Boeing Capital Corp. and/or Senior Vice President of Investor Relations at Boeing, as well as a member of the Employee Benefit Plans Committee, at the time the fiduciary breaches alleged herein occurred.  At some point, he became the President of Middle East Operations, and then became the Chief Financial Officer for International Finance at Boeing, a position that, on information and belief, he still holds.

F.    **Defendant J. Michael Luttig** was (and still is) an attorney in Boeing's legal department, as well as a member of the Employee Benefit Plans Committee, at the time the fiduciary breaches alleged herein occurred.  According to Boeing's website, Defendant Luttig became Executive Vice President and General Counsel in 2006, and "[i]n this role, Luttig is responsible for leading the Boeing Law Department across the company."  On information and belief, as General Counsel, Defendant Luttig oversees all legal issues related to employee benefits and pensions, including compliance with ERISA and fiduciary communications.

G.    **Defendant Alan R. May** was the Vice President, Strategy, Compensation and Benefits, as well as a member of the Employee Benefit Plans Committee, at the time the fiduciary breaches alleged herein occurred.  According to Boeing's website, in his position as Vice President of Strategy, Compensation and Benefits for Boeing, Defendant May "directed HR strategy, executive and enterprise compensation, health care policy and retirement benefits for the company."  Defendant May lists the following as his "specialties" on LinkedIn.com: "Strategic alignment of HR function with business requirements, performance management, M&A transactions and integration, organizational design, talent management/succession, labor strategy and executive

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

compensation." According to Boeing's website, Defendant May became (and still is) the Vice President of Human Resources at Boeing in 2013 and "reports to Ray Conner, Boeing vice chairman, president and CEO of Commercial Airplanes, and Tony Parasida, senior vice president of Human Resources and Administration for The Boeing Company." In between his former role as Vice President of Strategy, Compensation and Benefits and his current role as the Vice President of Human Resources, Defendant May was the Vice President of Human Resources for Boeing Defense, Space & Security, where he "was responsible for HR initiatives to drive business performance and to create and sustain a premier work environment for employees."

H.      **Defendant Harry S. McGee** was the Vice President, Finance and Corporate Controller, as well as a member of the Employee Benefit Plans Committee, at the time the fiduciary breaches alleged herein occurred. According to his LinkedIn profile, he is retired.

14.     The **Employee Benefit Plans Committee of The Boeing Company**, and the **Committee Member Defendants** are collectively referred to herein as the **"Committee Defendants."**

**3.      Direct Communication Defendants.[8]**

15.     **Defendant Gary Irons** was an employee of Defendant The Boeing Company with the title Senior Manager Production Flight Test Operations, with a work location in or around Seattle, Washington, at the time the fiduciary breaches alleged herein occurred. On information and belief, Defendant Irons was sent by Boeing to the MDC facility in Long Beach, California in 2007 to recruit employees to transfer from there to Boeing's facility in Washington. He personally recruited Plaintiff Monper and Plaintiff Lynch, among other Long Beach employees. On information and belief, he is still an employee of Boeing. As explained in more detail *infra* part V, Defendant Irons's statements made to Plaintiffs Monper and Lynch about

---

[8] As noted, *supra* note 4, descriptions of these former Defendants have been retained primarily for purposes of identifying relevant individuals and cross referencing.

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

pension benefits in the context of Boeing's recruitment effort render him a functional fiduciary within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), of both the Hourly West Plan and the BCERP.  As an employee of Boeing and/or MDC speaking on behalf of his employer(s) and/or the Committee regarding entitlements to future benefits, the fiduciary breaches of Defendant Irons are also the liability of his employer(s) and/or the Committee under *both* principles of agency and the doctrine of *respondeat superior*.

16.   **Defendant Mike Query** was an employee of Defendant The Boeing Company with the title Manager of Flight Test Operations, with a work location in or around Seattle, Washington, at the time the fiduciary breaches alleged herein occurred.  On information and belief, Defendant Query reported to Defendant Gary Irons.  On information and belief, Defendant Query was sent by Boeing to the MDC facility in Long Beach, California in 2007 to recruit employees to transfer from there to Boeing's facility in Washington.  He personally recruited Plaintiff Lynch, among other Long Beach employees.  On information and belief, he is still an employee of Boeing.  As explained in more detail *infra* part V, Defendant Query's statements made to Plaintiff Lynch about pension benefits in the context of Boeing's recruitment effort render him a functional fiduciary within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), of both the Hourly West Plan and the BCERP.  As an employee of Boeing and/or MDC speaking on behalf of his employer(s) and/or the Committee regarding entitlements to future benefits, the fiduciary breaches of Defendant Query are also the liability of his employer(s) and/or the Committee under *both* principles of agency and the doctrine of *respondeat superior*.

17.   **Defendant Kim Martin** was an employee of Defendant The Boeing Company with the title Recruiting Specialist, with a work location in or around Seattle, Washington, at the time the fiduciary breaches alleged herein occurred.  On information and belief, Defendant Martin was sent by Boeing to the MDC facility in Long Beach, California in 2007 to recruit employees to transfer from there to Boeing's facility in Washington.  She personally recruited

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1   Plaintiff Monper, among other Long Beach employees.  On information and belief, Defendant

2   Martin worked in HR and was sent on recruitment efforts to handle, disseminate, and/or oversee

3   HR related information relevant to recruitment.  On information and belief, in and for this

4   capacity, she was knowledgeable about employee benefits and pension plans.  On information

5   and belief, she is still an employee of Boeing.  At some point, her title became Human Resource

6   Generalist, Airplane Programs HR, 777 Program.  As explained in more detail *infra* part V,

7   Defendant Martin's participation and acquiescence in statements made to Plaintiff Monper about

8   pension benefits in the context of Boeing's recruitment effort render her a functional fiduciary

9   within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), of both the Hourly

10  West Plan and the BCERP.  As an employee of Boeing and/or MDC acting on behalf of her

11  employer(s) and/or the Committee regarding entitlements to future benefits, the fiduciary

12  breaches of Defendant Martin are also the liability of her employer(s) and/or the Committee

13  under *both* principles of agency and the doctrine of *respondeat superior*.

14          18.     **Defendant Tommy Small** was an employee of Defendant The Boeing Company

15  with the title Senior Manager, with a work location in or around Seattle, Washington, at the time

16  the fiduciary breaches alleged herein occurred.  On information and belief, Defendant Small was

17  sent by Boeing to the MDC facility in Long Beach, California in 2007 to recruit employees to

18  transfer from there to Boeing's facility in Washington.  He personally recruited Plaintiff Monper,

19  among other Long Beach employees.  On information and belief, he is still an employee of

20  Boeing.  As explained in more detail *infra* part V, Defendant Small's participation and

21  acquiescence in statements made to Plaintiff Monper about pension benefits in the context of

22  Boeing's recruitment effort render him a functional fiduciary within the meaning of ERISA

23  Section 3(21)(A), 29 U.S.C. § 1002(21)(A), of both the Hourly West Plan and the BCERP.  As

24  an employee of Boeing and/or MDC acting on behalf of his employer(s) and/or the Committee

25  regarding entitlements to future benefits, the fiduciary breaches of Defendant Small are also the

26

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1  liability of his employer(s) and/or the Committee under *both* principles of agency and the

2  doctrine of *respondeat superior*.

3      19.    **Defendant Cindy Cuto** was an employee of Defendant MDC with the title of

4  Human Resources Representative, with a work location in or around Long Beach, California, at

5  the time the fiduciary breaches alleged herein occurred.  On information and belief, Defendant

6  Cuto was authorized by MDC and/or Boeing to (and did) assist in the recruitment and transfer of

7  employees from the MDC facility in California to Boeing's facility in Washington.  She

8  personally was involved in recruiting and papering the transfer for Plaintiff Lynch, among other

9  Long Beach employees, including as that process related to pension benefits.  In her role at MDC

10  and/or Boeing, her entire focus was employee benefits and personnel matters.  On information

11  and belief, she has retired from Boeing.  As explained in more detail *infra* part V, Defendant

12  Cuto's statements made to Plaintiff Lynch about pension benefits in the context of Boeing's

13  recruitment effort render her a functional fiduciary within the meaning of ERISA Section

14  3(21)(A), 29 U.S.C. § 1002(21)(A), of both the Hourly West Plan and the BCERP.  As an

15  employee of Boeing and/or MDC acting or speaking on behalf of her employer(s) and/or the

16  Committee regarding entitlements to future benefits, the fiduciary breaches of Defendant Cuto

17  are also the liability of her employer(s) and/or the Committee under *both* principles of agency

18  and the doctrine of *respondeat superior*.

19      20.    **Defendant "Jane Doe 1"** was, on information and belief, an employee of

20  Defendant MDC and/or Defendant Boeing with the title of Human Resources Representative or

21  Employee Benefits Representative, with a work location in or around Long Beach, California, at

22  the time the fiduciary breaches alleged herein occurred.[9]  On information and belief, Defendant

23  Doe 1 worked in the pension office in "Building 54" in Long Beach, and she was authorized by

24  Boeing to (and did) assist in the recruitment and transfer of employees from the MDC facility in

25  California to Boeing's facility in Washington as that process related to their benefits.  In her role

26

---

[9] Plaintiffs do not currently know the identity of Defendant Doe 1, they have requested it from counsel for Boeing, and they will substitute in the correct name for Defendant Doe 1 when it is disclosed by counsel or becomes known through discovery in this matter.

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE
RETIREMENT INCOME SECURITY ACT - 13

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1    at the pension office, her entire focus was employee benefits matters.  She was instructed to

2    communicate about plan benefits to participants and answer questions, and she was supposed to

3    provide accurate information.  She personally was involved in recruiting and papering the

4    transfer for Plaintiff Veturis, among other Long Beach employees.  As explained in more detail

5    *infra* part V, Defendant Doe 1's statements made to Plaintiff Veturis about pension benefits in

6    the context of Boeing's recruitment effort render her a functional fiduciary within the meaning of

7    ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), of both the Hourly West Plan and the

8    BCERP.  As an employee of Boeing and/or MDC acting on behalf of her employer(s) and/or the

9    Committee regarding entitlements to future benefits, the fiduciary breaches of Defendant Doe 1

10   are also the liability of her employer(s) and/or the Committee under *both* principles of agency

11   and the doctrine of *respondeat superior*.

12          21.    **Defendant "Jane or John Doe 2"** was, on information and belief, an employee

13   of Defendant MDC and/or Defendant Boeing with the title of Employee Benefits Representative

14   at the time the fiduciary breaches alleged herein occurred.[10]  On information and belief,

15   Defendant Doe 2 worked for Boeing's TotalAccess benefits line or its predecessor,[11] and she or

16   he was authorized by Boeing to (and did) assist in the recruitment and transfer of employees

17   from the MDC facility in California to Boeing's facility in Washington as that process related to

18   their benefits.  In her or his role on the benefits line, Defendant Doe 2's entire purpose was to

19   provide information about employee benefits.  She or he was instructed to communicate about

20   plan benefits to participants and answer questions, and she or he was supposed to provide

21   accurate information.  She or he personally was involved in recruiting and providing benefits-

22   related information and answering benefits-related questions prior to Plaintiff Monper's decision

23   to transfer.  As explained in more detail *infra* part V, Defendant Doe 2's statements made to

24

25   [10] Plaintiffs do not currently know the identity of Defendant Doe 2, they have requested it from counsel for Boeing, and they will substitute in the correct name for Defendant Doe 2 when it is disclosed by counsel or becomes known through discovery in this matter.

26   [11] On information and belief, Boeing's current benefits line is TotalAccess, but in 2007, the structure of the benefits line was different than it is today, and "TotalAccess" did not always handle pension questions, including in 2007. Instead, the benefits line predecessor to TotalAccess handled pension issues.

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1  Plaintiff Monper about pension benefits in the context of Boeing's recruitment effort render her

2  or him a functional fiduciary within the meaning of ERISA Section 3(21)(A), 29 U.S.C.

3  § 1002(21)(A), of both the Hourly West Plan and the BCERP.  As an employee of Boeing and/or

4  MDC acting on behalf of her/his employer(s) and/or the Committee regarding entitlements to

5  future benefits, the fiduciary breaches of Defendant Doe 2 are also the liability of her/his

6  employer(s) and/or the Committee under *both* principles of agency and the doctrine of

7  *respondeat superior*.

8         22.    **Defendant "Jane or John Doe 3"** was, on information and belief, an employee

9  of Defendant MDC and/or Defendant Boeing with the title of Employee Benefits Representative

10  at the time the fiduciary breaches alleged herein occurred.[12]  On information and belief,

11  Defendant Doe 3 worked for Boeing's TotalAccess benefits line or its predecessor, and she or he

12  was authorized by Boeing to (and did) assist in the recruitment and transfer of employees from

13  the MDC facility in California to Boeing's facility in Washington as that process related to their

14  benefits.  In her or his role on the benefits line, Defendant Doe 3's entire purpose was to provide

15  information about employee benefits.  She or he was instructed to communicate about plan

16  benefits to participants and answer questions, and she or he was supposed to provide accurate

17  information.  She or he personally was involved in recruiting and providing benefits-related

18  information and answering benefits-related questions prior to Plaintiff Lynch's decision to

19  transfer.  As explained in more detail *infra* part V, Defendant Doe 3's statements made to

20  Plaintiff Lynch about pension benefits in the context of Boeing's recruitment effort render her or

21  him a functional fiduciary within the meaning of ERISA Section 3(21)(A), 29 U.S.C.

22  § 1002(21)(A), of both the Hourly West Plan and the BCERP.  As an employee of Boeing and/or

23  MDC acting on behalf of her/his employer(s) and/or the Committee regarding entitlements to

24  future benefits, the fiduciary breaches of Defendant Doe 3 are also the liability of her/his

25

26  _____

[12] Plaintiffs do not currently know the identity of Defendant Doe 3, they have requested it from counsel for Boeing, and they will substitute in the correct name for Defendant Doe 3 when it is disclosed by counsel or becomes known through discovery in this matter.

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

employer(s) and/or the Committee under *both* principles of agency and the doctrine of *respondeat superior*.

23.     **Defendants Irons, Query, Martin, and Small** are referred to herein collectively as the **"Recruiters."**  The **Recruiters**, together with **Defendants Cuto, Doe 1, Doe 2, and Doe 3** are referred to herein collectively as the **"Direct Communication Defendants."**

**4.     Director Defendants.**

24.     **Defendant The Boeing Company Board of Directors** appoints the members of the Employee Benefit Plans Committee.  As such, it is a named fiduciary and functional fiduciary of both the Hourly West Plan and the BCERP, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), as well as for the reasons discussed below.  The Boeing Company Board of Directors is also referred to herein as the **"Board of Directors."**

25.     **Defendants John H. Biggs, John E. Bryson, Arthur D. Collins, Jr., Linda Z. Cook, William M. Daley, Kenneth M. Duberstein, James L. Jones, Edward M. Liddy, John F. McDonnell** (former Chairman and CEO of MDC)**, W. James McNerney** (current Chairman and CEO of Boeing)**, Jr., Richard D. Nanula, Rozanne L. Ridgway, and Mike S. Zafirovski**, collectively the **"Individual Director Defendants,"** were, according to counsel for Boeing,[13] members of The Boeing Company Board of Directors for some but not necessarily all of 2007 and 2008.  As discussed in further detail below, as board members with fiduciary appointment and monitoring responsibilities, they are named fiduciaries and functional fiduciaries, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), of both the Hourly West Plan and the BCERP.  As directors of Boeing and/or MDC acting on behalf of Boeing, MDC, and/or the Employee Benefit Plans Committee regarding entitlements to future benefits, the fiduciary breaches of the Individual Director Defendants is also the liability of Boeing, MDC, and/or the Committee under *both* principles of agency and the doctrine of *respondeat superior*.

---

[13] Counsel for Boeing in this litigation provided these names by agreement of the parties on November 18, 2013.  Plaintiffs reserve the right to add additional Individual Director Defendants if their identities are later disclosed by counsel or become known through discovery in this matter.

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

26.      **The Boeing Company Board of Directors**, together with the **Individual Director Defendants**, are collectively referred to herein as the **"Director Defendants."**

5.      **Additional Defendants.**

27.      **Defendants "Jane or John Doe" 4-10**[14] were responsible for supervising or training Doe Defendants 1, 2, and 3, as well as Defendant Cindy Cuto, to the extent that these duties were performed by individuals *outside* of the Employee Benefit Plans Committee or *together with* the Employee Benefit Plans Committee.[15]  Doe Defendants 4-10 oversaw the operations of the "pension office" in "Building 54," as well as the TotalAccess benefits line and its predecessor and human resources representatives such as Defendant Cindy Cuto.  One of the responsibilities of the Doe Defendants 4-10 was to ensure that pension and benefits information given to employees in the context of job transfers for which they were recruited by the company was correct.  In their role as supervisors or trainers of employees in the pension office, human resources department, and on the benefits line, it was the responsibility of the Doe Defendants 4-10 to communicate about plan benefits to participants and ensure the accuracy of any affirmative representations and answers to questions provided to plan participants.  Such communications were the entire purpose of these offices and work groups.  Accordingly, Doe Defendants 4-10 are additional functional fiduciaries of the Hourly West Plan and the BCERP, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), as discussed in more detail *infra* part V.  The Doe Defendants 4-10 had responsibility for and performed fiduciary functions relating to communicating with participants about their benefits during the time period relevant to the claims pleaded herein.  As employees of Boeing and/or MDC speaking on behalf of their employer(s) and/or the Committee regarding entitlements to future benefits, the fiduciary breaches by Doe Defendants 4-10 are also the liability of their employer(s) and/or the Committee under *both* principles of agency and the doctrine of *respondeat superior*.

---

[14] As noted, *supra* note 4, descriptions of these former Defendants have been retained primarily for purposes of identifying relevant individuals and cross referencing.

[15] Plaintiffs do not currently know the identities of the Doe Defendants 4-10, and intend to conduct discovery to learn their names.  Plaintiffs will substitute in the correct names for Doe Defendants 4-10 when they are disclosed by counsel or become known through discovery in this matter.

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE
RETIREMENT INCOME SECURITY ACT - 17

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

28.     **Defendant Scott M. Buchanan** was the Director of Benefits Delivery for The Boeing Company and a plan fiduciary, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), of both the Hourly West Plan and the BCERP.  On information and belief, Defendant Buchanan held the same position at the company when the fiduciary breaches alleged herein occurred.  On information and belief, as the Director of Benefits Delivery and designated "plan administrator" who signs the IRS Forms 5500 for the plans at issue here, he is responsible for compliance with ERISA and fiduciary communications.  Defendant Buchanan is a formal delegee of the Committee with fiduciary responsibility for certain day-to-day administration functions, which encompass communications with participants about their benefits. As an employee of Boeing and/or MDC acting on behalf of his employer(s) and/or the Committee regarding entitlements to future benefits, the co-fiduciary liability of Defendant Buchanan is also the liability of his employer(s) and/or the Committee under *both* principles of agency and the doctrine of *respondeat superior*.

29.     **Defendant Myra Elliot** was the Shared Services Group Vice President of Employee Services for The Boeing Company and a plan fiduciary, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), of both the Hourly West Plan and the BCERP.  On information and belief, Defendant Elliot held this position at the company when the fiduciary breaches alleged herein occurred.  On information and belief, Defendant Elliot is responsible for compliance with ERISA and fiduciary communications.  Defendant Elliot is a formal delegee of the Committee with fiduciary responsibility for certain day-to-day administration functions, which encompass communications with participants about their benefits. As an employee of Boeing and/or MDC acting on behalf of her employer(s) and/or the Committee regarding entitlements to future benefits, the co-fiduciary liability of Defendant Elliot is also the liability of her employer(s) and/or the Committee under *both* principles of agency and the doctrine of *respondeat superior*.

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

30.     **Defendants Boeing, MDC,** the **Committee Defendants, Scott Buchanan,** and **Myra Elliot** are referred to herein collectively as the **"Fiduciary Communication Defendants."**

31.     All Defendants are referred to herein collectively as "Defendants."

## IV.   THE NATURE AND TERMS OF THE RELEVANT PLANS

**A.    Employee Retirement Income Plan—Hourly West, f/k/a the Employee Retirement Income Plan of McDonnell Douglas Corporation—Hourly West Plan (Plan 002) ("Hourly West Plan").**

32.     The Hourly West Plan's sponsor through 2009 was Defendant McDonnell Douglas Corporation, a wholly owned subsidiary of The Boeing Company.  As of December 31, 2009, McDonnell Douglas Corporation was merged with and into Defendant The Boeing Company, at which time sponsorship of the Hourly West Plan transferred to The Boeing Company.

33.     The Hourly West Plan is a defined benefit pension plan providing an option for Early Retirement Benefits.

34.     Normal Retirement Age under the Hourly West Plan is 65.

35.     Participants with at least 10 years of vesting service may retire early under the Hourly West Plan.  As members of United Automobile Workers, Local 148 ("UAW 148") with at least 10 years of vesting service while they were working for McDonnell Douglas Corporation and The Boeing Company in Long Beach, California, Plaintiffs Monper, Lynch, and Veturis are eligible to retire as early as age 55 and receive Early Retirement Benefits under the Hourly West Plan.

36.     The level of benefits available under the Early Retirement provisions of the Hourly West Plan depends on the years of "Aggregate Benefit Service" each participant has attained at his early retirement age.

37.     According to the Hourly West Plan Summary Plan Description (2006 Edition), Aggregate Benefit Service includes "years of benefit service earned under this Plan" and "years of benefit service earned under The Pension Value Plan for Employees of The Boeing

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

Company," among others.  In contrast to service under the Pension Value Plan, service under the BCERP—the plan Plaintiffs were put into after they moved—does not count as additional Aggregate Benefit Service under the Hourly West Plan.

38.     For a participant who has attained 30 or more years of Aggregate Benefit Service, benefits are paid in full—or "Unreduced"—upon early retirement.

39.     However, if fewer than 30 years of Aggregate Benefit Service have been attained, Early Retirement Benefits at ages 55, 56, 57, 58, 59, 60, and 61 are paid only at a "Reduced" level.  Normal Retirement Benefits are reduced by 6% per year before age 62.  Retiring at age 62, 63, 64, or 65 pays 100% of Normal Retirement Benefits.

40.     Normal Retirement Benefits under the Hourly West Plan for members of UAW 148 are calculated as a "Benefit Rate" multiplied by "Total Benefit Service" (which is not exactly the same as Aggregate Benefit Service).  If an Early Retirement Factor applies, the Normal Retirement Benefit is multiplied by the Early Retirement Factor to determine the Total Monthly Benefit Payable as a Single Life Annuity.

41.     Applying an "Early Retirement Reduction Factor" of 58%—*i.e.*, 6% per year for someone who retires at age 55—reduces the participant's benefits by 42%.  For example, if Normal Retirement Benefits would be $2,000 per month, and if retiring at age 55 without having attained 30 years of Aggregate Benefit Service, the participant would receive only $1,160 per month—a reduction of $840, or 42%.

42.     Not only do those who have attained 30 years of Aggregate Benefit Service receive Unreduced Early Retirement Benefits under the Hourly West Plan, they also receive an Early Retirement Supplement ("ERS") when retiring at age 55.  For members of UAW 148, the ERS currently provides an extra $550 per month from age 55 to 62½.  Thus, whether the ERS is available greatly impacts the level of benefits to which a participant is entitled.

43.     Using the same example as above, a participant who is eligible for Unreduced Early Retirement Benefits would receive $2,000 + $550 = $2,550.  But a participant who has not

LAW OFFICES OF
KELLER ROHRBACK L.L.P.
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

attained 30 years of Aggregate Benefit Service and retires at age 55 will only receive Reduced Early Retirement Benefits of $1,160 per month with no ERS—a total reduction of $1,390, or about 55%—resulting in benefits at *less than half* the level available if all the Early Retirement requirements are met to receive maximum benefits under the terms of the Hourly West Plan.

44.     As explained more fully below, Plaintiffs Monper, Lynch, and Veturis all moved from Long Beach, California to the Seattle, Washington area prior to attaining 30 years of Aggregate Benefit Service.  Therefore, under the terms of the Hourly West Plan, none of them is entitled to an Unreduced Early Retirement Benefit, and none of them is entitled to the ERS Accordingly, their benefits upon early retirement will be significantly reduced—losses they seek to remedy through the equitable relief sought herein.

**B.      The Boeing Company Employee Retirement Plan ("BCERP").**

45.     The Boeing Company is the plan sponsor of the BCERP.

46.     The BCERP is a defined benefit pension plan providing an option for Early Retirement Benefits.

47.     Normal Retirement Age under the BCERP is 65.

48.     Participants with at least 10 years of qualifying vesting service may retire early under the BCERP.  As members of International Association of Machinists and Aerospace Workers ("IAM 751"), Plaintiffs Monper and Lynch are eligible to retire as early as age 55 and receive Early Retirement Benefits under the BCERP if they otherwise qualify to retire early.  Likewise, as a member of the Society of Professional Engineering Employees in Aerospace ("SPEEA"), Plaintiff Veturis is eligible to retire as early as age 55 and receive Early Retirement Benefits under the BCERP if he otherwise qualifies to retire early.

49.     The level of benefits available under the Early Retirement option provided by the BCERP depends on (A) meeting the minimum 10 years of qualifying service; and (B) the participant's early retirement age.

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

50.     According to the BCERP Summary Plan Description (2007 Edition), Early Retirement Benefits at ages 55, 56, 57, 58, and 59 are paid only at a "Reduced" level—*i.e.*, Unreduced Early Retirement Benefits are not available. Such benefits are reduced by 2% per year for each year before age 60. For example, retiring early at age 55 means that benefits at Normal Retirement Age are calculated and then multiplied by an "Early Retirement Adjustment" of 90%. Retiring at age 60, 61, 62, 63, 64, or 65 pays 100% of Normal Retirement Benefits available under the BCERP.

51.     Plaintiffs Monper, Lynch, and Veturis all are projected to have at least 10 years of qualifying benefit service under the BCERP by the time they are 55, thus entitling each of them to receive BCERP Early Retirement Benefits at a Reduced level, depending on retirement age, under the terms of the BCERP. These benefits will be in addition to what they are entitled to receive under the terms of the Hourly West Plan.

52.     Even taking into consideration the early retirement benefits available under the BCERP, Plaintiffs will face significantly reduced total benefits in early retirement as compared to what they expected and were promised prior to transferring to the Seattle area, because without having at least 30 years of Aggregate Benefit Service under the Hourly West Plan, they must take Reduced Early Retirement Benefits under the Hourly West Plan and will not be entitled to the Hourly West Plan's ERS when they retire at age 55, as they all plan to do.

## V.     RELEVANT LAW AND FACTS PERTAINING TO DEFENDANTS' FIDUCIARY STATUS

**A.     The Nature of Fiduciary Status.**

**1.     Named Fiduciaries.**

53.     ERISA requires every plan to provide for one or more named fiduciaries of the plan pursuant to ERISA Section 402(a)(1), 29 U.S.C. § 1102(a)(1). The person named as the "administrator" in the plan instrument is automatically a named fiduciary, and, in the absence of such a designation, the sponsor is the administrator. ERISA Section 3(16)(A), 29 U.S.C. § 1002(16)(A). Where a committee or entity is a named fiduciary, corporate officers or employees

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

"who carry out the fiduciary functions" of the named fiduciary "are themselves fiduciaries and cannot be shielded from liability by the company." *See Stewart v. Thorpe Holding Co. Profit Sharing Plan*, 207 F.3d 1143, 1156 (9th Cir. 2000) (citing *Kayes v. Pac. Lumber Co.*, 51 F.3d 1449, 1459-61 (9th Cir. 1995)).

### 2. *De Facto* Fiduciaries.

54.  ERISA treats as fiduciaries not only persons and entities explicitly *named* as fiduciaries under ERISA Section 402(a)—*i.e.*, those with the *capacity* to act as fiduciaries due to their designated fiduciary roles—but also any other persons who, in fact, *perform* fiduciary functions, regardless of any official fiduciary role, designation, or capacity they may or may not have been granted.  Thus, a person is a fiduciary to the extent:

> (i) he *exercises* any discretionary authority or discretionary control respecting *management* of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he *has* any discretionary authority or discretionary responsibility in the *administration* of such plan.

ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) (emphasis added).  Under this statute, whether someone is a "named fiduciary" is irrelevant to the analysis of functional fiduciary status.  Nor must there be a formal delegation of fiduciary responsibility or a fiduciary role for an individual to be found a fiduciary under the functional test.  *See Kayes v. Pacific Lumber Co.*, 51 F.3d 1449, 1461 (9th Cir. 1995).

55.  Under ERISA Section 3(21)(A), a person can become a functional fiduciary by *exercising* fiduciary powers and fiduciary functions, even when the person does not *have* such powers by designation or delegation.  It is therefore irrelevant to functional fiduciary status whether or not the person was "authorized" or approved to engage in fiduciary functions by higher level corporate or fiduciary entities.  Simply *engaging* in fiduciary conduct will render one a fiduciary.  *See Yeseta v. Baima*, 837 F.2d 380, 386 (9th Cir. 1988).  What matters to *de*

LAW OFFICES OF
KELLER ROHRBACK L.L.P.
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

*facto* fiduciary status is the conduct at issue and whether it entails fiduciary functions.  If so, the person becomes a fiduciary by virtue of that conduct.

56.     Additionally, an alleged fiduciary's state of mind is not determinative of fiduciary status under ERISA.  A person's own opinions or beliefs about their fiduciary status are "of no consequence" to the inquiry.  *See Thomas, Head & Greisen Emps. Trust v. Buster*, 24 F.3d 1114, 1119 (9th Cir. 1994).

57.     ERISA provides for personal as well as corporate liability for violations of the act and imposes fiduciary duties on individuals, groups of individuals, and corporate entities under ERISA Section 3(21)(A)'s functional test.

**3.     Agents as Fiduciaries.**

58.     Corporations and non-human entities or defined groups can only act through their human counterparts.  Courts recognize corporate agency principles under ERISA for the purposes not only of determining corporate or entity liability for fiduciary breach, but also for the purpose of determining fiduciary status.  Thus, individuals who are also agents of a corporation or entity can act in ways that impose not only personal fiduciary liability on these individuals, but also fiduciary liability on the corporation or entity they represent or on whose behalf they act.

**4.     Fiduciary Status for the Purpose of Communications.**

59.     Communication about benefits is a fundamental fiduciary act of plan management and administration.  The Supreme Court held in *Varity v. Howe*, 516 U.S. 489, 498 (1996), that an employer who makes misrepresentations about employee benefits *exercises* discretionary authority respecting plan management or administration.  *Varity* also held that "[c]onveying information about the likely future of plan benefits, thereby permitting beneficiaries to make an informed choice about continued participation, would seem to be an exercise of a power 'appropriate' to carrying out an important plan purpose."  *Id.* at 502.  Further, "[t]o offer beneficiaries detailed plan information in order to *help them decide whether to remain with the plan* is essentially the same kind of plan-related activity [otherwise engaged in by plan

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

administrators].” *Id.* at 503 (emphasis added).  Accordingly, “Varity’s statements about the security of benefits amounted to an act of plan administration.” *Id.* at 505.  To mislead participants about future benefits in the context of a job transfer within the company is a breach of the duty of loyalty owed by all fiduciaries.  To fail to provide necessary information is also a breach.

60.     The statements described herein cannot be characterized as solely relating to employment matters or as made solely in the capacity as an employer or nonfiduciary employee. Rather they were plainly about employee benefits and therefore they were fiduciary communications.  They ostensibly were made in order to help Plaintiffs decide whether to remain in Long Beach and, therefore, with the Hourly West Plan for purposes of benefit accrual.

61.     As noted above, the statute does not require a person who *acts* as a fiduciary to first *be* a fiduciary.  It is the acts themselves that can turn an otherwise nonfiduciary speaker into a fiduciary.  Thus, the *same* activities or speech can *establish fiduciary status* and simultaneously *constitute a breach*, which is exactly what happened here as to all Defendants who are not “named fiduciaries.”  For example, it is not a prerequisite to fiduciary status for a person actually to know correct information about plan benefits, but not knowing the correct information is a breach once a person decides to speak and make him- or herself a fiduciary under certain circumstances—such as those alleged here.  If a formal prior grant of fiduciary status were required before a finding of fiduciary status, ERISA Section 3(21)(A) would be meaningless and functional fiduciaries would rarely exist.

62.     Because *communication* about benefits is a fiduciary function, the *act of communicating* about future plan benefits can *confer* fiduciary status on the speaker even if the speaker does not otherwise have fiduciary status as a “named fiduciary” or delegee.  Statements by company representatives in the context of ERISA fiduciary breach communication cases— where the statements are not even directly about benefits but instead are about the health or future of the company—are commonly held to be fiduciary acts under *Varity* because they

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

ultimately relate to future plan benefits and the value of plan investments or entitlements. Under the facts alleged herein, the existence of fiduciary status is even clearer. There is no need to connect general statements about the company or employment to unspoken implications for plan benefits, because the statements at issue here were *about benefits* in the first instance. Thus, these statements can and do confer fiduciary status on both the speakers and the entities they represent.

63.     Any person who is not otherwise a "named fiduciary" or fiduciary delegee and does not want to acquire fiduciary status need only refrain from undertaking fiduciary responsibilities. Here, as discussed below, the Defendants who are *de facto* fiduciaries (and not "named fiduciaries") could have avoided fiduciary status by not communicating under the circumstances alleged here on the likely future of plan benefits, which are matters of plan administration and management. Instead, they chose to take on these duties and perform discretionary communication functions. Designated "authority" to do so is not an element of fiduciary status in this scenario.

64.     Responsibility for fiduciary communications may rest with multiple entities and individuals. Regardless of whether anyone else has become a functional fiduciary for this purpose, the plan administrator remains ultimately responsible for fiduciary communications. As with all aspects of the fiduciary duties the statute imposes, ERISA does not allow a "fiduciary-less plan" when it comes to future benefits communication matters.

65.     Moreover, principles of agency apply to ERISA plan administrators. If a named fiduciary could effectively dispatch anyone who is not a fiduciary to carry out plan communication tasks without any accountability back to the named fiduciary for misleading communications that ensue, the purpose of ERISA in ensuring that fiduciaries do not mislead participants about the future of plan benefits would be eviscerated. ERISA does not allow named fiduciaries to insulate themselves in this way to avoid liability yet still carry out fiduciary communication functions.

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

66.     Finally, the misleading communications alleged herein cannot be characterized as mere "ministerial" acts under the circumstances.  They are fiduciary acts.

**B.     The Nature and Circumstances of the Misleading Communications Made to Plaintiffs Render the Fiduciary Communication Defendants Fiduciaries For Purposes of These Communications.**

67.     The statements at issue here and described in more detail below were made under circumstances that render them fundamental fiduciary communications for the following reasons, which, particularly when combined, make Defendants' fiduciary status clear:

A.     **Recruitment.**  The statements were made in the context of *recruitment for an intra-company job transfer*.  Plaintiffs worked for Boeing's subsidiary MDC and they were induced to transfer to new work locations at Boeing—at Boeing's instigation and behest.  Plaintiffs did not initiate job applications or seek out the job transfers they ultimately accepted.  The statements at issue here were not made in casual or random conversations with co-workers or managers.  Plaintiffs did not have conversations about their future pension benefits with benefits professionals or managers "out of the blue."  When these conversations occurred, Plaintiffs were already in a posture as *recruits*—a posture into which Boeing put them.  Boeing actively recruited Plaintiffs through job fairs it hosted and by making job offers to the MDC employees in Long Beach it wanted.  Therefore, the need for correct benefits information and the conversations that ensued also *originated with Boeing*.  But for Boeing's recruitment push, Plaintiffs never would have been in the situation of needing the information that this case is about.  They were about to transfer employment and enter a new pension benefits structure.  They needed the truth to make informed decisions about their *futures* in light of the company's recruitment *of them*.

B.     **A Consistent Message From the Top.**  *The "nothing to lose" message was consistent as to each of the Plaintiffs and it originated at the top.*  Defendants—and in particular Boeing and the Committee Defendants—cannot hide behind

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT - 27

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

characterizations that the misleading statements made here were by "low-level" or "rogue" employees.  Given the repeated statements and their consistency across the Plaintiffs and over a long period of time, some level of intentional coordination or, at the very least, known pervasive systemic failure with foreseeable results, by Boeing and/or the Employee Benefit Plans Committee is obvious.  The misinformation that Plaintiffs consistently and repeatedly received—during and after their recruitment, including even three years *after* they moved—had to come from somewhere.  It is implausible that all of the individual speakers here independently came up with the *same wrong* answers and disseminated misleading information with such uniformity in the absence of Boeing's and/or the Committee's participation.  Further, high-level Boeing employees, including members of the Employee Benefit Plans Committee were both (i) directly involved with or aware of the company's recruitment efforts and (ii) responsible for fiduciary communications by virtue of their positions within the company *and* as members of the Employee Benefit Plans Committee (*i.e.*, "named fiduciaries").  Other high-level Boeing employees actively recruited Plaintiffs and acted as messengers for the company and the Committee Member Defendants to accomplish recruitment goals that were designed to benefit the company.  These benefits to the company were achieved at severe expense to Plaintiffs through reduced pension benefits, about which Plaintiffs were lied to or materially and actively misled.  The uniformity of the false statements at issue in this case is no coincidence.

       C.      **Informational Imbalance Regarding Future Benefits.**  The false statements here were about the *likely future of plan benefits* and Plaintiffs had *no other source of information than the speakers who misled them*.  Specifically, the statements related to how Plaintiffs' benefits under two plans—the Hourly West Plan and a then-unknown future plan—would accrue and how those two plans would (or would not) interface to provide a total retirement package after a job transfer.  Of critical importance

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

is that Plaintiffs were *not yet members of their new plan*—the BCERP—at the time they were misled.  Nor did they even know its name, much less its terms or whether it was actually a plan that would allow them continued accrual of Aggregate Benefit Service under the terms of the Hourly West Plan as they were told.  They did not have documentation telling them which plan they would be joining, much less access to the plan documents themselves.  These were not questions about *current* plan benefits. Plaintiffs had no way to independently verify what they were consistently and repeatedly told or to know that what they were told was incorrect.  Moreover, the plan documents for the Hourly West Plan available to Plaintiffs in 2007 were *consistent* with what Plaintiffs were told about how the Hourly West Plan would interface with their new plan after the move.  Specifically, Plaintiffs were promised continued accrual of Aggregate Benefit Service under the Hourly West Plan via participation in the (then as yet unidentified) new plan they would be joining.  There was *no contradiction* between what Plaintiffs were told (*i.e.*, the notion that Hourly West Plan benefits could continue to grow through service in other plans) and the terms of the Hourly West Plan.  The Hourly West Plan *does* count service in a number of other pension plans (including the Pension Value Plan for Employees of The Boeing Company, which Plaintiff Veturis was incorrectly told would *be* his new plan).  Without knowing the correct identity of their new plan at the time they were misled, reference to the Hourly West Plan documents available to Plaintiffs only would have confirmed for Plaintiffs the concept of dual accrual, not raised a red flag.  Under these facts—a stark imbalance of information and a complete lack of any mechanism to obtain the truth other than asking—Plaintiffs had to rely on the gatekeepers of critical information who misinformed them.  Plaintiffs expected these people to have the correct information and to pass it along to them.

   D. **Complexity.**  As it turned out, the amount of Plaintiffs' future benefits was an *exceedingly complicated inquiry*, and providing *correct* information required

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

research and knowledge well beyond the typical ministerial functions of telling a participant, for example, what normal retirement age is under a single plan that everyone already knows the participant is in or making rote benefits calculations based on a single formula under a plan in which the participant is already a member.  Here, the context is extremely important: the interaction of two different pension plans, in one of which Plaintiffs were not yet participants.  To answer Plaintiffs' questions as they did— immediately, with confidence and authority, and without so much as hinting that they were withholding the truth, that they did not actually know the correct information, and/or that research was required—far exceeded any "ministerial" or "employment" related tasks that any Direct Communication Defendant might otherwise have been hired or sent to perform.  This case is *not* about giving straightforward but obviously mistaken information or casual misinterpretations of clear current plan terms.  It involves highly complex and discretionary fiduciary communications about future benefits.

  E.  **Magnitude.**  The *magnitude of the difference* between the wrong information Plaintiffs were given and the reality of their present situation is enormous. Plaintiffs were not misled on trivial matters.  They will be without approximately two-thirds of the pension benefits they expected at early retirement.  Plaintiffs were about to make a huge decision based on misinformation and the speakers all *knew* this.  Moreover, the larger group of Fiduciary Communication Defendants all *knew or should have known* this.  The consequences of being wrong make the giving of wrong information a fiduciary act.

  F.  **Company Integration and Control.**  *No third party administrators or phone operators were involved here*.  The *same* plan administrator was the named fiduciary for both the Hourly West Plan and the BCERP at the time Plaintiffs were misled.  All of the speakers who misled Plaintiffs were under the direct supervision and/or control of Plaintiffs' employers and/or plan administrators who knew or should

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

have known what was being said.  Whether their misleading statements were due to a failure of training, supervision, or competence—or the result of intentional misinformation—both the speakers and the entities on whose behalf they were acting as agents are fiduciaries.

68.     The existence of Defendants' fiduciary status under the foregoing facts, particularly for the *de facto* fiduciaries, does not mean that fiduciary status would exist for the same people or entities under a different set of facts.  On these facts though, fiduciary status is clear.  The *de facto* fiduciaries had every opportunity to refrain from exercising discretion in matters of plan management and administration and they chose to forge ahead.  When those who are not named fiduciaries or formal delegees nevertheless exercise fiduciary functions and occupy fiduciary roles, they cannot avoid the necessary result under ERISA that they have become fiduciaries and are bound by the duties that go with that status, one of the most important of which is the duty of loyalty, which includes telling participants the truth about the future of their plan benefits.

## C.     Boeing's and MDC's Fiduciary Status.

69.     Boeing and MDC were Plaintiffs' employers and the plan sponsors at the time Plaintiffs were recruited and transferred in 2007-2008.  They are not "named fiduciaries" under the plans, but they are fiduciaries under ERISA's functional test because they acted in the capacity of plan managers and administrators.  Specifically, as described herein, they performed critical fiduciary functions by communicating to plan participants about future pension benefits in the context of actively recruiting them for a job transfer that would involve a new pension plan and a complicated interface between the old plan and the new plan about which Plaintiffs had no independent knowledge or means of verification other than information they received from Boeing and MDC agents and human counterparts.

70.     Boeing and MDC became fiduciaries by functioning as plan managers and administrators.  Once Boeing and MDC, through their human agents, began talking about

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1   pensions and making assurances about the state of future plan benefits in the context of

2   recruiting Plaintiffs from California to Washington, these employers ceased to be acting merely

3   as *employers* and began acting as *fiduciaries*.  As noted above, there is no requirement under

4   ERISA for an employer to be a named fiduciary before it can be found a *de facto* fiduciary.

5   Whether an entity or person who *is* otherwise a named fiduciary is functioning as a fiduciary

6   under a particular fact pattern is a separate and distinct inquiry from whether an employer that *is*

7   *not* otherwise a named fiduciary has assumed a fiduciary role through its conduct by inserting

8   itself into matters of plan management and administration and exercising discretion in these

9   realms.  Fiduciary status under the first scenario is not a prerequisite to fiduciary status under the

10  second scenario.

11          71.     An employer-fiduciary does not always function as a fiduciary.  If an employer

12  simply recruits individuals for a job transfer without speaking about employee benefits in the

13  process, it functions only as an employer.  However, the employer ceases to function as an

14  employer and puts on a fiduciary "hat" once it takes on the role of fiduciary communicator, as

15  happened here.  When Boeing and MDC, through their human counterparts and employees—the

16  Direct Communication Defendants (Defendants Irons, Query, Martin, Small, Cuto, Doe 1, Doe

17  2, and Doe 3) and certain trainers or supervisors (Doe Defendants 4-10)—made or caused to be

18  made the misrepresentations at issue here, they were exercising discretionary authority or control

19  over plan management and/or administration.

20          **1.      Boeing's Recruitment Efforts.**

21          72.     In 2007, Boeing was desperate to get employees to move from MDC in Long

22  Beach to Boeing's Seattle-area facilities.  The 787 Dreamliner was behind schedule.  At the July

23  2007 Dreamliner "rollout" ceremony, Boeing created a façade of a finished airplane by using

24  painted doors and panels held together with temporary fasteners to cover up what was not really

25  finished, misleading onlookers in a public relations stunt.  Shortly thereafter, the first delivery of

26  the jet was delayed several times, from spring 2008 to late 2011.  Boeing's fake "rollout" grew

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

out of an established practice of misleading "business partners, investors and the public."  A June

25, 2009 *Wall Street Journal* article reported on pervasive "[c]ommunication woes" at Boeing

during the Dreamliner's development.  "Boeing has staked much of its credibility on promises

that haven't been met," the article reported, noting that in the two years between mid-2007 and

mid-2009, "some investors described optimistic statements by management as misleading"

(internal quotations omitted).  The article noted that others believe "internal communication" at

the company was a "key element in the Dreamliner's troubles."  Given how willing Boeing

apparently was to mislead the public and investors about its progress on the plane, it is plausible

to conclude that it would mislead its employees about their benefits in its frantic push to get them

to move to Seattle and salvage the flailing Dreamliner program.  This case is about "promises

that haven't been met."  Boeing's import of these business practices into the realm of employee

benefits communications makes it a fiduciary.

### 2.    Boeing's Recruiters Performed Fiduciary Functions on Behalf of Boeing.

73.    Boeing, through its human counterparts, sent the Recruiters with management and

human resources positions from Seattle to Long Beach with a mandate to get employees to move

to Washington and to do whatever it took to get them there.  Boeing imposed quotas on the

Recruiters, telling them that they needed to get a certain number of experienced employees to

move up to Seattle as soon as possible.

74.    As alleged above, the Recruiters acting on behalf of Boeing were Defendants

Gary Irons, Mike Query, Kim Martin, and Tommy Small.

75.    Boeing created the misinformation at issue here either by (a) giving the

misinformation to the Recruiters about what to say about pension benefits or (b) by failing to

adequately brief or police the Recruiters, leaving it to the Recruiters to guess what to say about

pension benefits in the context of their recruiting efforts on behalf of the company *while under

pressure to close the deals*.  Under ERISA, allowing guessing is just as bad as lying.  *Wayne v.

Pac. Bell*, 238 F.3d 1048, 1055 (9th Cir. 2004).  Further, whether Boeing told the Recruiters to

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE
RETIREMENT INCOME SECURITY ACT - 33

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1  lie, provided them with false benefits information, or suggested with a wink and a nod that

2  benefits reductions should be minimized in the interest of securing job transfers, Boeing knew or

3  should have known that recruits would be misled and was the catalyst when that very thing

4  predictably and actually occurred.  Boeing *instigated* these conversations and *encouraged* its

5  human counterparts to actively misinform Plaintiffs through intent or complicity in known

6  pervasive incompetence in an environment that made the dissemination of misinformation more

7  likely than not.  In any event, the misleading information originated with Boeing, which

8  produced and disseminated it through its agents.  Boeing's leaders knew that the company would

9  (and did) benefit from misinformed job transfer decisions.

10        76.      Without discovery, Plaintiffs (like all ERISA Plaintiffs alleging a failure of

11  fiduciary functions) cannot know what specific instructions were given to the Recruiters about

12  what to say about pension or other employee benefits.  What is clear, however, is that the

13  Recruiters *uniformly* misinformed Plaintiffs in the same way on separate occasions.  The same

14  misinformation was then repeated separately by Defendants Cindy Cuto and Doe Defendants 1,

15  2, and 3 when Plaintiffs sought verification and information from these additional sources.  This

16  fact pattern plausibly and strongly suggests that the misinformation originated with Boeing.

17        77.      Boeing and its human counterparts knew or should have known that information

18  about pension benefits would be discussed by the Recruiters as part of Boeing's recruiting

19  efforts.  Boeing uses its pension plans and employee benefits to attract talent.  It is not possible

20  for a company of this size to recruit employees without the expectation that questions about

21  benefits will come up.  It is implausible to conclude that Boeing could have expected to recruit

22  employees to a new job site without its agents and employees having to discuss future pension

23  benefits with the recruits.  Boeing took on a fiduciary role once those conversations were

24  predictable.

25

26

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

78.     Its fiduciary role vis-à-vis the Recruiters is underscored by Boeing's specific knowledge that the recruits would be in need of accurate benefits information to make an informed employment decision, whether the recruits asked or not.

79.     Further, Boeing had or should have had the expectation that pension benefits would be an *important* factor in the decision of any recruited employee to move.  It would be completely out of touch with reality for Boeing and its human counterparts to think that pension benefits are a minor consideration, particularly where, as here, the reduction is drastic and the Plaintiffs had been working for MDC/Boeing for over twenty years by then.  Boeing and its human counterparts knew or should have known that total pension benefits would be materially lower for employees who left Long Beach for Seattle if, as was true for Plaintiffs, they had not already attained 30 years of Aggregate Benefit Service but wanted to retire at age 55.

80.     Boeing knew that Plaintiffs, as recruits, would have no independent source of information about which pension plan they would join after a transfer and how their then-unidentified new plan would interface with their Hourly West Plan to provide a total retirement package.  Boeing assumed the duty to provide accurate information because it knew the unique need Plaintiffs had for it.

81.     Boeing exercised fiduciary responsibility for the communication function of plan management and administration when it sent the Recruiters to have discretionary conversations that necessarily would involve the future of plan benefits in the context of recruitment.  In so doing, it delegated fiduciary communication authority to the Recruiters as its agents.  Whether or not the Recruiters were acting "without authority" in talking about benefits in this situation is irrelevant to Boeing's ultimate responsibility for their actions, which Boeing failed to appropriately restrict or control.

82.     If Boeing and its human counterparts did not want to assume fiduciary responsibility for misrepresentations about benefits made in the recruiting context, they should

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1   have said nothing, ensured that the Recruiters said nothing, and ensured an alternative source of

2   truthful information about benefits.

3       **3.    MDC's Participation in Boeing's Recruitment Efforts.**

4       83.    At the time of the recruitments at issue here, MDC was a subsidiary of Boeing.

5   Though the two companies were technically separate entities until MDC was merged into Boeing

6   in 2009, on information and belief, they functioned as one after Boeing's acquisition of MDC in

7   the late 1990s.  The two companies appeared to be "one company" (as Boeing marketed itself) to

8   their employees, including Plaintiffs.  MDC knew or should have known about Boeing's

9   recruitment efforts, which were taking place on its premises, during work hours, targeted at

10  MDC employees, and with MDC's approval.  Both MDC and Boeing management encouraged

11  MDC employees to attend the Boeing job fairs and consider taking Boeing's transfer offers.

12      **4.    Boeing's and MDC's Additional Fiduciary Roles in Plan Communications.**

13      84.    The Employee Benefit Plans Committee is comprised of high-level Boeing

14  executives.  By placing (through its Board of Directors) human counterparts to the company in

15  this position, Boeing was and is aware of and participates in the plan management and

16  administration activities of the Employee Benefit Plans Committee, including communications,

17  as well as monitoring of individuals who are actually speaking about benefits to plan

18  participants.  As a participant in communications about pension benefits through its high-level

19  executives, Boeing is a functional fiduciary that regularly partners with the named plan

20  administrator to carry out functions of plan management and administration.  The Employee

21  Benefit Plans Committee, its individual members, and Boeing frequently operate as one in this

22  regard.

23      85.    Boeing and MDC—either independently or in conjunction with the Committee

24  Defendants—set up, maintained, and staffed (a) the TotalAccess benefits line or its predecessor,

25  (b) the pension office in "Building 54" in Long Beach, and (c) the human resources

26  representatives in Long Beach.  Both Boeing and MDC knew or should have known that

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

important information about pension benefits would be disseminated by these representatives as part of Boeing's recruiting efforts, because, beyond the Recruiters, these were the individuals most likely to receive follow up questions about benefits after the Recruiters had been in contact with Plaintiffs (as with Plaintiffs Monper and Lynch) or job offers had been extended (as with Plaintiff Veturis).  Indeed the benefits line, the pension office, and the human resources personnel were specifically *tasked* with providing benefits information to plan participants and answering their questions and inquiries.  To make such personnel available, to empower them to provide benefits information, and to encourage employees to seek information about pension benefits from these sources is a fiduciary communication function of plan management and administration.  By taking on this responsibility, Boeing and MDC assumed a fiduciary role.

86.     As alleged above, the benefits line, pension office, and human resources representatives, trainers, and supervisors acting on behalf of Boeing and/or MDC were Defendants Cindy Cuto, Defendant Jane Doe 1, Defendant Jane or John Doe 2, Defendant Jane or John Doe 3, and Defendants Jane or John Doe 4-10.

87.     When Plaintiffs asked questions about future pension benefits after they had been recruited but before they accepted their transfers or knew which new pension plan they would be joining, they made clear to Defendants Cuto, Doe 1, Doe 2, and Doe 3 that they were asking about benefits *in the recruitment context* and *without information on their future plan benefits other than what they had been told and were seeking to verify*.

88.     As alleged above, Boeing knew or should have known that pension benefits would be an *important* consideration for recruits and that recruits would respond to being recruited by Boeing with questions about the future of these important benefits.  Foreseeably, these questions were directed to Defendants Cuto, Doe 1, Doe 2, and Doe 3.  Boeing took on a fiduciary role once these conversations were predictable because of its recruitment efforts.

89.     Its fiduciary role vis-à-vis the actions of Defendants Cuto, Doe 1, Doe 2, and Doe 3 is underscored by Boeing's specific knowledge that the recruits would be in need of accurate

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1    benefits information to make an informed employment decision, whether the recruits asked or

2    not.

3         90.    Because Boeing *instigated* recruitment and benefits conversations, Boeing

4    became responsible for taking action to ensure that accurate benefits information would be

5    disseminated to recruits.  Boeing created the misinformation at issue here either by (a) giving the

6    misinformation to Defendants Cuto, Doe 1, Doe 2, and Doe 3 or their supervisors and trainers

7    (Does 4-10) about what to say about pension benefits to recruits or (b) by failing to adequately

8    brief or police these individuals or their work groups, leaving it to them to guess what to say

9    about pension benefits in the context of Boeing's recruiting efforts—about which Defendants

10   Cuto, Doe 1, Doe 2, and Doe 3 knew *before* they spoke.  As noted above, ERISA allows neither.

11   Further, whether Boeing told these individuals to lie, provided them with false benefits

12   information, or suggested with a wink and a nod that benefits reductions should be minimized in

13   the interest of securing job transfers, Boeing knew or should have known that recruits would be

14   misled and was the catalyst when that very thing predictably and actually occurred.  Boeing

15   *encouraged* its human counterparts to actively misinform Plaintiffs through intent or complicity

16   in known pervasive incompetence in an environment that made the dissemination of

17   misinformation more likely than not.  In any event, the misleading information originated with

18   Boeing, which produced and disseminated it through its agents.  Boeing's leaders knew that the

19   company would (and did) benefit from misinformed job transfer decisions.

20        91.    As alleged above, without discovery, Plaintiffs (like all ERISA Plaintiffs alleging

21   a failure of fiduciary functions) cannot know what specific instructions were given to Defendants

22   Cuto, Doe 1, Doe 2, and Doe 3 or their supervisors and trainers (Does 4-10) about what to say

23   about pension or other employee benefits to its recruits.  What is clear, however, is that these

24   Direct Communication Defendants *uniformly* misinformed Plaintiffs in the same way on separate

25   occasions.  The same misinformation already had been separately conveyed by the Recruiters.

26   This fact pattern plausibly and strongly suggests that the misinformation originated with Boeing.

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

92.     Boeing knew that Plaintiffs, as recruits, would have no independent source of information about which pension plan they would join after a transfer and how their then-unidentified new plan would interface with their Hourly West Plan to provide a total retirement package.  Boeing assumed the duty to provide accurate information because it knew the unique need Plaintiffs had for it.

93.     Boeing exercised fiduciary responsibility for the communication function of plan management and administration when it authorized or allowed Defendants Cuto, Doe 1, Doe 2, Doe 3, and Defendants Jane or John Doe 4-10 to have or oversee discretionary conversations that necessarily would involve the future of plan benefits in the context of recruitment.  In so doing, it delegated fiduciary communication authority to these individuals as Boeing's agents.  Whether or not these employees were acting "without authority" in talking about benefits in this situation is irrelevant to Boeing's ultimate responsibility for their actions, which Boeing failed to appropriately restrict or control.

94.     If Boeing, MDC, and their human counterparts did not want to assume fiduciary responsibility for misrepresentations about benefits made in this recruiting context by personnel on the benefits line, in the pension office, or in human resources positions employed by Boeing and/or MDC, they should not have set up, maintained, and staffed these mechanisms whose *purpose and function* was to *disseminate benefits information*.  Nor should they have allowed their employees to work in positions where they would perform fiduciary communication functions of plan administration and management.  Alternatively, they should not have allowed these personnel to answer benefits questions (and should have provided an alternative source of truthful information) where the context was that (a) *Boeing had initiated* recruitment conversations that involved affirmative representations about pension benefits that Plaintiffs were seeking to verify, (b) that the future benefits questions posed were *complex* and involved *more than one plan*—one of which Plaintiffs had no knowledge about because they were not yet

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1  participants in it, (c) that the *stakes were high*, and/or (d) that Plaintiffs would be making

2  *important employment decisions that would negatively impact their future pension benefits*.

3          95.     Finally, Boeing did and still does hold itself out as a fiduciary of the plans.

4  Today, Boeing is clearly in charge of TotalAccess on the web and through a telephone line.  The

5  current TotalAccess website directs participants to contact the "Boeing Pension Service Center"

6  via the TotalAccess telephone line if they have questions about pension benefits.  Boeing holds

7  itself out as a fiduciary and conflates its own role with that of the Employee Benefit Plans

8  Committee.  On TotalAccess online, Boeing says that "the Company" (*not* the Employee Benefit

9  Plans Committee) "will apply the terms of the Plan and will, as appropriate, *use its discretion* in

10  interpreting terms of the Plan" (emphasis added).  Boeing (not the Committee) publishes and

11  copyrights written plan communications.  Boeing employees (not Committee Members) sign

12  many benefits-related messages and announcements.  Benefits estimates direct participants to

13  call Boeing TotalAccess for information about their pension benefits.  On information and belief,

14  these current practices and control structures were materially the same in 2007-2008, even if the

15  services were operated by Boeing under different names.  Boeing cannot have it both ways.  It

16  cannot act like a fiduciary and hold itself out as one, yet evade fiduciary status under ERISA

17  under circumstances where it has actually *exercised* discretion in performing a plethora of

18  fiduciary functions, as alleged here.

19       **5.**     **Misleading Fiduciary Communications Were Uniform, Pervasive, Repeated Years Later, and Acknowledged by Boeing Executives.**

20          96.     Remarkably, the misrepresentations about Plaintiffs' future pension benefits made

21  by personnel on the benefits line, in the pension office, and in human resources positions in Long

22  Beach was consistent across all three Plaintiffs and these statements *confirmed* the same

23  misinformation that Plaintiffs Monper and Lynch had already received from the Recruiters.

24  Thus, it is more than plausible that Boeing and/or MDC directed Recruiters and other personnel

25  about how to answer questions in the recruitment context.

26

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

97.     The Direct Communication Defendants who misled Plaintiffs about their benefits either were instructed by Boeing and/or MDC to say what they uniformly said or the fiduciary communication system in which they worked and which Boeing and MDC created and oversaw was so broken that the foreseeable, likely, and actual result was that all three Plaintiffs repeatedly and consistently received the *same wrong* information about future pension benefits.  In either event (and regardless of their own fiduciary status), these individuals served as mouthpieces for Boeing and MDC to exercise discretion in matters of plan management and administration by actively misleading Plaintiffs with false information about important future benefits, which was produced and disseminated by Boeing.

98.     These fiduciary miscommunications were so pervasive that they continued, in Plaintiff Monper's case, to be repeated (in recorded and transcribed phone calls) *more than three years later*, long after he had moved.  Boeing and MDC thus not only undertook a fiduciary communication role, but also severely botched it again and again.

99.     High-level Boeing executives and employees have *admitted* that false and misleading information was communicated not only to Plaintiff Monper, but also to thirteen additional individuals (including Plaintiffs Lynch and Veturis) in 2007-2008 as part of Boeing's recruitment effort.  Specifically, Julie-Ellen B. Acosta (Vice President of Human Resources and Administration)—who was succeeded by Defendant Alan May—and Sonya Bell (Boeing Commercial Airplanes HR Chief of Staff) told Monper in April of 2013 that they knew about the misleading information that had been given out to recruits in Long Beach and that the company had detailed information about which fourteen people were misled in the same manner.  There is simply no way Boeing could have researched, documented, and calculated this impact and the scope of misinformation disseminated by Boeing and/or MDC representatives to this set of recruits without having directed it or at least known who was told to say what by whom, with Boeing's approval.  The misinformation originated somewhere high up in the company and came from the top down, one way or another.  Boeing knows more about what it has done than

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1  Plaintiffs know, but the company is responsible for it and, under ERISA, should be held

2  accountable.

3        **6.     Boeing and MDC Cannot Blame Their Agents.**

4        100.     Boeing and MDC are ERISA fiduciaries for the purposes of these

5  miscommunications.  These companies and their human counterparts could have and should

6  have prevented the false statements made here.  They could have fixed all of this if they had been

7  willing to tell the truth before it was too late for Plaintiffs.  Boeing and MDC cannot take on

8  fiduciary roles recognized under ERISA and then shirk responsibility for them by blaming "low-

9  level" employees who were acting at Boeing's and MDC's direction, within their corporate

10 human resources and benefits systems, and/or on their behalf.  Representatives of the companies

11 clearly were communicating about future plan benefits in the context of recruiting employees for

12 the benefit of Boeing, which makes their statements matters of plan management and

13 administration and therefore discretionary fiduciary acts.

14       101.     Boeing and MDC's actions in donning a fiduciary "hat" to talk about benefits in

15 aid of Boeing's recruitment push are particularly repugnant under the facts alleged here, where

16 the objective and result of the statements that rendered them fiduciaries in the first place was to

17 benefit the company to the detriment of long term and loyal employees that they induced to

18 transfer.  This is a conflict of interest of the highest order.  Boeing cannot puppeteer its human

19 counterparts and employees to perform fiduciary functions by *exercising* discretion and then wall

20 off its fiduciary conduct as if it never happened, meanwhile as a corporate entity reaping the

21 benefits of its own fiduciary status and breaches.  In denying fiduciary status under the facts

22 alleged here, Boeing is effectively saying that its fiduciary "hat" is invisible now that it got what

23 it wanted from its misleading fiduciary communications, dispersed by its agents.  The company

24 lied about benefits to get people to move across the country and now wants to pretend that it—as

25 a company—did not say anything about benefits at all or that it did not have the affirmative

26 obligation to provide truthful benefits information whether asked or not.  Clever maneuvering

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1  such as this—where "nonfiduciaries" do the dirty work—cannot withstand ERISA's functional

2  test.

3      102.    For the foregoing reasons, Boeing and MDC are functional fiduciaries, within the

4  meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), of both the Hourly West Plan

5  and the BCERP.  Under the facts alleged here, Boeing and MDC have fiduciary status regardless

6  of whether the Direct Communication Defendants or Doe Defendants 4-10 (supervisors or

7  trainers) are independently fiduciaries, though Plaintiffs allege below that all of them are.

8  **D.    The Committee Defendants' Fiduciary Status.**

9      103.    The Committee Defendants are both "named fiduciaries" and *de facto* fiduciaries.

10     104.    As designated plan administrators, they are responsible for communications to

11 participants about their benefits.  Both the committee entity and its members share fiduciary

12 authority and responsibility, and individual committee members cannot avoid their independent

13 status as plan administrators.

14     105.    Since communication is a fundamental act of plan management and

15 administration, as described above, it follows that plan administrators are fiduciaries for this

16 purpose, including with respect to supervising and monitoring any agents that perform

17 communications tasks.

18     106.    Moreover, under the facts alleged here, the Committee Defendants are also

19 functional fiduciaries within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A),

20 of both the Hourly West Plan and the BCERP, because they actually exercised discretion over

21 fiduciary communication.  Both actions and omissions can be exercises of fiduciary discretion

22 under the law.

23     107.    The Committee Defendants knew or should have known about Boeing's

24 recruitment efforts both (a) because they were "named fiduciaries" with the responsibility to

25 make sure that benefits information disseminated in the recruitment context is accurate and (b)

26 because of the committee members' roles within the company, which are high up in the

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE
RETIREMENT INCOME SECURITY ACT - 43

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

corporate structure and relate *directly* to recruitment and benefits matters, as well as compliance with ERISA.

108.    Notably, the *same committee* was the plan administrator for both the Hourly West Plan and the BCERP at the time the misrepresentations here occurred, demonstrating that a high level of coordination and integration between these plans was not only possible and necessary, but also in place.  As the two plan sponsors drew closer to their 2009 merger, the Committee Defendants knew or should have known about and been able to effectively communicate the complexities of how the Hourly West Plan, the BCERP, and other Boeing and MDC plans would interact when employees moved around.  Correctly articulating future benefits under such circumstances appears to have been among the Committee Member Defendants' professional specialties.  It was certainly their duty as named fiduciaries.

109.    The Committee Defendants were responsible for and/or participated in all aspects of communication with plan participants about their benefits.  As fiduciaries, they could not simply turn loose benefits personnel or recruiters as their agents to communicate about the likely future of plan benefits, yet avoid responsibility for whatever was said.  Members of the Employee Benefit Plans Committee *personally* talking to Plaintiffs is not a requirement for the liability of the Committee Defendants.  Nor must *any* of the Direct Communication Defendants be found fiduciaries themselves for the Committee Defendants to have liability for what the Direct Communication Defendants said.

110.    The Committee Defendants had not only direct fiduciary responsibility for communications as matters of plan management and administration, but also had fiduciary monitoring responsibility of all parties who were tasked with *or who actually performed* fiduciary communication functions for which the Committee Defendants were ultimately responsible, including Boeing, MDC, and the rest of the Fiduciary Communication Defendants (Irons, Query, Martin, Small, Cuto, Doe 1, Doe 2, Doe 3, and Does 4-10).

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

111.    As the designated plan administrators, the Committee Defendants were directly involved—or should have been directly involved—in the following fiduciary communication tasks:

A.    Informing the Direct Communication Defendants of accurate benefits information relevant to the recruitment of Plaintiffs and others from Long Beach to Seattle in 2007-2008, and in particular which plan recruits would be joining and how it would interface with the Hourly West Plan.

B.    Overseeing the actions of Boeing and MDC with regard to pension-related communications in the context of Boeing's recruitment efforts, and in particular knowing and disseminating correct information about which plan recruits would be joining and how it would interface with the Hourly West Plan.

C.    Overseeing the functions of (a) the TotalAccess benefits line or its predecessor, (b) the pension office in "Building 54" in Long Beach, and (c) the human resources representatives in Long Beach, and in particular the messages that were given to Boeing recruits who were then in the Hourly West Plan.

D.    Overseeing the competency and adequacy of Doe Defendants 4-10, who were responsible for supervising or training some of the Direct Communication Defendants (*i.e.*, Doe Defendants 1, 2, and 3, as well as Defendant Cindy Cuto), and promptly correcting course when communications were inaccurate or misleading.

E.    Promptly correcting misinformation given to Plaintiffs and others by Boeing, MDC, and the Direct Communication Defendants before it was too late.

112.    Boeing and MDC employees were routinely encouraged to seek out information on employee benefits from the benefits line, the pension office, and human resources representatives—all of which were ultimately under the supervision and control of the Committee Defendants.  These resources were and are touted as an authoritative source for

LAW OFFICES OF
KELLER ROHRBACK L.L.P.
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

benefits information.  If participants cannot rely on them for accurate information, it is unclear where else they could possibly turn.

113.    Not only were the Committee Defendants in charge of the clearinghouses for pension benefits information, the activities of the Direct Communication Defendants and Doe Defendants 4-10 under the facts alleged here went beyond what could be described as a "ministerial" function.  The inquiries that Direct Communication Defendants and Doe Defendants 4-10 undertook and answered were not simple calculations, explanations of benefit terms under a single plan, or other similar typically ministerial tasks.  Rather, in the situation described here, they used discretion and chose to participate in matters of plan management and administration.  Once they took that step, they became fiduciary communicators.  Whether or not they were acting "without authority" is irrelevant to the Committee Defendants' ultimate responsibility for their actions.

114.    The Committee Defendants knew that Plaintiffs, as recruits, would have no independent source of information about which pension plan they would join after a transfer and how their then-unidentified new plan would interface with their Hourly West Plan to provide a total retirement package.  The Committee Defendants assumed the duty to provide accurate information because they knew the unique need Plaintiffs had for it.

115.    The Committee Member Defendants' responsibilities in this regard are only enhanced by their positions within the company, which also demonstrate that they are *de facto* fiduciaries as well as human counterparts to Boeing as an employer-fiduciary, as follows:

A.    **Defendant Richard D. Stephens** was the Senior Vice-President of Human Resources and Administration at Boeing.  On information and belief, in this role, he was responsible for employee programs and benefits, including pension benefits and fiduciary communications.  It is not only plausible but also likely that Defendant Stephens had full knowledge of Boeing's recruitment efforts.  A company recruiting campaign necessarily involves the knowledge and participation of high-level HR

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

executives such as Defendant Stephens.  He also must have had responsibility for and a working understanding of (a) the TotalAccess benefits line or its predecessor, (b) the pension office in "Building 54" in Long Beach, and (c) the human resources representatives in Long Beach.  As alleged above, Defendant Stephens broadcast in a company publication that he values the dissemination of "reliable information" to plan participants about their future financial condition because it is necessary to "sound, proactive decisions" that employees need to make "about their health and finances." Long term financial stability and predictability apparently was not lost on Defendant Stephens either, as he said "the more money you have in the piggy bank" the more you can take advantage of "future opportunities"—perhaps such as retiring early.  Without accountability for misleading employees about future plan benefits, Defendant Stephens's statement that it's "all about people" rings hollow.  Defendant Stephens knew or should have known about the vast failures of his company and the Committee in ensuring that Plaintiffs' pension "piggy banks" were accurately described in the context of their recruitment for the benefit of the company and its executives such as himself.

B.      **Defendant Bryan H. Baumeister** was (and still is) an attorney in Boeing's legal department.  As alleged above, at some point, Defendant Baumeister became Chief Counsel for Boeing, where, on information and belief, he oversees all legal issues related to employee benefits and pensions, including compliance with ERISA and fiduciary communications.  As a company lawyer, Defendant Baumeister was in a position to know—and should have known—what the company was doing in the realms of recruitment and fiduciary communications.  Whether or not he personally works on ERISA matters, as an in-house attorney on the Employee Benefit Plans Committee, he certainly had the duty to pay attention to what was being done under his own supervision with respect to communications about future plan benefits that had the potential to violate

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

ERISA, a law the Committee was obligated to follow and with which Defendant

Baumeister must be familiar.

C.     **Defendant David Dohnalek** was Boeing's Vice President of Investor

Relations, the Vice President of Financial Planning and Analysis, and/or the Vice

President of Finance and Treasurer.  On information and belief, he still holds the title

Vice President of Finance & Treasurer.  Money matters—and future financial planning—

appear to be Defendant Dohnalek's specialty, and as a company executive on the

Employee Benefit Plans Committee, he had the duty to make sure that financial aspects

of fiduciary communications were correctly made.  In his position, he knew or should

have known about Boeing's recruitment efforts as well as the botched and misleading

representations with enormous financial implications for Plaintiffs.

D.     **Defendant Pamela A. French** was the Director of Benefits, International

Rewards and M&A Integration.  On information and belief, in this role, one of Defendant

French's *primary* responsibilities at Boeing has been to disseminate information about

employee benefit programs.  As alleged above, in her biography as a Member of the

Quality Alliance Steering Committee, Defendant French highlights that at Boeing she is

"responsible for company-wide employee benefit strategies, policies, compliance,

communications, as well as integration of pay and benefit issues in M&A transactions,

international sites and labor negotiations," and she focuses on "stakeholder engagement

in the health care and retirement areas."  Carrying out employee benefits "compliance"

and "communications" efforts in the manner described herein cannot possibly be

sufficient under Defendant French's professional standards.  It certainly falls below

relevant fiduciary standards.  On information and belief, given the specificity of her title,

Defendant French has deep knowledge of best practices in employee benefits

communications and knows the importance of such communications in merger and

acquisition contexts and intra-company job transfers.  She had both the duty and the

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

expertise to make sure that the communications made in the context of Boeing's recruitment of Plaintiffs and others was carried out according to the law and without misleading recruits about future plan benefits.

E.    **Defendant R. Paul Kinscherff** was the Corporate Treasurer of Boeing Capital Corp. and/or Senior Vice President of Investor Relations at Boeing.  At some point, he became the President of Middle East Operations, and then became the Chief Financial Officer for International Finance at Boeing, a position that, on information and belief, he still holds.  Like Defendant Dohnalek, money matters—and future financial planning—appear to be Defendant Kinscherff's specialty.  As a company executive on the Employee Benefit Plans Committee with specialized financial knowledge, he had the duty to make sure that financial aspects of fiduciary communications were correctly made.  In his position, he knew or should have known about Boeing's recruitment efforts as well as the botched and misleading representations with enormous financial implications for Plaintiffs.

F.    **Defendant J. Michael Luttig** was (and still is) an attorney in Boeing's legal department.  According to Boeing's website, Defendant Luttig became Executive Vice President and General Counsel in 2006, and "[i]n this role, Luttig is responsible for leading the Boeing Law Department across the company."  On information and belief, as General Counsel, Defendant Luttig oversees all legal issues related to employee benefits and pensions, including compliance with ERISA and fiduciary communications.  As a company lawyer—indeed the *head* lawyer—Defendant Luttig knew or should have known what the company was doing in the realms of recruitment and fiduciary communications.  Whether or not he personally works on ERISA matters, as Boeing's *General Counsel* and a member of the Employee Benefit Plans Committee, he certainly had the duty to pay attention to what was being done under his own supervision with respect to communications about future plan benefits that had the potential to violate

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE
RETIREMENT INCOME SECURITY ACT - 49

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

ERISA, a law the Committee was obligated to follow and with which Defendant Luttig—a former federal judge—must be familiar.

G.     **Defendant Alan R. May** was the Vice President, Strategy, Compensation and Benefits.  As alleged above, in this position, Defendant May "directed HR strategy, executive and enterprise compensation, health care policy and retirement benefits for the company."  As alleged above, Defendant May touts the following as his specialties: "Strategic alignment of HR function with business requirements, performance management, M&A transactions and integration, organizational design, talent management/succession, labor strategy and executive compensation."  Yet this case demonstrates a vast *mis*alignment of "HR function with business requirements," such as truthful recruitment regarding employee benefits matters.  According to Boeing's website, Defendant May became (and still is) the Vice President of Human Resources at Boeing in 2013 and "reports to Ray Conner, Boeing vice chairman, president and CEO of Commercial Airplanes, and Tony Parasida, senior vice president of Human Resources and Administration for The Boeing Company."  In between his former role as Vice President of Strategy, Compensation and Benefits and his current role as the Vice President of Human Resources, Defendant May was the Vice President of Human Resources for Boeing Defense, Space & Security, where he "was responsible for HR initiatives to drive business performance and to create and sustain a premier work environment for employees."  With this resume, Defendant May was situated in the company and had the expertise to bring to the Committee to prevent exactly what occurred in this case, and he had the duty to do so.  What he has created is something less than a "premier work environment" for Plaintiffs, who only learned they could not trust what they were told about their pensions until it was too late.

H.     **Defendant Harry S. McGee** was the Vice President, Finance and Corporate Controller, as well as a member of the Employee Benefit Plans Committee, at

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE
RETIREMENT INCOME SECURITY ACT - 50

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

the time the fiduciary breaches alleged herein occurred.  Like Defendants Dohnalek and

Kinscherff, financial concerns are Defendant McGee's area of expertise.  As a company

executive on the Employee Benefit Plans Committee with specialized financial

knowledge, he had the duty to make sure that financial aspects of fiduciary

communications were correctly made.  In his position, he knew or should have known

about Boeing's recruitment efforts as well as the botched and misleading representations

with enormous financial implications for Plaintiffs.

116.    The collective expertise and high-level company executive positions seated on the

Employee Benefit Plans Committee are indicative of the sort of competence with which the

Committee *should* have performed its fiduciary duties.

117.    The human resources, benefits, and legal roles within the company that the

Committee Member Defendants had indicate that they had professional oversight of lower-level

employee benefits and human resources personnel who were unquestionably involved in direct

communications with plan participants about their future benefits.  As such, they are not only

"named fiduciaries" who *had* specific and defined fiduciary authority, but also functional

fiduciaries to the extent that the misleading benefits statements at issue here were made at their

direction, under their supervision, and within their discretionary authority and control.  Both their

actions and their failures to act are exercises of discretion for the purpose of their fiduciary status

and duties.  Further, they acted and failed to act not only as *de facto* fiduciaries in their own

rights, but also as human counterparts of fiduciaries Defendants Boeing and MDC.

**E.    The Direct Communication Defendants' Fiduciary Status.**

118.    The Direct Communication Defendants are the Defendants who *personally*

recruited and talked to Plaintiffs about their future plan benefits in the context of Boeing's

recruitment.

119.    The Direct Communication Defendants were under the direction and supervision

of Boeing, MDC, and/or the Committee Defendants and acted as agents of those fiduciaries.  But

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE
RETIREMENT INCOME SECURITY ACT - 51

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

whether or not they were told exactly what to say about benefits by Boeing, MDC, or the Committee Defendants, and regardless of the fiduciary status of Boeing, MDC, and/or the Committee Defendants, the Direct Communication Defendants' actions and failures to act independently confer functional fiduciary status, because they were holding themselves out as knowledgeable on the topic of benefits in the particular context of recruiting described herein.

120.    Though not "named fiduciaries," each of the Direct Communication Defendants acquired functional fiduciary status by acting in the capacity of plan managers and administrators when they inserted themselves into conversations that entailed core discretionary fiduciary functions: communicating to participants about the future of plan benefits in the context of Boeing's recruitment efforts, where (a) *Boeing had initiated* recruitment conversations and job offers, the benefits implications of which Plaintiffs sought to confirm and verify, (b) the future benefits questions posed were *complex* and involved *more than one plan*—one of which Plaintiffs had no knowledge about because they were not yet participants in it, (c) the *stakes were high*, and/or (d) Plaintiffs would be making *important employment decisions that would negatively impact their future pension benefits*.  By personally making statements or through their participation and acquiescence in statements made in their presence by others to Plaintiffs, each of the Direct Communication Defendants acquired fiduciary status for the purpose of fiduciary communications about future pension benefits.

121.    For these reasons as well as those discussed below, each of the Direct Communication Defendants is a functional fiduciary within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), of both the Hourly West Plan and the BCERP.

### 1.    Defendant Gary Irons.

122.    Defendant Irons had the title Senior Manager Production Flight Test Operations at the time the fiduciary breaches alleged herein occurred.  On information and belief, Defendant Irons was sent by Boeing from Seattle to the MDC facility in Long Beach, California in 2007 to recruit employees to transfer from there to Boeing's facility in Washington.  He personally

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

recruited Plaintiff Monper and Plaintiff Lynch, among other Long Beach employees.  Defendant

Irons made misleading statements to Plaintiffs Monper and Lynch about pension benefits in the

context of Boeing's recruitment effort, as follows:

A.     Defendant Irons went to and presented at a job fair hosted by Boeing on

the MDC premises in Long Beach in the autumn of 2007 where he recruited Plaintiff

Monper.  With Defendant Irons were Defendants Kim Martin and Tommy Small.  In a

conversation between Irons, Monper, and several others in attendance, Irons stated that

the group of Long Beach employees being recruited would have "nothing to lose" by

moving to the Seattle area, that their retirement benefits available in Long Beach,

including early retirement benefits, would "not change or be affected," and that vacation

time also would be secure.  Irons discussed how he would try to get the group into "flight

test" and reiterated that they had "nothing to lose."  Defendant Irons held a particularly

high status in the eyes of the recruits at the job fair that Plaintiff Monper attended.

Attendees gathered around him to hear what he had to say.  Monper and others knew and

trusted him.  He had people's ears.  He came across as knowledgeable.  He held several

sidebars.  Not just Plaintiff Monper, but also another 5 to 10 attendees were told the same

thing Monper heard in sidebar conversations.  When someone asked the Recruiters about

health benefits, the recruits were similarly assured that health benefits would "not change

or be affected."

B.     Later that autumn, Defendant Irons went to and presented at a separate job

fair hosted by Boeing in Long Beach where he recruited and, along with Defendant Mike

Query, interviewed Plaintiff Lynch for a flight line mechanic position.  During the

interview, Lynch asked questions about what impact a move would have on his

retirement benefits.  In response to Lynch's questions about his early retirement benefits,

both Defendants Irons and Query told Lynch that "nothing would change" in his

retirement benefits.  Specifically, they told Lynch that he would "keep accruing time"

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE
RETIREMENT INCOME SECURITY ACT - 53

LAW OFFICES OF
KELLER ROHRBACK L.L.P.
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

under the Hourly West Plan and that his Hourly West Plan benefits would "continue to grow" while he worked in Seattle.  When Defendant Query made these statements, Defendant Irons did not correct him.  Instead, Defendant Irons reiterated the very same points.  As with the prior job fair, recruits were also assured that health plans would not significantly change, even though providers in Washington would differ from those in California.

123.    Defendant Irons was intent on recruiting Plaintiffs Monper and Lynch along with others on Boeing's behalf.

124.    As a recruiter, Defendant Irons knew or should have known the *correct* information about what their pension benefits would be after the move.  He knew or should have known which plan Plaintiffs Monper and Lynch would be joining and how—or whether—dual accrual worked for that plan vis-à-vis the Hourly West Plan.  He did not disclose this information and instead he actively misled Plaintiffs Monper and Lynch.

125.    Defendant Irons knew or should have known that moving to a new work location with a new pension plan involved complex questions of how the two benefit plans would interface.

126.    Defendant Irons knew or should have known the magnitude of the questions he was answering and the importance of early retirement benefits to the recruits.  That he received so many questions about early retirement benefits demonstrated that these benefits mattered a great deal.

127.    Defendant Irons knew or should have known that the recruits were not yet in any new plan, so they only could know the terms of their Hourly West Plan.  He knew or should have known that the recruits had no way to independently know whether time accrued in their new plan would count under the Hourly West Plan.  Defendant Irons knew or should have known that they would rely on what he told them as they made their decisions.

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

128.   Defendant Irons made affirmative statements and immediately answered Plaintiff Monper's, Plaintiff Lynch's, and other recruits' questions with confidence and while projecting knowledge and authority.  He did not project uncertainty or hesitation.  He was definitive and sure.  He made Plaintiffs Monper and Lynch believe what he was saying.  Plaintiffs Monper and Lynch expected Defendant Irons to know the correct information and to tell them the truth.

129.   In reality, Defendant Irons either did not know what he was talking about or he was intentionally misleading Plaintiffs Monper and Lynch.  Regardless, he held himself out as knowledgeable about future pension benefits when he should not have.  He chose to speak and answer complex questions with simple and reassuring answers.  He made no effort to deflect these questions, to indicate he was not sure of the truth, or that he needed to research the issue further before responding.  He did not direct Plaintiffs Monper and Lynch to benefits, pension office, or human resources personnel who were tasked with such communications (but of course, had he done this, the misinformation would have been the same).  He did not direct Plaintiffs Monper and Lynch to the Employee Benefit Plans Committee for answers.

130.   By behaving in this manner, Defendant Irons entered into the realm of discretionary fiduciary communications and conferred on himself functional fiduciary status by speaking on matters central to plan management and administration in the context of recruiting employees to transfer to a location where their pension benefits would be lower than if they did not move.

131.   Defendant Irons's fiduciary status exists independently from his role as a mouthpiece for Boeing's, MDC's, the Committee's, or any other Defendant's fiduciary speech.  His fiduciary status arises from his own actions and omissions and does not depend on the fiduciary status of any other Defendant.

**2.   Defendant Mike Query.**

132.   Defendant Query had the title Manager of Flight Test Operations at the time the fiduciary breaches alleged herein occurred.  On information and belief, Defendant Query

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

reported to Defendant Gary Irons.  On information and belief, Defendant Query was sent by Boeing from Seattle to the MDC facility in Long Beach, California in 2007 to recruit employees to transfer from there to Boeing's facility in Washington.  He personally recruited Plaintiff Lynch, among other Long Beach employees.  Defendant Query made misleading statements to Plaintiff Lynch about pension benefits in the context of Boeing's recruitment effort, as follows:

A.      Defendant Query, along with Defendant Irons, went to and presented at a job fair hosted by Boeing in Long Beach where he recruited and interviewed Plaintiff Lynch.  The job fair was during work hours.  During the interview, Lynch asked questions about what impact a move would have on his retirement benefits.  In response to Lynch's questions about his early retirement benefits, Defendants Query and Irons told Lynch that "nothing would change" in his retirement benefits.  Specifically, they told Lynch that he would "keep accruing time" under the Hourly West Plan and that his Hourly West Plan benefits would "continue to grow" while he worked in Seattle.  When Defendant Irons made these statements, Defendant Query did not correct him.  Instead, he reiterated the very same points.  As alleged above, Lynch and other attendees were assured that health benefits would not significantly change either.

133.    Defendant Query was intent on recruiting Plaintiff Lynch along with others on Boeing's behalf.

134.    As a recruiter, Defendant Query knew or should have known the *correct* information about their pension benefits after the move.  He knew or should have known which plan Plaintiff Lynch would be joining and how—or whether—dual accrual worked for that plan vis-à-vis the Hourly West Plan.  He did not disclose this information and instead he actively misled Plaintiff Lynch.

135.    Defendant Query knew or should have known that moving to a new work location with a new pension plan involved complex questions of how the two benefit plans would interface.

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

136.     Defendant Query knew or should have known the magnitude of the questions he was answering and the importance of early retirement benefits to the recruits.

137.     Defendant Query knew or should have known that the recruits were not yet in any new plan, so only could know the terms of their Hourly West Plan.  He knew or should have known that they would rely on what he told them as they made their decisions.

138.     Defendant Query made affirmative statements and immediately answered Plaintiff Lynch's questions with confidence and while projecting knowledge and authority.  He did not project uncertainty or hesitation.  He was definitive and sure.  He made Plaintiff Lynch believe what he was saying.  Plaintiff Lynch expected Defendant Query to know the correct information and to tell him the truth.

139.     In reality, Defendant Query either did not know what he was talking about or he was intentionally misleading Plaintiff Lynch.  Regardless, he held himself out as knowledgeable about future pension benefits when he should not have.  He chose to speak and answer complex questions with simple and reassuring answers.  He made no effort to deflect these questions, to indicate he was not sure of the truth, or that he needed to research the issue further before responding.  He did not direct Plaintiff Lynch to benefits, pension office, or human resources personnel who were tasked with such communications (but of course, had he done this, the misinformation would have been the same).  He did not direct Plaintiff Lynch to the Employee Benefit Plans Committee for answers.

140.     By behaving in this manner, Defendant Query entered into the realm of discretionary fiduciary communications and conferred on himself functional fiduciary status by speaking on matters central to plan management and administration.

141.     Defendant Query's fiduciary status exists independently from his role as a mouthpiece for Boeing's, MDC's, the Committee's, or any other Defendant's fiduciary speech.  His fiduciary status arises from his own actions and omissions and does not depend on the fiduciary status of any other Defendant.

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1

### 3.    Defendant Kim Martin.

2          142.    Defendant Martin was a Recruiting Specialist at the time the fiduciary breaches

3    alleged herein occurred.  On information and belief, Defendant Martin was sent by Boeing to the

4    MDC facility in Long Beach, California in 2007 to recruit employees to transfer from there to

5    Boeing's facility in Washington.  She personally recruited Plaintiff Monper, among other Long

6    Beach employees.  On information and belief, Defendant Martin worked in HR and was sent on

7    recruitment efforts to handle, disseminate, and/or oversee HR related information relevant to

8    recruitment.  On information and belief, in and for this capacity, she was knowledgeable about

9    employee benefits and pension plans.

10         143.    As alleged above, Defendant Martin attended and presented at the job fair that

11   Plaintiff Monper attended.  Defendant Irons made misleading statements to Plaintiff Monper

12   about pension benefits in the context of Boeing's recruitment effort, and Defendant Martin

13   acquiesced in these statements, failing to correct misleading information, as follows:

14              A.     Defendant Martin went to and presented at a job fair hosted by Boeing on

15         the MDC premises in Long Beach in the autumn of 2007 where she recruited Plaintiff

16         Monper.  With Defendant Martin were Defendants Gary Irons and Tommy Small.  In a

17         conversation between Defendant Irons, Monper, and several others in attendance,

18         Defendant Irons stated that the group of Long Beach employees being recruited would

19         have "nothing to lose" by moving to the Seattle area, that their retirement benefits

20         available in Long Beach, including early retirement benefits, would "not change or be

21         affected," and that vacation time also would be secure.  Defendant Irons discussed how

22         he would try to get the group into "flight test" and reiterated that they had "nothing to

23         lose."  Defendant Martin was listening to these statements and did not interject the truth

24         or correct the misleading assurances that Defendant Irons made to recruits.  Instead, she

25         stood idly by while misinformation was disseminated.

26

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

144.    Defendant Martin was intent on recruiting Plaintiff Monper along with others on Boeing's behalf.

145.    Given her position in the company—and specifically her professional focus on *benefits* and *recruitment*, Defendant Martin knew or should have known the *correct* information about the nature and amount of future pension benefits after the move.  She knew or should have known which plan Plaintiff Monper would be joining and how—or whether—dual accrual worked for that plan vis-à-vis the Hourly West Plan.  She did not disclose this information and instead she actively misled Plaintiff Monper by failing to correct misstatements or counsel Plaintiff Monper or others to seek out people to answer these questions who could give truthful information.

146.    Defendant Martin knew or should have known that moving to a new work location with a new pension plan involved complex questions of how the two benefit plans would interface.

147.    Defendant Martin knew or should have known the magnitude of the questions her co-recruiters were answering and the importance of early retirement benefits to the recruits.

148.    Defendant Martin knew or should have known that the recruits were not yet in any new plan, so only could know the terms of their Hourly West Plan.  She knew or should have known that they would rely on what they were told as they made their decisions.

149.    Defendant Martin stood idly by while Defendant Irons made affirmative statements and immediately answered Plaintiff Monper's and others' questions with confidence and while projecting knowledge and authority.  She observed that Defendant Irons did not project uncertainty or hesitation and was instead definitive and sure.  She knew or should have known that Plaintiff Monper would believe what Defendant Irons was saying.  Plaintiff Monper expected Defendant Martin to know the correct information and to tell him the truth.

150.    In reality, Defendant Martin either did not know what Irons was talking about or she was intentionally participating in misleading Plaintiff Monper.  Regardless, by standing there

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

and acquiescing in everything that was said, she held herself out as knowledgeable about future pension benefits when she should not have.  She made no effort to deflect these questions, to indicate she was not sure of the truth, or that she (or others) needed to research the issue further before responding.  Defendant Martin did not direct Plaintiff Monper to benefits, pension office, or human resources personnel who were tasked with such communications (but of course, had she done this, the misinformation would have been the same).  She did not direct Plaintiff Monper to the Employee Benefit Plans Committee for answers.

151.    By behaving in this manner, Defendant Martin entered into the realm of discretionary fiduciary communications and conferred on herself functional fiduciary status by participating in communications on matters central to plan management and administration.

152.    Defendant Martin's fiduciary status exists independently from her role as an agent of Boeing's, MDC's, the Committee's, or any other Defendant's fiduciary speech.  Her fiduciary status arises from her own actions and omissions and does not depend on the fiduciary status of any other Defendant.

**4.    Defendant Tommy Small.**

153.    Defendant Small was a Senior Manager for Boeing at the time the fiduciary breaches alleged herein occurred.  On information and belief, Defendant Small was sent by Boeing to the MDC facility in Long Beach, California in 2007 to recruit employees to transfer from there to Boeing's facility in Washington.  He personally recruited Plaintiff Monper, among other Long Beach employees.

154.    As alleged above, Defendant Small attended and presented at the job fair that Plaintiff Monper attended.  Defendant Irons made misleading statements to Plaintiff Monper about pension benefits in the context of Boeing's recruitment effort, and Defendant Small acquiesced in these statements, failing to correct misleading information, as follows:

A.    Defendant Small went to and presented at a job fair hosted by Boeing on the MDC premises in Long Beach in the autumn of 2007 where he recruited Plaintiff

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

Monper.  With Defendant Small were Defendants Gary Irons and Kim Martin.  In a conversation between Defendant Irons, Monper, and several others in attendance, Defendant Irons stated that the group of Long Beach employees being recruited would have "nothing to lose" by moving to the Seattle area, that their retirement benefits available in Long Beach, including early retirement benefits, would "not change or be affected," and that vacation time also would be secure.  Defendant Irons discussed how he would try to get the group into "flight test" and reiterated that they had "nothing to lose."  Defendant Small was listening to these statements and did not interject the truth or correct the misleading assurances that Defendant Irons made to recruits.  Instead, he stood idly by while misinformation was disseminated.

155.    Defendant Small was intent on recruiting Plaintiff Monper along with others on Boeing's behalf.

156.    As a recruiter, Defendant Small knew or should have known the *correct* information about the nature and amount of future pension benefits after the move.  He knew or should have known which plan Plaintiff Monper would be joining and how—or whether—dual accrual worked for that plan vis-à-vis the Hourly West Plan.  He did not disclose this information and instead he actively misled Plaintiff Monper by failing to correct misstatements or counsel Plaintiff Monper or others to seek out people to answer these questions who could give truthful information.

157.    Defendant Small knew or should have known that moving to a new work location with a new pension plan involved complex questions of how the two benefit plans would interface.

158.    Defendant Small knew or should have known the magnitude of the questions his co-recruiters were answering and the importance of early retirement benefits to the recruits.

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

159.     Defendant Small knew or should have known that the recruits were not yet in any new plan, so only could know the terms of their Hourly West Plan.  He knew or should have known that they would rely on what they were told as they made their decisions.

160.     Defendant Small stood idly by while Defendant Irons made affirmative statements and immediately answered Plaintiff Monper's and others' questions with confidence and while projecting knowledge and authority.  He observed that Defendant Irons did not project uncertainty or hesitation and was instead definitive and sure.  He knew or should have known that Plaintiff Monper would believe what Defendant Irons was saying.  Plaintiff Monper expected Defendant Small to know the correct information and to tell him the truth.

161.     In reality, Defendant Small either did not know what Irons was talking about or he was intentionally participating in misleading Plaintiff Monper.  Regardless, by standing there and acquiescing in everything that was said, he held himself out as knowledgeable about future pension benefits when he should not have.  He made no effort to deflect these questions, to indicate he was not sure of the truth, or that he (or others) needed to research the issue further before responding.  Defendant Small did not direct Plaintiff Monper to benefits, pension office, or human resources personnel who were tasked with such communications (but of course, had he done this, the misinformation would have been the same).  He did not direct Plaintiff Monper to the Employee Benefit Plans Committee for answers.

162.     By behaving in this manner, Defendant Small entered into the realm of discretionary fiduciary communications and conferred on himself functional fiduciary status by participating in communications on matters central to plan management and administration.

163.     Defendant Small's fiduciary status exists independently from his role as an agent of Boeing's, MDC's, the Committee's, or any other Defendant's fiduciary speech.  His fiduciary status arises from his own actions and omissions and does not depend on the fiduciary status of any other Defendant.

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

**5.    Defendant Cindy Cuto.**

164.    Defendant Cuto was, an employee of Defendant MDC with the title of Human Resources Representative at the time the fiduciary breaches alleged herein occurred.  On information and belief, Defendant Cuto was authorized by MDC and/or Boeing to (and did) assist in the recruitment and transfer of employees from the MDC facility in California to Boeing's facility in Washington.  In her role at MDC and/or Boeing, her entire focus was employee benefits and personnel matters.  She worked in Long Beach and personally was involved in recruiting and papering the transfer for Plaintiff Lynch, among other Long Beach employees, including as that process related to pension benefits.

165.    After Plaintiff Lynch was recruited by Defendants Irons and Query and received the assurances about his future pension benefits described above, he talked to Defendant Cuto, in part to verify what he already had been told:

A.    Defendant Cuto was Lynch's HR representative in Long Beach.  Lynch was required to meet with Cuto to sign his transfer paperwork.  Before he signed, he asked her confirm that his retirement benefits would not change, which she did confirm.  Consistent with what Plaintiff Lynch had by then heard from Defendants Irons and Query, as well as Defendant Doe 3, as alleged below, Defendant Cuto too said that Plaintiff Lynch's benefits would "continue to grow" under the Hourly West Plan.

166.    Defendant Cuto was, on information and belief, aware of and actively participating in Boeing's recruitment of Plaintiff Lynch and others.

167.    Given her position in the company—as a go-to person for human resources and employee benefits matters and the keeper of Lynch's transfer paperwork—Defendant Cuto knew or should have known the *correct* information about the nature and amount of future pension benefits after Plaintiff Lynch's move.  She knew or should have known which plan Plaintiff Lynch would be joining and how—or whether—dual accrual worked for that plan vis-à-vis the Hourly West Plan.  She did not disclose this information and instead she actively misled Plaintiff

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

Lynch by reassuring him with the same incorrect information he had already received.  She did not counsel Plaintiff Lynch to seek out people to answer these questions who could give truthful information.

168.    Defendant Cuto knew or should have known that moving to a new work location with a new pension plan involved complex questions of how the two benefit plans would interface.

169.    Defendant Cuto knew or should have known the magnitude of the questions she was answering and the importance of early retirement benefits to Plaintiff Lynch.

170.    Defendant Cuto knew or should have known that the recruits were not yet in any new plan, so only could know the terms of their Hourly West Plan.  She knew or should have known that Plaintiff Lynch would rely on what he was told as he made his transfer decision.

171.    Defendant Cuto immediately answered Plaintiff Lynch's questions with confidence and while projecting knowledge and authority.  She did not project uncertainty or hesitation and was instead definitive and sure.  She knew or should have known that Plaintiff Lynch would believe what she was saying.  Plaintiff Lynch expected Defendant Cuto to know the correct information and to tell him the truth.

172.    In reality, Defendant Cuto either did not know what she was talking about or she was intentionally participating in misleading Plaintiff Lynch.  Regardless, she held herself out as knowledgeable about future pension benefits when she should not have.  She made no effort to deflect these questions, to indicate she was not sure of the truth, or that she (or others) needed to research the issue further before responding.  Defendant Cuto did not direct Plaintiff Lynch to other benefits, pension office, or human resources personnel who were, like herself, tasked with such communications (but of course, had she done this, the misinformation would have been the same).  She did not direct Plaintiff Lynch to the Employee Benefit Plans Committee for answers.

173.    Defendant Cuto's actions were not "ministerial."

LAW OFFICES OF
KELLER ROHRBACK L.L.P.
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

174.     By behaving in this manner, Defendant Cuto entered into the realm of discretionary fiduciary communications and conferred on herself functional fiduciary status by participating in communications on matters central to plan management and administration.

175.     Defendant Cuto's fiduciary status exists independently from her role as an agent of Boeing's, MDC's, the Committee's, or any other Defendant's fiduciary speech.  Her fiduciary status arises from her own actions and omissions and does not depend on the fiduciary status of any other Defendant.

**6.     Defendant "Jane Doe 1."**

176.     Defendant Doe 1 was a Human Resources Representative or Employee Benefits Representative for Boeing and/or MDC, with a work location in or around Long Beach, California, at the time the fiduciary breaches alleged herein occurred.  On information and belief, Defendant Doe 1 worked in the pension office in "Building 54" in Long Beach.  The pension office is between bays 2 and 3 in Building 54.  On information and belief, Defendant Doe 1 was authorized by Boeing to (and did) assist in the recruitment and transfer of employees from the MDC facility in California to Boeing's facility in Washington as that process related to their benefits.  In her role at the pension office, her entire focus was employee benefits matters.  She was instructed to communicate about plan benefits to participants and answer questions.  She was supposed to provide accurate information.  She personally was involved in recruiting and papering the transfer for Plaintiff Veturis, among other Long Beach employees.

177.     The day after he received the transfer offer, Plaintiff Veturis visited Boeing's pension office in "Building 54" in Long Beach with his offer letter in hand:

A.     At the pension office, Veturis specifically inquired whether the move from California to Washington would affect his early retirement benefits in any way.  He was assured by Defendant Jane Doe 1 that his early retirement benefits would not be reduced or penalized under the Hourly West Plan and, specifically, that he would "not lose his 30 and out at 55" Unreduced Early Retirement benefits.  Defendant Doe 1 had a copy of the

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE
RETIREMENT INCOME SECURITY ACT - 65

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

Hourly West Plan Summary Plan Description (2006 Edition) on her desk, and she showed Veturis the section on Aggregate Benefit Service on pages 13 and 14.  She pointed to the list of plans for which years of service would also count toward Hourly West Plan benefits accrual.  Defendant Doe 1 explained that upon his move to Washington, Veturis would become a participant in The Pension Value Plan for Employees of The Boeing Company, and, therefore, he had nothing to worry about, because years of service accrued under that plan would be included in the calculation of Aggregate Benefit Service under the Hourly West Plan.  Defendant Doe 1 also told Veturis that he would have two plan benefits—one from the Hourly West Plan and another from this new plan in Washington.  She said that, while the money for each pension benefit would be "separate," the "time for [your] heritage benefit [*i.e.*, the Hourly West Plan] would be added, no problem, go and get your new job."

178.     Defendant Doe 1 was, on information and belief, aware of and actively participating in Boeing's recruitment of Plaintiff Veturis and others.

179.     Given her position in the company—as a go-to person for employee benefits matters who was confident enough to speak about Veturis's future benefits with great specificity—Defendant Doe 1 knew or should have known the *correct* information about the nature and amount of future pension benefits after Plaintiff Veturis moved.  She knew or should have known which plan Plaintiff Veturis would be joining and how—or whether—dual accrual worked for that plan vis-à-vis the Hourly West Plan.  She did not disclose this information and instead she actively misled Plaintiff Veturis by reassuring him that he would continue to accrue Aggregate Benefit Service under Hourly West Plan.  She voluntarily told him that he was going into the Pension Value Plan for Employees of The Boeing Company—a patently false statement at the time.  If Veturis had been a management or non-represented employee, he *would* have been put into the Pension Value Plan.  Defendant Doe 1 should have known the difference, given

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

how critical that fact was.  Defendant Doe 1 did not counsel Plaintiff Veturis to seek out people to answer these questions who could give truthful information.

180.    Defendant Doe 1 knew or should have known that moving to a new work location with a new pension plan involved complex questions of how the two benefit plans would interface.

181.    Defendant Doe 1 knew or should have known the magnitude of the questions she was answering and the importance of early retirement benefits to Plaintiff Veturis.

182.    Defendant Doe 1 knew or should have known that the recruits were not yet in any new plan, so only could know the terms of their Hourly West Plan.  She knew or should have known that Plaintiff Veturis would rely on what he was told as he made his transfer decision.

183.    Defendant Doe 1 immediately answered Plaintiff Veturis's questions with confidence and while projecting knowledge and authority.  She did not project uncertainty or hesitation and was instead definitive and sure.  She even showed Plaintiff Veturis relevant pages of his own then-current pension SPD.  In so doing, she *assured him that she knew which plan he was going into*, as she pointed to the Pension Value Plan for Employees of The Boeing Company—which was listed, in writing, in the Hourly West Plan SPD—saying this would be his new plan, under which his accrual would *also* count for the Hourly West Plan.  She knew or should have known that Plaintiff Veturis would believe what she was saying, particularly given the name of the plan she falsely promised Veturis he would join and its lack of limitation on work location—*i.e.*, the Pension Value Plan for Employees of The Boeing Company was listed in the SPD as being simply for employees *of Boeing* and was not limited to participation by employees of Boeing at heritage MDC locations such as Long Beach.  Nor did the Pension Value Plan's name reveal that it was limited to non-union and management employees.  Plaintiff Veturis expected Defendant Doe 1 to know the correct information and to tell him the truth.

184.    In reality, Defendant Doe 1 either did not know what she was talking about or she was intentionally participating in misleading Plaintiff Veturis.  Regardless, she held herself out

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

as knowledgeable about future pension benefits when she should not have.  She made no effort

to deflect these questions, to indicate she was not sure of the truth, or that she (or others) needed

to research the issue further before responding.  Defendant Doe 1 did not direct Plaintiff Veturis

to other benefits, pension office, or human resources personnel who were, like herself, tasked

with such communications (but of course, had she done this, the misinformation would have

been the same).  She did not direct Plaintiff Veturis to the Employee Benefit Plans Committee

for answers.

185.     Defendant Doe 1's actions were not "ministerial."

186.     By behaving in this manner, Defendant Doe 1 entered into the realm of

discretionary fiduciary communications and conferred on herself functional fiduciary status by

participating in communications on matters central to plan management and administration.

187.     Defendant Doe 1's fiduciary status exists independently from her role as an agent

of Boeing's, MDC's, the Committee's, or any other Defendant's fiduciary speech.  Her fiduciary

status arises from her own actions and omissions and does not depend on the fiduciary status of

any other Defendant.

### 7.     Defendant "Jane or John Doe 2."

188.     Defendant Doe 2 was an employee of Defendant MDC and/or Defendant Boeing

with the title of Employee Benefits Representative at the time the fiduciary breaches alleged

herein occurred.  On information and belief, Defendant Doe 2 worked for Boeing's TotalAccess

benefits line or its predecessor, and she or he was authorized by Boeing to (and did) assist in the

recruitment and transfer of employees from the MDC facility in California to Boeing's facility in

Washington as that process related to their benefits.  In her or his role on the benefits line,

Defendant Doe 2's entire purpose was to provide information about employee benefits.  She or

he was instructed to communicate about plan benefits to participants and answer questions, and

she or he was supposed to provide accurate information.  She or he personally was involved in

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1   recruiting and providing benefits-related information and answering benefits-related questions

2   prior to Plaintiff Monper's decision to transfer.

3   189.   After Plaintiff Monper was recruited by Defendants Irons, Martin, and Small and

4   received the assurances about his future pension benefits described above, he called the benefits

5   line and talked to Defendant Doe 2 to verify what he had been told at the job fair:

6   A.   Monper explained in his call to the Boeing benefits line that he was

7   considering transferring to Seattle and that he was curious about what his retirement

8   benefits would be.  He was told by Defendant Doe 2 that he would have the ability to

9   take early retirement after 30 years of service (and at 50 years of age) under the Hourly

10   West Plan with no penalties, that he would *continue to accrue* Aggregate Benefit Service

11   under the Hourly West Plan *after* his move, and that he would have a second pension

12   benefit he would accrue in Washington that would be reduced for early retirement.

13   190.   Defendant Doe 2 was, on information and belief, aware of and actively

14   participating in Boeing's recruitment of Plaintiff Monper and others.

15   191.   The purpose of Boeing's benefits line was to provide information about pension

16   and other employee benefits.  Given Defendant Doe 2's position in the company—as a go-to

17   person for employee benefits matters working on the benefits line—Defendant Doe 2 knew or

18   should have known the *correct* information about the nature and amount of future pension

19   benefits after Plaintiff Monper's move.  She or he knew or should have known which plan

20   Plaintiff Monper would be joining and how—or whether—dual accrual worked for that plan vis-

21   à-vis the Hourly West Plan.  Defendant Doe 2 did not disclose this information and instead

22   actively misled Plaintiff Monper by reassuring him with the same incorrect information he had

23   already received.  Defendant Doe 2 did not counsel Plaintiff Monper to seek out people to

24   answer these questions who could give truthful information.

25

26

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

192.    Defendant Doe 2 knew or should have known that moving to a new work location with a new pension plan involved complex questions of how the two benefit plans would interface.

193.    Defendant Doe 2 knew or should have known the magnitude of the questions she or he was answering and the importance of early retirement benefits to Plaintiff Monper.

194.    Defendant Doe 2 knew or should have known that the recruits were not yet in any new plan, so only could know the terms of their Hourly West Plan.  Defendant Doe 2 knew or should have known that Plaintiff Monper would rely on what he was told as he made his transfer decision.

195.    Defendant Doe 2 immediately answered Plaintiff Monper's questions with confidence and while projecting knowledge and authority.  Defendant Doe 2 did not project uncertainty or hesitation and was instead definitive and sure.  Defendant Doe 2 knew or should have known that Plaintiff Monper would believe what she or he was saying.  Plaintiff Monper expected Defendant Doe 2 to know the correct information and to tell him the truth.

196.    In reality, Defendant Doe 2 either did not know what she or he was talking about or was intentionally participating in misleading Plaintiff Monper.  Regardless, Defendant Doe 2 held her- or himself out as knowledgeable about future pension benefits when she or he should not have.  Defendant Doe 2 made no effort to deflect Plaintiff Monper's questions, to indicate she or he was not sure of the truth, or that she or he (or others) needed to research the issue further before responding.  Defendant Doe 2 did not direct Plaintiff Monper to other benefits, pension office, or human resources personnel who were similarly tasked with such communications (but of course, had she or he done this, the misinformation would have been the same).  Defendant Doe 2 did not direct Plaintiff Monper to the Employee Benefit Plans Committee for answers.

197.    Defendant Doe 2's actions were not "ministerial."

LAW OFFICES OF
KELLER ROHRBACK L.L.P.
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

198.    By behaving in this manner, Defendant Doe 2 entered into the realm of discretionary fiduciary communications and conferred on her- or himself functional fiduciary status by participating in communications on matters central to plan management and administration.

199.    Defendant Doe 2's fiduciary status exists independently from her or his role as an agent of Boeing's, MDC's, the Committee's, or any other Defendant's fiduciary speech.  Her or his fiduciary status arises from her or his own actions and omissions and does not depend on the fiduciary status of any other Defendant.

**8.      Defendant "Jane or John Doe 3."**

200.    Defendant Doe 3 was an employee of Defendant MDC and/or Defendant Boeing with the title of Employee Benefits Representative at the time the fiduciary breaches alleged herein occurred.  On information and belief, Defendant Doe 3 worked for Boeing's TotalAccess benefits line or its predecessor, and she or he was authorized by Boeing to (and did) assist in the recruitment and transfer of employees from the MDC facility in California to Boeing's facility in Washington as that process related to their benefits.  In her or his role on the benefits line, Defendant Doe 3's entire purpose was to provide information about employee benefits.  She or he was instructed to communicate about plan benefits to participants and answer questions, and she or he was supposed to provide accurate information.  She or he personally was involved in recruiting and providing benefits-related information and answering benefits-related questions prior to Plaintiff Lynch's decision to transfer.

201.    After Plaintiff Lynch was recruited by Defendants Irons and Query and received the assurances about his future pension benefits described above, he received a transfer package and called the benefits line to verify what he had been told at the job fair.  He talked to Defendant Doe 3:

A.      Lynch explained in his call to the Boeing benefits line that he was considering transferring to Seattle and that he was curious about what his retirement

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

benefits would be.  He was told by Defendant Doe 2 that his credited time and retirement benefits would continue to "build" under the Hourly West Plan after moving to Washington.  This confirmed what he had already been told by Defendants Irons and Query and was also consistent with what he later heard from Defendant Cuto.

202.    Defendant Doe 3 was, on information and belief, aware of and actively participating in Boeing's recruitment of Plaintiff Lynch and others.

203.    The purpose of Boeing's benefits line was to provide information about pension and other employee benefits.  Given Defendant Doe 3's position in the company—as a go-to person for employee benefits matters working on the benefits line—Defendant Doe 3 knew or should have known the *correct* information about the nature and amount of future pension benefits after Plaintiff Lynch's move.  She or he knew or should have known which plan Plaintiff Lynch would be joining and how—or whether—dual accrual worked for that plan vis-à-vis the Hourly West Plan. Defendant Doe 3 did not disclose this information and instead actively misled Plaintiff Lynch by reassuring him with the same incorrect information he had already received.  Defendant Doe 3 did not counsel Plaintiff Lynch to seek out people to answer these questions who could give truthful information.

204.    Defendant Doe 3 knew or should have known that moving to a new work location with a new pension plan involved complex questions of how the two benefit plans would interface.

205.    Defendant Doe 3 knew or should have known the magnitude of the questions she or he was answering and the importance of early retirement benefits to Plaintiff Lynch.

206.    Defendant Doe 3 knew or should have known that the recruits were not yet in any new plan, so only could know the terms of their Hourly West Plan.  Defendant Doe 3 knew or should have known that Plaintiff Lynch would rely on what he was told as he made his transfer decision.

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

207.     Defendant Doe 3 immediately answered Plaintiff Lynch's questions with confidence and while projecting knowledge and authority.  Defendant Doe 3 did not project uncertainty or hesitation and was instead definitive and sure.  Defendant Doe 3 knew or should have known that Plaintiff Lynch would believe what she or he was saying.  Plaintiff Lynch expected Defendant Doe 3 to know the correct information and to tell him the truth.

208.     In reality, Defendant Doe 3 either did not know what she or he was talking about or was intentionally participating in misleading Plaintiff Lynch.  Regardless, Defendant Doe 3 held her- or himself out as knowledgeable about future pension benefits when she or he should not have.  Defendant Doe 3 made no effort to deflect Plaintiff Lynch's questions, to indicate she or he was not sure of the truth, or that she or he (or others) needed to research the issue further before responding.  Defendant Doe 3 did not direct Plaintiff Lynch to other benefits, pension office, or human resources personnel who were similarly tasked with such communications (but of course, had she or he done this, the misinformation would have been the same).  Defendant Doe 3 did not direct Plaintiff Lynch to the Employee Benefit Plans Committee for answers.

209.     Defendant Doe 3's actions were not "ministerial."

210.     By behaving in this manner, Defendant Doe 3 entered into the realm of discretionary fiduciary communications and conferred on her- or himself functional fiduciary status by participating in communications on matters central to plan management and administration.

211.     Defendant Doe 3's fiduciary status exists independently from her or his role as an agent of Boeing's, MDC's, the Committee's, or any other Defendant's fiduciary speech.  Her or his fiduciary status arises from her or his own actions and omissions and does not depend on the fiduciary status of any other Defendant.

**F.     The Director Defendants' Fiduciary Status.**

212.     The Hourly West Plan and BCERP grant the Director Defendants the authority and fiduciary responsibility to appoint the Employee Benefit Plans Committee members.  As

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

such, the Director Defendants are indisputably both named and functional fiduciaries, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), of both the Hourly West Plan and the BCERP.

213.   As appointment fiduciaries, the Director Defendants also have monitoring responsibilities to regularly review and ensure that appointees are doing their jobs, and if not, to remove them.

214.   The Director Defendants failed to monitor their appointees who had responsibility to ensure that fiduciary communications were accurate and truthful.

215.   Further, the Board of Directors served as one of the human counterparts to Defendant Boeing.  To this end, the Director Defendants share the same role and responsibilities to the Plans as Defendant Boeing with regard to assuming responsibility for fiduciary communications in the context of recruitment efforts made on behalf of the company.

**G.     Defendants Jane or John Doe 4-10's Fiduciary Status.**

216.   Doe Defendants 4-10 were responsible for supervising or training Doe Defendants 1, 2, and 3, as well as Defendant Cindy Cuto, to the extent that these duties were performed by individuals *outside* of the Employee Benefit Plans Committee or *together with* the Employee Benefit Plans Committee.

217.   Doe Defendants 4-10 oversaw the operations of the "pension office" in "Building 54," the TotalAccess benefits line and its predecessor, as well as human resources representative Cindy Cuto.  One of the responsibilities of the Doe Defendants 4-10 was to ensure that pension and benefits information given to employees in the context of job transfers for which they were recruited by the company was correct.  In their role as supervisors or trainers of employees in the pension office, human resources department, and on the benefits line, it was the responsibility of the Doe Defendants 4-10 to communicate about plan benefits to participants and ensure the accuracy of any affirmative representations and answers to questions provided to plan participants.

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

218.    The Doe Defendants 4-10 knew or should have known which plan Plaintiffs Monper, Lynch, and Veturis would be joining and how—or whether—dual accrual worked for that plan vis-à-vis the Hourly West Plan. They failed to ensure that correct information was given and failed to prevent Plaintiffs from being actively misled.

219.    The Doe Defendants 4-10 had responsibility for and performed fiduciary functions relating to communicating with participants about their benefits during the time period relevant to the claims pleaded herein.

220.    The Doe Defendants 4-10 were under the direction and supervision of Boeing, MDC, and/or the Committee Defendants. But whether or not they were told exactly what to say about benefits by Boeing, MDC, or the Committee Defendants, their actions and failures to act independently confer functional fiduciary status, because they were holding themselves and their direct reports out as knowledgeable on the topic of benefits in the particular context of recruiting described herein.

221.    Though not "named fiduciaries," the Doe Defendants 4-10 acquired functional fiduciary status by inserting themselves and their direct reports into conversations that entailed core discretionary fiduciary functions of plan management and administration: communicating to participants about the future of plan benefits in the context of Boeing's recruitment efforts, where (a) *Boeing had initiated* recruitment conversations and job offers, the benefits implications of which Plaintiffs sought to confirm and verify, (b) the future benefits questions posed were *complex* and involved *more than one plan*—one of which Plaintiffs had no knowledge about because they were not yet participants in it, (c) the *stakes were high*, and/or (d) Plaintiffs would be making *important employment decisions that would negatively impact their future pension benefits*. By their participation and acquiescence in statements made by others to Plaintiffs, each of the Doe Defendants 4-10 acquired fiduciary status for the purpose of fiduciary communications about future pension benefits. They failed to ensure that Plaintiffs were told the truth.

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

222.     As alleged above, Boeing and MDC employees were routinely encouraged to seek out information on employee benefits from the benefits line, the pension office, and human resources representatives.  These resources were and are touted as an authoritative source for benefits information.  If participants cannot rely on them for accurate information, it is unclear where else they could possibly turn.  When Plaintiffs went to Defendants Cuto, Doe 1, Doe 2, and Doe 3 for answers, they *expected* these people to know which plan they would be joining and after they received definitive (but wrong) answers, they justifiably concluded that the people they had talked to had this information and had correctly communicated it.

223.     Not only were they in charge of the clearinghouses for pension benefits information, the role of the Doe Defendants 4-10 under the facts alleged here went beyond what could be described as a "ministerial" function.  The inquiries that the Doe Defendants 4-10 and their staff undertook and answered were not simple calculations, explanations of benefit terms under a single plan, or other similar typically ministerial tasks.  Rather, in the situation described here, they and the people they supervised used discretion and chose to participate in matters of plan management and administration.  Once they took that step, they became fiduciary communicators.

224.     For these reasons, each of the Doe Defendants 4-10 is a functional fiduciary within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), of both the Hourly West Plan and the BCERP.

**H.     Defendant Scott M. Buchanan's Fiduciary Status.**

225.     Defendant Scott M. Buchanan was the Director of Benefits Delivery for The Boeing Company and a plan fiduciary, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), of both the Hourly West Plan and the BCERP.  On information and belief, Defendant Buchanan held the same position at the company when the fiduciary breaches alleged herein occurred.  On information and belief, as the Director of Benefits Delivery and designated "plan administrator" who signs the IRS Forms 5500 for the plans at issue here, he was

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

responsible for compliance with ERISA and fiduciary communications.  Further, as the Director of Benefits Delivery, Defendant Buchanan oversaw the managers of the Shared Services Group's Pension Operations group, which, on information and belief, performed fiduciary functions of plan administration through contracts between Boeing and the Committee. Pursuant to the Committee's "Memorandum No. 545," which was the first formal delegation-related document ever produced to Plaintiffs in this litigation, on June 3, 2016, Defendant Buchanan was a formal delegee of the Committee with fiduciary responsibility for certain day-to-day administration functions, which encompass communications with participants about their benefits, maintenance of records, handling benefits claims, negotiating vendor and service provider contracts (including for TotalAccess), making periodic reports to the Committee, and performing other day-to-day plan administration functions.  He was the Committee's formal delegee, for the title "Director – Benefits Delivery" (or variations thereof as his title changed), between 2003 and 2016. He is liable for the breaches of his co-fiduciaries because he knew or should have known about them given his role. Plaintiffs were not aware of any formal delegation of fiduciary authority until Defendants provided written discovery responses and produced relevant documents starting on June 3, 2016 and continuing into mid-July 2016. Defendants' counsel revealed for the first time on June 14, 2016 that Defendant Buchanan is in fact one of the fiduciary delegees referenced in "Memorandum No. 545." On June 30, 2016, they confirmed the time period of his involvement (2003-2016).

**I.      Defendant Myra Elliot's Fiduciary Status.**

226.      Defendant Myra Elliot was the Shared Services Group Vice President of Employee Services throughout 2007 and 2008 for The Boeing Company and a plan fiduciary, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), of both the Hourly West Plan and the BCERP.  On information and belief, Defendant Elliot held this position at the company when the fiduciary breaches alleged herein occurred. On information and belief, as the Vice President of Employee Services she was responsible for compliance with ERISA and

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

fiduciary communications. Further, as the Vice President of Employee Services, Defendant Elliot oversaw the Director of Benefits Delivery, who in turn oversaw the managers of the Shared Services Group's Pension Operations group. Pursuant to the Committee's "Memorandum No. 545," which was the first formal delegation-related document ever produced to Plaintiffs in this litigation, on June 3, 2016, Defendant Elliot was a formal delegee of the Committee with fiduciary responsibility for certain day-to-day administration functions, which encompass communications with participants about their benefits, maintenance of records, handling benefits claims, negotiating vendor and service provider contracts (including for TotalAccess), making periodic reports to the Committee, and performing other day-to-day plan administration functions.  She was the Committee's formal delegee, for the title "Vice President – Employee Services," in 2007 and 2008. She is liable for the breaches of her co-fiduciaries because she knew or should have known about them given her role. Plaintiffs were not aware of any formal delegation of fiduciary authority until Defendants provided written discovery responses and produced relevant documents starting on June 3, 2016 and continuing into mid-July 2016. At a Rule 30(b)(6) deposition of the Employee Benefit Plans Committee, Defendants revealed for the first time on June 22, 2016 that Defendant Elliot is in fact one of the delegees referenced in "Memorandum No. 545." Defendants' counsel later confirmed that fact and the time period of her involvement (2007-2008) on June 30, 2016.

**J.     All Defendants' Fiduciary Status Exists Independently.**

227.     As outlined above, *each* of the Defendants was a fiduciary with respect to one or both of the plans at issue here and owed fiduciary duties to those plans and the those plans' participants under ERISA in the manner and to the extent set forth in the plan documents, through their conduct, and/or under ERISA.

228.     Plaintiffs do not allege that each Defendant was a fiduciary with respect to all aspects of the plans' management and administration.  Rather, as set forth above, Defendants were fiduciaries to the extent of the specific fiduciary discretion and authority assigned to *or*

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

*exercised by* each of them and, as further set forth above, the claims against each Defendant are based on such specific discretion, authority, and/or actions taken by them in the capacity of managers or administrators of the plans.

229.     Whether the Defendants were granted a realm of fiduciary capacity in a formal designation or assumed fiduciary capacity through their actions in exercising fiduciary communication functions, they all were capable of operating in a fiduciary role for the purposes of communication about future benefits.

230.     Some Defendants here are alleged to be named fiduciaries who also performed fiduciary communication functions.  Some Defendants are alleged to be functional fiduciaries only, because they exercised discretion in fiduciary communication functions.  Some Defendants are alleged to be fiduciaries for multiple factual reasons, each of which *separately* confer fiduciary status.  No Defendant's fiduciary status depends on the fiduciary status of any other Defendant and instead exists independently, based on each Defendant's acts and omissions as alleged herein.

## VI.   FACTS BEARING ON FIDUCIARY BREACH AND LOSSES

**A.    Plaintiff Gene R. Monper Was Induced to Transfer to a New Position at Boeing in a New City through Promises that His Early Retirement Benefits would not Change or Be Reduced.**

### 1.    Monper's Employment and Plan Participation.

231.     Plaintiff Monper started working for McDonnell Douglas Corporation on January 13, 1986.  His work location was in Long Beach, California, where he remained until February of 2008, at which time he transferred to the Seattle, Washington area.  Monper's title in his final position in Long Beach was K2A Aircraft Assembly Mechanic.  He worked on the Boeing C-17. From 1986 to 2008, Monper built his life in California, and he still has family there.  When he moved to Washington, Monper was a single father and he left his teenaged son with his mother, left his house, left his elderly parents, and left many friends and family members behind.

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

232.    As an employee of McDonnell Douglas, Monper became a participant in the Hourly West Plan, as a member of UAW 148.

233.    After he was recruited to transfer from Boeing's MDC subsidiary location in Long Beach, California to another Boeing facility in Washington, Monper accepted a voluntary job transfer offer to a new position in the Seattle area and began working there in February of 2008. In his new position as an aviation maintenance technician and inspector in flight tests, he is a member of IAM 751.

234.    As of February 8, 2008, Monper also became a participant in the BCERP.

**2.    Monper's Job Fair Attendance and Transfer.**

235.    In the autumn of 2007, Monper received an invitation from management to attend a job fair hosted by Boeing. Monper attended the job fair to learn more about potential opportunities. No layoffs had been threatened. Rather, this was a recruiting event put on by management to entice employees in Long Beach to voluntarily move to Seattle, where Boeing was in need of additional experienced skilled mechanics and other personnel to work on the 787 Dreamliner flight test team. Boeing representatives articulated at the job fair that the 787 Dreamliner was approximately two years behind schedule and that the teams in the Seattle area needed the experience of Long Beach employees on the aircraft. They anticipated work on this project to last a minimum of 8 to 10 years. In return for transferring, Boeing would pay for all moving expenses and up to 30 days in housing, with no loss in pay rate.

236.    Approximately 20 to 30 Long Beach Boeing and/or MDC employees attended the same job fair that Monper attended. The event lasted about two hours. It was on the MDC premises in Long Beach during work hours.

237.    Several managers from Boeing's Seattle area facilities presented information about job opportunities in and around Seattle. The presentations were both to the attendee group as a whole and in sidebar conversations. At least three Boeing employees from Seattle were in Long Beach for this recruiting event.

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

238.    Defendant Gary Irons was one of the managers presenting.  Defendant Kim
Martin also participated in the presentation, along with Defendant Tommy Small.  In a
conversation between Irons, Monper, and several others in attendance, Defendant Irons stated
that the group of Long Beach employees being recruited would have "nothing to lose" by
moving to the Seattle area, that their retirement benefits available in Long Beach, including early
retirement benefits, would "not change or be affected," and that vacation time also would be
secure.  Defendant Irons discussed how he would try to get the group into "flight test" and
reiterated that they had "nothing to lose."  Recruits were also assured that health benefits would
"not change or be affected."  When Defendant Irons spoke, neither Defendant Martin nor
Defendant Small corrected his false statements, though they were standing right there listening.

239.    Monper's primary concern in considering whether to accept a new job was what
effect a transfer might have on his ability to take early retirement and the amount of those
benefits.  Therefore, he sought confirmation that the benefits he expected would not change.  He
called Boeing's benefits line[16] a few days after the job fair.

240.    Monper explained in his call to the Boeing benefits line that he was considering
transferring to Seattle and that he was curious about what his retirement benefits would be.  He
was told by Defendant Doe 2 that he would have the ability to take early retirement after 30
years of service (and at 50 years of age) under the Hourly West Plan with no penalties, that he
would *continue to accrue* Aggregate Benefit Service under the Hourly West Plan *after* his move,
and that he would have a second pension benefit he would accrue in Washington that would be
reduced for early retirement.  Whether his time in Washington would continue to accrue under
the terms of the Hourly West Plan was vitally important to his ability to take Unreduced Early
Retirement benefits at age 55.

---

[16] It appears that Boeing has unable to retrieve information regarding this call, whether it was to TotalAccess or
another department.

LAW OFFICES OF
KELLER ROHRBACK L.L.P.
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

241.    Based on his conversations with Defendants Irons, Martin, and Small at the job fair and with Defendant Doe 2 on the Boeing benefits line, Monper accepted the job offer to transfer from California to Washington.

**3.    Monper's Early Retirement Benefits Under the Terms of the Hourly West Plan Will Be Significantly Reduced Because He Transferred to the Seattle Area.**

242.    As it turned out, Monper had been misinformed and his future accrual rights (other than to his vested, accrued benefits) under the Hourly West plan ceased upon his transfer. Because he does not (and will not) have 30 years of Aggregate Benefit Service under the Hourly West Plan, he is not entitled to Unreduced Early Retirement Benefits; nor will he be entitled to an Early Retirement Supplement.  Had Monper not been misinformed, he would not have agreed to the transfer.

243.    The difference between the pension benefits upon early retirement to which Monper is now entitled and the benefits to which he would have been entitled had he received accurate and truthful information—and thus never transferred to Seattle—is considerable.

244.    Monper is currently 53 years old.  He will be eligible for Early Retirement under the terms of the Hourly West Plan in approximately two more years, when he reaches age 55. According to Boeing plan records, Monper has 22.5034 years of "Aggregate Benefit Service" and 22.3334 of "Total Benefit Service" as a participant in the Hourly West Plan.  Because the number for Aggregate Benefit Service is less than 30, Monper is not eligible for an Unreduced Early Retirement Benefit under the Hourly West Plan.  Accordingly, after his Monthly Benefit is calculated at Normal Retirement Age (age 65), his benefits for an age 55 early retirement will be subject to an Early Retirement Reduction Factor of 58%.

245.    According to Boeing plan records and the current terms of the Hourly West Plan, Monper's Benefit Rate will be $81.00.  Multiplied by his current 22.3334 years of "Total Benefit Service," Monper's Monthly Benefit at Normal Retirement Age from the Hourly West Plan is

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

projected to be $1,809.01.  At age 55, the benefit will be $1,049.23 after applying the 6% per year reduction.

246.    By not having credit for at least 30 years of Aggregate Benefit Service, and using 22.3334 years for the calculations, Monper is losing *at least* $759.78 in benefits (due to the Reduction Factor), as well as the $550 ERS.  Together this is a loss of at least $1,309.78 per month.

247.    Under the terms of the Hourly West Plan, Monper is not entitled to anything more than a Reduced benefit with no ERS if he retires at age 55 as he plans to do.

248.    Regardless of the proper method of calculating losses,[17] each of the following examples demonstrates a significant loss in benefits to Monper caused by Defendants' misrepresentations that induced him to transfer from California to Washington:

A.    Using Monper's actual years of service in the Hourly West Plan, but calculating his benefits as Unreduced and with the ERS he was expecting, he faces significant losses.  With 22.3334 years of Total Benefit Service, his Monthly Benefit at Normal Retirement Age is projected to be $1,809.01.  Adding the $550 ERS thereto makes his benefit $2,359.01.  Compared to his current estimated Monthly Benefit of $1,049.23, this is a loss of $1,309.78, or about 56% of the Unreduced and supplemental benefits available under the Hourly West Plan.

B.    Assuming exactly 30 years of Aggregate Benefit Service under the Hourly West Plan to deem compliance with the Hourly West Plan's terms, multiplied by $81.00, Monper would be entitled to a Normal Retirement Age benefit of $2,430.  Taking into account the additional $550 ERS he also would be entitled to with 30 years of Aggregate Benefit Service, the difference between $2,980.00 and his current estimated Monthly

---

[17] Plaintiffs reserve all rights to seek the most advantageous calculation of losses allowed in equity to make right the fiduciary breaches alleged here.  These examples are presented for illustrative purposes only and to demonstrate that by a multitude of logical measures, Plaintiffs' losses are substantial.

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE
RETIREMENT INCOME SECURITY ACT - 83

LAW OFFICES OF
KELLER ROHRBACK L.L.P.
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

Benefit of $1,049.23 is staggering—a loss of $1,930.77 per month, or about 65% of the Unreduced and supplemental benefits available under the Hourly West Plan.

C.     Monper had over 22 years in the Hourly West Plan when he left.  If he had stayed there and worked until he turns 55 in 2018, his total years of service would have been almost 33.  At this level, his Normal Retirement Age benefit would be approximately $2,673.00.  Adding the $550 ERS, his Hourly West Plan benefits would total $3,223.00.  The difference between that and the current estimated Monthly Benefit of $1,049.23 is even greater—a loss of $2,173.77 per month, or about 67% of the Unreduced and supplemental benefits available under the Hourly West Plan.

249.    Monper is also a participant in the BCERP.  Since his move to Seattle, he has been accruing benefits under that plan.  When he retires, he will have a benefit from the Hourly West Plan and an additional benefit from the BCERP.  While a detailed loss analysis will be appropriate at a later stage in the litigation, even taking into consideration the BCERP benefits to which Monper would be entitled if retiring at age 55, he will face significant losses in his total benefits because he must take a Reduced Early Retirement Benefit under the terms of the Hourly West Plan, and he will not be entitled to the Hourly West Plan's ERS.

**4.     Monper Detrimentally Relied on Defendants' Misrepresentations Regarding Available Benefits.**

250.    When he made the decision to move, Monper was relying on the false assurances from Defendants described above that his retirement benefits would not take a hit.  Only several years later did he discover he had been repeatedly misled and would face a significant reduction in available benefits under the terms of his retirement plans.

251.    Monper never would have left Long Beach if he had known that his Early Retirement Benefits would be negatively impacted by the move.  Specifically, had Monper known that his years of Aggregate Benefit Service would *stop* accruing under the Hourly West Plan once he moved to Seattle and that he would be forced to take a *Reduced* Early Retirement benefit from the Hourly West Plan, *without* an ERS, he would not have moved.

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

252.     Not only has Monper's ability to retire early with the full level of benefits he was promised and expected to receive based on Defendants' misrepresentations been eliminated, he has uprooted his life, moved to a new city and state, and left family behind in California—all to his further detriment.  As one of Monper's letters to Boeing Pension Operations shortly after he discovered in 2011 that he had been misled stated: "I could have stayed right [where] I was at and retired in 4 years with no penalties according to the Boeing pension specialist I talked to.  I've been a single dad for 13 years and I left my boy behind with his mom.  I have two elderly parents, a home, family, Friends, and the sunshine!!  I left all that for what!  To take a 50 percent hit on retirement… I DON'T THINK SO!!!!"

**5.     Monper Discovered His Benefits Would be Cut and Filed a Futile Claim and Appeal.**

253.     Monper had been working in Seattle for several years—completely unaware of the adverse benefits consequences of his transfer—when he learned that he had been misled at the 2007 job fair.

254.     In January of 2011, Monper had several phone conversations with representatives of Boeing TotalAccess, which is the current phone line that handles pension questions for Boeing.  Monper originally contacted TotalAccess with a question about credited service due to overtime he had worked at McDonnell Douglas before Boeing bought it out.  In the course of these phone calls, Monper inquired about his early retirement benefits under the Hourly West Plan and the BCERP, seeking to determine the amounts of his anticipated monthly benefits checks.  The answers he received were consistent with what he had been told in 2007 before he accepted the transfer from California to Washington.  Specifically, on January 13, 2011 and January 20, 2011, Monper was told that he would be able to receive an Unreduced Benefit under the Hourly West Plan in four more years, because by then he would have 30 years of Aggregate Benefit Service under the Hourly West Plan's terms.  Explaining his entitlement to two different benefits, a TotalAccess representative also told Monper that the "heritage portion"—*i.e.*, his

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

Hourly West Plan benefit—"would be unreduced once you reach the 30 year[s] of benefit service."

255.    Monper called back again on January 25, 2011 to find out the exact dollar amounts he could expect in early retirement.  On January 25, 2011, as well as in later calls in February 2011, he was told that what he had been promised in 2007, as well as on the two prior calls in January of 2011, was not in fact correct.  This is the *first* time Monper was told that his Hourly West Plan benefits would be Reduced if he retired at 55, regardless of how long he planned to work at Boeing in Washington.

256.    Monper wrote to Defendant Kim Martin in April of 2011, requesting her assistance.  He wrote: "I would have never left the C-17 had I been told I would take a 42% hit on my retirement.  I've spent over 25 years with Boeing, and this is what I get!  This must be a mistake, there is no way that Boeing would take 42% of my retirement after 30 years of service. Would they?"  Monper copied Defendant Irons on this email.

257.    Defendant Martin claimed to have "absolutely no familiarity with any" of Boeing's pension plans and referred him elsewhere, but said she "totally" remembered Monper and said, "Call me if you get stuck."

258.    Monper filed a formal claim on or about May 13, 2011.  He described the 2007 job fair and his subsequent call to the benefits line before accepting the job transfer.  In both conversations he had been assured that his Hourly West Plan benefits would not be affected and that he could take them Unreduced.  He noted that once he learned the truth—*i.e.* in 2011—it was too late: "If this had been disclosed prior to me accepting this position; I would have never left California and the C-17, and still [would] be employed."

259.    Rudy C. Coffman had been Monper's senior manager in Long Beach; when Monper transferred to Seattle, Coffman was Monper's senior manager of flight tests.  After having met once previously (in the spring of 2011) with Coffman to discuss his concerns about having been misled about his early retirement benefits, Monper wrote Coffman an email on June

LAW OFFICES OF
KELLER ROHRBACK L.L.P.
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1, 2011 to request another appointment.  Monper asked that Defendant Gary Irons be included.  Monper also asked that Plaintiff Lynch be included in this second meeting, because Monper knew that Lynch also had been told that his early retirement benefits would not be reduced or penalized if he moved to Seattle from Long Beach.  Monper copied Larry L. Olguin (a director of flight tests) and Susan L. Abbott (Director of HR), on this email.  Olguin wrote back to say "Please let HR work the issue.  They are the experts and should be the ones working it.  Meeting with Rudy will not get an answer any faster.  Please be patient as this issue is not an easy one."  The meeting never happened.

260.   Two days later, on June 3, 2011, The Boeing Company Pension Operations office sent Monper a letter notifying Monper that he "will not earn any further benefit service/aggregate service toward the [Hourly West Plan] benefit while employed as an IAM 751 represented employee under the [BCERP]."  The letter explained that "[a]ssuming you remain an IAM 751 represented employee until you retire, your aggregate benefit service will not increase."  The letter stated that Monper's early retirement under the Hourly West Plan therefore would be reduced by 42% if he retired at age 55, and that he would have a separate reduced benefit under the BCERP.  The letter asserted that because the BCERP is not "maintained by [McDonnell Douglas]," the years of service under the BCERP would not count toward the Hourly West Plan benefit formula.

261.   Acknowledging that incorrect information had been communicated to Monper, on June 8, 2011, Boeing employee Jon James wrote in an email to Cecilia L. Burian (Employee Benefit Specialist, Boeing Pension Operations) that "As a result of Mr. Monper's escalation, we did conduct 50/30 refresher training and made some improvements to our Plan FAQs in the 50/30 sections."

262.   In a letter dated August 11, 2011 from Burian, Monper's claim was denied.  The claim denial letter explains that under the terms of the Hourly West Plan, Monper had 22.5034 years of Aggregate Benefit Service, and that when he transferred to the BCERP on February 8,

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

2008, he no longer continued to accrue Aggregate Benefit Service toward his Hourly West Plan benefit. Specifically, under the terms of the Hourly West Plan, the letter said that Monper could not have his benefit service under the BCERP included toward his Aggregate Benefit Service under the Hourly West Plan, because the BCERP is not "one of the defined benefit plans that were maintained by McDonnell Douglas Corporation which accrues aggregate benefit service."

263.    Monper appealed his claim denial on September 9, 2011, noting that had he been put into the Pension Value Plan for Employees of The Boeing Company—a plan that was *not* maintained by McDonnell Douglas—he would have been able to keep accruing Aggregate Benefit Service under the Hourly West Plan. By then, he said, it was clear to Monper that the Boeing employees who had recruited him and others had gotten the retirement plans "mixed up," leading them to provide grossly incorrect information to a group of Hourly West Plan participants in Long Beach who would only discover the truth after it was too late.

264.    Monper's appeal letter clearly stated that he never would have left Long Beach had he known that his early retirement benefits would be severely curtailed. He summed up his appeal by saying, "We all just want what is fair and what we agreed to. For the company to penalize me for these errors after I helped the company on a critical program, at a critical time, is not only unfair it's unethical." Demonstrating his detrimental reliance, he added, "I can only make life choices from what I am told, and assume that the information that I receive is correct coming from people that are suppose[d] to be specialist[s]."

265.    Monper's appeal languished with Boeing's Employee Benefit Plans Committee for months longer than the plan claim and appeal procedure allowed. Though a "claim for benefits" under the terms of the Hourly West Plan cannot provide Monper with the benefits he was promised in 2007, Boeing's violation of its own plan claim and appeal rules added insult to injury.

266.    Finally, Boeing's Employee Benefit Plans Committee denied Monper's appeal in a document entitled "Memorandum No. 1588" and dated May 3, 2012. The fundamental issue

LAW OFFICES OF
KELLER ROHRBACK L.L.P.
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

the committee considered was "whether Mr. Monper is entitled to an unreduced benefit at age 55 under the Hourly West Plan portion of his benefit."  The committee acknowledged that Monper had been "misinformed" and received "incorrect information" provided "over the course of several confusing calls" in 2011, but stated that because Monper had not attained 30 years of Aggregate Benefit Service under the terms of the Hourly West Plan, his appeal had to be denied.

267.    On June 4, 2012, Monper received a letter noting that his appeal had been denied by the Employee Benefit Plans Committee, attaching a copy of the May 3, 2012 Memorandum No. 1588.

6.    **Because Monper is Not Entitled to Unreduced Early Retirement Benefits or the ERS Under the Terms of the Hourly West Plan, Equity Demands that He Be Made Whole for Being Misled.**

268.    Under the clear terms of the Hourly West Plan, what Boeing and certain Direct Communication Defendants had promised Monper was not possible.  Frustrated by this, Monper reached out to Raymond L. Conner (Executive Vice President of The Boeing Company and President and CEO of Boeing Commercial Airplanes), Defendant Rick Stephens (Senior Vice-President of Human Resources and Administration), and Julie-Ellen B. Acosta (Vice-President of Human Resources and Administration) on November 26, 2012 to seek an equitable solution.  He was assured in response from Conner the next day that the group "will give this our utmost attention" and "get to the bottom of this situation."

269.    Monper requested and was granted a meeting on April 5, 2013 with Acosta and Sonya Bell (Boeing Commercial Airplanes HR Chief of Staff).  This meeting was also to include Plaintiff Lynch.  Boeing's HR department sent an email invitation to Lynch for the meeting, but, only hours before the meeting was to occur, the HR department un-invited Lynch.  Monper went ahead with the meeting.

270.    Acosta and Bell told Monper in the April 5, 2013 meeting that due to the misinformation he and others in Long Beach had received about their eligibility for Unreduced post-transfer Early Retirement Benefits under the Hourly West Plan, Boeing had changed its

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

recruiting and information provision process to avoid future misrepresentations such as the ones

that in 2007 had induced Monper and others to move from California to Washington.

Specifically, Boeing made the following changes: (a) Boeing now always has pension

representatives at job recruitment fairs; (b) Transferring employees are required to sign that they

understand and accept any benefits changes; and (c) TotalAccess has been given a refresher

course on 30/50 early retirement benefits.

271.    Despite this acknowledgement, Defendants refused to honor the promises they

made, as described above, that Monper would be eligible for Unreduced Early Retirement

benefits and the ERS under the Hourly West Plan by adding accrued benefit service in the Seattle

area to the years accrued in Long Beach.

272.    In their meeting, Acosta also conveyed that Monper and others were being denied

the benefits they had been promised because Boeing "didn't want to set a precedent."  Acosta

acknowledged that Boeing was aware of a total of at least *fourteen* individuals who had

transferred from Long Beach around the same time and were in a situation similar to Monper's.

Boeing personnel admitted to Monper that false statements had been made and they knew that

the group of fourteen had been misled about the impact on the value and calculation of their

Hourly West Plan Early Retirement benefits once they were transferred to the Seattle area.  They

knew that the recruited individuals did not understand this negative impact on their benefits at

the time they were induced to transfer.  Yet Boeing and other fiduciaries refused—and still

refuse—to do anything about it.

273.    On April 8, 2013, after Monper met with Acosta and Bell on April 5, 2013,

Acosta sent Monper an email saying that the "letter you have from the benefits committee

contains how your retirement benefits will pay out and when.  The letter is the official

correspondence and position on this subject."  She continued, "there are strict laws that govern

the various pension plans.  It is my understanding that this is the final position of the company on

this matter."

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

274.     On April 15, 2013, Monper wrote to Anthony M. Parasida (who is, on information and belief, in the same position that Defendant Rick Stephens had been in before his retirement) and copied Acosta.  He relayed the changes that had been made and the information about Boeing's and other fiduciaries' knowledge that fourteen employees had been misled and induced to transfer with false promises.

275.     In response, Parasida curtly replied that the issue was "thoroughly reviewed" and is now "closed."  He finished with "Thank you for all you do for our company."

276.     Monper's only recourse to remedy the harm caused by Defendants is this lawsuit.

277.     As Acosta put it, there are "strict laws" indeed.  Under ERISA, fiduciaries cannot promise benefits to participants to induce them to materially change their position by transferring to a new job, and then pull the benefits rug out from under them after the participants have detrimentally relied on those very promises.  The remedy for this conduct is found outside a "claim for benefits."

**B.     Plaintiff Brett A. Lynch Was Induced to Transfer to a New Position at Boeing in a New City through Promises that His Early Retirement Benefits would not Change or Be Reduced**

**1.     Lynch's Employment and Plan Participation.**

278.     Plaintiff Lynch started working for McDonnell Douglas Corporation on March 3, 1986.  His work location was in Long Beach, California, where he remained until February of 2008, at which time he transferred to Seattle, Washington.  Lynch's title in his final position in Long Beach was K4G3 Field & Service Mechanic.  Lynch worked on both commercial and military planes during his tenure in Long Beach, and when he transferred from Long Beach to Seattle, he was working on the Boeing C-17.  From 1986 to 2008, Lynch built his life in California, and he still has family there.  When he moved to Washington, he left his elderly parents, his daughter, and many friends and family members.

279.     As an employee of McDonnell Douglas, Lynch became a participant in the Hourly West Plan, as a member of UAW 148.

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

280.     After he was recruited to transfer from Long Beach, California to another Boeing facility in Washington, Lynch accepted a voluntary job transfer offer to a new position in the Seattle, Washington area and began working there in February of 2008.  In his new position, he is a flight test mechanic and is a member of IAM 751.

281.     As of February 1, 2008, Lynch also became a participant in the BCERP.

**2.     Lynch's Job Fair Attendance and Transfer.**

282.     Like Plaintiff Monper, Lynch was invited by Boeing management to attend a job fair in Long Beach in November of 2007.  Lynch attended a different job fair than the one Plaintiff Monper attended.  This job fair was on or about November 13, 2007 at the Westin Hotel in Long Beach, California.  Lynch attended the job fair during work hours to learn more about potential opportunities.  No layoffs had been threatened.  Rather, this was a recruiting event put on by management to entice employees in Long Beach to voluntarily move to Seattle, where Boeing was in need of additional experienced skilled mechanics and other personnel to work on the 787 Dreamliner.

283.     The job fair Lynch attended was preceded by a written invitation.  Lynch received a letter indicating he would be interviewed for a flight line mechanic position at the job fair. After Lynch checked in at the job fair, Defendants Gary Irons and Mike Query interviewed him.

284.     During the interview, Lynch asked questions about what impact a move would have on his retirement benefits.  In response to Lynch's questions about his early retirement benefits, both Defendants Irons and Query told Lynch that "nothing would change" in his retirement benefits.  Specifically, they told Lynch that he would "keep accruing time" under the Hourly West Plan and that his Hourly West Plan benefits would "continue to grow" while he worked in Seattle.  Whether he would "keep accruing time" was vitally important to his ability to take Unreduced Early Retirement benefits at age 55 under the terms of the Hourly West Plan. Defendants Irons and Query sent the same messages, and did not correct each other's false statements.

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

285.     Lynch's primary concern in considering whether to accept a new job was what effect it might have on his ability to take Unreduced Early Retirement benefits and the amount of those benefits.  Therefore, he sought confirmation that the benefits he expected would not change.

286.     After his interview at the job fair, Lynch received a transfer package from Boeing with paperwork regarding his new position.  Lynch then called Boeing's benefits telephone line to confirm his benefits availability.  Again he was told by Defendant Doe 3 that his credited time and retirement benefits would continue to "build" under the Hourly West Plan after moving to Washington.

287.     Lynch also talked to Defendant Cindy Cuto, who was Lynch's HR representative in Long Beach.  Lynch was required to meet with Defendant Cuto to sign his transfer paperwork.  Before he signed, he asked her confirm that his retirement benefits would not change, which she did confirm.  She too said that his benefits would "continue to grow" under the Hourly West Plan.

288.     Based on his conversations at the job fair, on the Boeing benefits line with Defendant Doe 3, and with Defendant Cuto, Lynch accepted the job offer to transfer from California to Washington.

**3.     Lynch's Early Retirement Benefits Under the Terms of the Hourly West Plan Will Be Significantly Reduced Because He Transferred to the Seattle Area.**

289.     As it turned out, Lynch had been misinformed and his future accrual rights (other than to his vested, accrued benefits) under the Hourly West plan ceased upon his transfer.  Because he does not (and will not) have 30 years of Aggregate Benefit Service under the Hourly West Plan, he is not entitled to Unreduced Early Retirement Benefits; nor will he be entitled to an Early Retirement Supplement.  Had Lynch not been misinformed, he would not have agreed to the transfer.

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

290.    The difference between the pension benefits upon early retirement to which Lynch is now entitled and the benefits to which he would have been entitled had he received accurate and truthful information—and thus never transferred to the Seattle area—is considerable.

291.    Lynch is currently 54 years old.  He will be eligible for Early Retirement under the terms of the Hourly West Plan in approximately one more year, when he reaches age 55. According to Boeing plan records, Lynch has 21.7634 years of "Aggregate Benefit Service" and 21.5934 years of "Total Benefit Service" as a participant in the Hourly West Plan.  Because the number for Aggregate Benefit Service is less than 30, Lynch is not eligible for an Unreduced Early Retirement Benefit under the Hourly West Plan.  Accordingly, after his Monthly Benefit is calculated at Normal Retirement Age (age 65), his benefits for an age 55 early retirement will be subject to an Early Retirement Reduction Factor of 58%.

292.    According to Boeing plan records and the current terms of the Hourly West Plan, Lynch's Benefit Rate will be $81.00.  Multiplied by his current 21.5934 years of "Total Benefit Service," Lynch's Monthly Benefit at Normal Retirement Age is projected to be $1,749.07.  At age 55, the benefit will be $1,014.46 after applying the 6% per year reduction.

293.    By not having credit for at least 30 years of Aggregate Benefit Service, and using 21.5934 years for the calculations, Lynch is losing *at least* $734.61 in benefits (due to the Reduction Factor), as well as the $550 ERS.  Together this is a loss of at least $1,284.61 per month.

294.    Under the terms of the Hourly West Plan, Lynch is not entitled to anything more than a Reduced benefit with no ERS if he retires at age 55 as he plans to do.

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

295.     Regardless of the proper method of calculating losses,[18] each of the following examples demonstrates a significant loss in benefits to Lynch caused by Defendants' misrepresentations that induced him to transfer from California to Washington:

A.      Using Lynch's actual years of service in the Hourly West Plan, but calculating his benefits as Unreduced and with the ERS he was expecting, he faces significant losses.  With 21.5934 years of Total Benefit Service, his Monthly Benefit at Normal Retirement Age is projected to be $1,749.07.  Adding the $550 ERS thereto makes his benefit $2,299.07.  Compared to his current estimated Monthly Benefit of $1,014.46, this is a loss of $1,284.61, or about 56% of the Unreduced and supplemental benefits available under the Hourly West Plan.

B.      Assuming exactly 30 years of Aggregate Benefit Service under the Hourly West Plan to deem compliance with the Hourly West Plan's terms, multiplied by $81.00, Lynch would be entitled to a Normal Retirement Age benefit of $2,430.00.  Taking into account the additional $550 ERS he also would be entitled to with 30 years of Aggregate Benefit Service, the difference between $2,980.00 and his current estimated Monthly Benefit $1,014.46 is staggering—a loss of $1,965.54 per month, or about 66% of the Unreduced and supplemental benefits available under the Hourly West Plan.

C.      Lynch had over 21 years in the Hourly West Plan when he left.  If he had stayed there and worked until he turns 55 in 2017, his total years of service would have been about 31.5.  At this level, his Normal Retirement Age benefit would be approximately $2,551.50.  Adding the $550 ERS, his Hourly West Plan benefits would total $3,101.50.  The difference between that and the current estimated Monthly Benefit of $1,014.46 is even greater—a loss of $2,087.04 per month, or about 67% of the Unreduced and supplemental benefits available under the Hourly West Plan.

---

[18] Plaintiffs reserve all rights to seek the most advantageous calculation of losses allowed in equity to make right the fiduciary breaches alleged here.  These examples are presented for illustrative purposes only and to demonstrate that by a multitude of logical measures, Plaintiffs' losses are substantial.

LAW OFFICES OF
KELLER ROHRBACK L.L.P.
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

296.     Lynch is also a participant in the BCERP.  Since his move to Seattle, he has been accruing benefits under that plan.  When he retires, he will have a benefit from the Hourly West Plan and an additional benefit from the BCERP.  While a detailed loss analysis will be appropriate at a later stage in the litigation, even taking into consideration the BCERP benefits to which Lynch would be entitled if retiring at age 55, he will face significant losses in his total benefits because he must take a Reduced Early Retirement Benefit under the terms of the Hourly West Plan, and he will not be entitled to the Hourly West Plan's ERS.

### 4.     Lynch Detrimentally Relied on Defendants' Misrepresentations Regarding Available Benefits.

297.     When he made the decision to move, Lynch was relying on the false assurances from Defendants described above that his retirement benefits would not take a hit.  Only several years later did he discover he had been repeatedly misled and would face a significant reduction in available benefits under the terms of his retirement plans.

298.     Lynch never would have left Long Beach if he had known that his Early Retirement Benefits would be negatively impacted by the move.  Specifically, had Lynch known that his years of Aggregate Benefit Service would *stop* accruing under the Hourly West Plan once he moved to Seattle and that he would be forced to take a *Reduced* Early Retirement benefit from the Hourly West Plan, *without* an ERS, he would not have moved.

299.     Not only has Lynch's ability to retire early with the full level of benefits he was promised and expected to receive based on Defendants' misrepresentations been eliminated, he has uprooted his life, moved to a new city and state, and left family behind in California—all to his further detriment.  He never would have moved if he had known the truth about the benefits reduction he would face.

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

5. **Lynch Has Discovered His Benefits Would be Cut, But a Claim or Appeal Would Be Futile.**

300.     Lynch had been working in Seattle for several years—completely unaware of the adverse benefits consequences of his transfer—when he learned that he had been misled at the 2007 job fair.

301.     In the spring of 2011, Plaintiff Monper called Lynch to ask if Lynch knew what was going on with their Hourly West Plan early retirement benefits.  Lynch had no idea what Monper was talking about or that his benefits would be anything different than what he had been promised in 2007 before he transferred.  Monper made Lynch aware of his own situation and that other employees who transferred from Long Beach to Washington had only recently learned that they would be subject to the early retirement penalty as well.  This is the *first* time Lynch received information that he would not be able to take an Unreduced Early Retirement Benefit with an ERS from the Hourly West Plan at age 55, no matter how many years he worked in Washington.

302.     As described above, Lynch was set to attend the meeting on April 5, 2013 that Monper had arranged with Julie Acosta and Sonya Bell, and to which Lynch had been invited by a Boeing HR employee.  On the day of the meeting, just a few hours before it was to occur, Lynch was "excused" from the meeting via an email notice, and was not allowed to sit in.  Lynch was told that he could not be present when another Boeing employee (Monper) was discussing his own benefits with Boeing.

303.     On April 8, 2013, Lynch requested a benefits calculation estimate for age 55 early retirement from Boeing.  He received a response indicating that he would be allowed only a Reduced Early Retirement Benefit, without the ERS, under the terms of the Hourly West Plan.

304.     Were Lynch to make a formal "claim" for Unreduced Early Retirement benefits under the terms of the Hourly West Plan, he would end up in the same place as Monper, as described above, and Veturis, as described below: denial of both a claim and any subsequent

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1    appeal, because such benefits are *unavailable* under the terms of the Hourly West Plan in his

2    circumstances.

3    **6.     Because Lynch is Not Entitled to Unreduced Early Retirement Benefits or the ERS Under the Terms of the Hourly West Plan, Equity Demands that He Be Made Whole for Being Misled.**

4

5    305.    Under the clear terms of the Hourly West Plan, what Boeing and certain Direct

6    Communication Defendants had promised Lynch was not possible.

7    306.    On April 5, 2013, Plaintiff Monper met with Acosta in the meeting at which

8    Lynch's attendance had been requested and then prohibited by Boeing.

9    307.    Monper relayed to Lynch after the meeting that Acosta had admitted that incorrect

10   information had been provided to Monper and Lynch, as well as other Long Beach employees

11   who transferred to Washington, but that Boeing was not going to honor the promises made to

12   those individuals in 2007 because Boeing did not want to set a "precedent."

13   308.    Under ERISA's strict fiduciary standards, misleading communications about

14   benefits are fiduciary breaches that are remedied in equity.

15   **C.     Plaintiff Mark C. Veturis Was Induced to Transfer to a New Position at Boeing in a New City through Promises that His Early Retirement Benefits would not Change or Be Reduced.**

16

17   **1.     Veturis's Employment and Plan Participation.**

18   309.    Plaintiff Veturis started working for McDonnell Douglas Corporation on August

19   13, 1979.  His work location was in Long Beach, California, where he was laid off and rehired

20   twice in the early 1980s.  Since his most recent rehire in 1985, he remained in Long Beach until

21   January of 2008, at which time he transferred to Auburn, Washington to become a

22   Manufacturing Planner in the Boeing Commercial Airplanes division.  Veturis's title in his final

23   position in Long Beach was Aircraft Structure Mechanic in Boeing's Airlift & Tanker Division.

24   From 1979 to 2008, Veturis built his life in California, and he still has family there.  Veturis

25   grew up in southern California and owns a house there.  When he moved to Washington, he left

26   his elderly parents and three brothers, as well as many other friends and family members.

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE
RETIREMENT INCOME SECURITY ACT - 98

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

310.    As an employee of McDonnell Douglas, Veturis became a participant in the Hourly West Plan, as a member of UAW 148.

311.    After he was recruited to transfer from Long Beach, California to another Boeing facility in Washington, Veturis accepted a voluntary job transfer offer to a new position in Auburn, Washington and began working there in January of 2008.  In his new position as a Manufacturing Planner, he is a member of SPEEA.

312.    As of January 18, 2008, Veturis also became a participant in the BCERP.

**2.    Veturis's Benefits Inquiries and Transfer.**

313.    On November 21, 2007, Veturis received a job offer from the Boeing Commercial Fabrication Division in Auburn, Washington.  No layoffs had been threatened.  Rather, Boeing sought to entice employees in Long Beach to voluntarily move to Seattle, where Boeing was in need of additional experienced skilled mechanics and other personnel to work on the new 787 and 747-8 programs.  Boeing emphasized its need for experienced mechanics and other personnel to move from California to Washington.

314.    Veturis's primary concern in considering whether to accept a new job was what effect it might have on his ability to take early retirement and the amount of those benefits.  Therefore, he sought confirmation that the benefits he expected would not change.

315.    The day after he received the transfer offer, Veturis visited Boeing's pension office in "Building 54" in Long Beach with his offer letter in hand.  Veturis was aware that the pension plan available to him in Long Beach as a McDonnell Douglas employee—and in particular the "30 and out at 55" benefit—was better than what had been available to Boeing employees elsewhere when Boeing acquired McDonnell Douglas in the late 1990s.  Therefore, he was concerned about making sure he understood the impact of a move.  At the pension office, Veturis specifically inquired whether the move from California to Washington would affect his early retirement benefits in any way.  He was assured by a female employee benefits representative in the pension office—Defendant Doe 1—that his early retirement benefits would

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1   not be reduced or penalized under the Hourly West Plan and, specifically, that he would "not

2   lose his 30 and out at 55" Unreduced Early Retirement benefits.  Defendant Doe 1 had a copy of

3   the Hourly West Plan Summary Plan Description (2006 Edition) on her desk, and she showed

4   Veturis the section on Aggregate Benefit Service on pages 13 and 14.  She pointed to the list of

5   plans for which years of service would also count toward Hourly West Plan benefits accrual.

6   Defendant Doe 1 explained that upon his move to Washington, Veturis would become a

7   participant in The Pension Value Plan for Employees of The Boeing Company, and, therefore, he

8   had nothing to worry about, because years of service accrued under that plan would be included

9   in the calculation of Aggregate Benefit Service under the Hourly West Plan.  At that point, he

10  only needed 2.33 more years to reach 30 years of Aggregate Benefit Service under the Hourly

11  West Plan.  Defendant Doe 1 also told Veturis that he would have two plan benefits—one from

12  the Hourly West Plan and another from this new plan in Washington.  She said that, while the

13  money for each pension benefit would be "separate," the "time for [your] heritage benefit [*i.e.*,

14  the Hourly West Plan] would be added, no problem, go and get your new job."  Veturis

15  understood from this conversation that the time he worked in Washington would be added to

16  what he had accrued in California, which was vitally important to his ability to take Unreduced

17  Early Retirement Benefits under the terms of the Hourly West Plan.

18      316.    Not only did Veturis have no reason to doubt what Defendant Doe 1 told him

19  about the identity of his new plan and how it would interface with the Hourly West Plan, Veturis

20  also was assured by the name of the plan that Defendant Doe 1 falsely promised Veturis he

21  would join and its lack of limitation on work location.  The Pension Value Plan was listed in the

22  SPD as being simply for employees *of Boeing* and was not limited to employees of Boeing at

23  heritage MDC locations such as Long Beach.  Further, without being able to tell from the face of

24  the SPD page he was shown by Defendant Doe 1 that participation in the Pension Value Plan

25  (and thus continued benefit accrual in the Hourly West Plan) was limited to non-union and

26

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1   management employees of Boeing, no red flags were apparent to Veturis on that basis either, as

2   Defendant Doe 1 assured Veturis about his future benefits.

3   317.   Based on his conversation with Defendant Doe 1 and the information he was

4   shown, Veturis accepted the job offer to transfer from California to Washington shortly

5   thereafter.

6   **3.   Veturis's Early Retirement Benefits Under the Terms of the Hourly West
        Plan Will Be Significantly Reduced Because He Transferred to Auburn.**

7   318.   As it turned out, Veturis had been misinformed and his future accrual rights (other

8   than to his vested, accrued benefits) under the Hourly West plan ceased upon his transfer.

9   Because he does not (and will not) have 30 years of Aggregate Benefit Service under the Hourly

10  West Plan, he is not entitled to Unreduced Early Retirement Benefits; nor will he be entitled to

11  an Early Retirement Supplement.  Had Veturis not been misinformed, he would not have agreed

12  to the transfer.

13  319.   The difference between the pension benefits upon early retirement to which

14  Veturis is now entitled and the benefits to which he would have been entitled had he received

15  accurate and truthful information—and thus never transferred to Auburn—is considerable.

16  320.   Veturis is currently 55 years old.  He is already eligible for Early Retirement

17  under the terms of the Hourly West Plan, because he has reached age 55, but if he takes it now it

18  will be reduced and unsubsidized.  According to Boeing plan records, Veturis has 27.8400 years

19  of "Aggregate Benefit Service" and 27.6700 years of "Total Benefit Service" as a participant in

20  the Hourly West Plan.  Because the number for Aggregate Benefit Service is less than 30,

21  Veturis is not eligible for an Unreduced Early Retirement Benefit under the Hourly West Plan.

22  Accordingly, after his Monthly Benefit is calculated at Normal Retirement Age (age 65), his

23  benefits for an age 55 early retirement will be subject to an Early Retirement Reduction Factor of

24  58%.

25  321.   According to Boeing plan records and the current terms of the Hourly West Plan,

26  Veturis's Benefit Rate will be $81.00.  Multiplied by his current 27.6700 years of "Total Benefit

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE
RETIREMENT INCOME SECURITY ACT - 101

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

Service," Veturis's Monthly Benefit at Normal Retirement Age is projected to be $2,241.27. At age 55, the benefit will be $1,299.94 after applying the 6% per year reduction.

322.     By not having credit for at least 30 years of Aggregate Benefit Service, and using 27.6700 years for the calculations, Veturis is losing *at least* $941.33 in benefits (due to the Reduction Factor), as well as the $550 ERS. Together this is a loss of at least $1,491.33 per month.

323.     Under the terms of the Hourly West Plan, Veturis is not entitled to anything more than a Reduced benefit with no ERS if he retires at age 55 as he plans to do.

324.     Regardless of the proper method of calculating losses,[19] each of the following examples demonstrates a significant loss in benefits to Veturis caused by Defendants' misrepresentations that induced him to transfer from California to Washington:

A.     Using Veturis's actual years of service in the Hourly West Plan, but calculating his benefits as Unreduced and with the ERS he was expecting, he faces significant losses. With 27.6700 years of Total Benefit Service, his Monthly Benefit at Normal Retirement Age is projected to be $2,241.27. Adding the $550 ERS thereto makes his benefit $2,791.27. Compared to his current estimated Monthly Benefit of $1,299.94, this is a loss of $1,491.33, or about 53% of the Unreduced and supplemental benefits available under the Hourly West Plan.

B.     Assuming exactly 30 years of Aggregate Benefit Service under the Hourly West Plan to deem compliance with the Hourly West Plan's terms, multiplied by $81.00, Veturis would be entitled to a Normal Retirement Age benefit of $2,430.00. Taking into account the additional $550 ERS he also would be entitled to with 30 years of Aggregate Benefit Service, the difference between $2,980.00 and his current estimated Monthly

---

[19] Plaintiffs reserve all rights to seek the most advantageous calculation of losses allowed in equity to make right the fiduciary breaches alleged here. These examples are presented for illustrative purposes only and to demonstrate that by a multitude of logical measures, Plaintiffs' losses are substantial.

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

Benefit $1,299.94 is staggering—a loss of $1,680.06 per month, or about 56% of the Unreduced and supplemental benefits available under the Hourly West Plan.

C.     Veturis had over 27 years in the Hourly West Plan when he left.  If he had stayed there and worked until he turns 55 in 2016, his total years of service would have been almost 36.  At this level, his Normal Retirement Age benefit would be approximately $2,916.00.  Adding the $550 ERS, his Hourly West Plan benefits would total $3,466.00.  The difference between that and the current estimated Monthly Benefit of $1,299.94 is even greater—a loss of $2,166.06 per month, or about 62% of the Unreduced and supplemental benefits available under the Hourly West Plan.

325.     Veturis is also a participant in the BCERP.  Since his move to Auburn, he has been accruing benefits under that plan.  When he retires, he will have a benefit from the Hourly West Plan and an additional benefit from the BCERP.  While a detailed loss analysis will be appropriate at a later stage in the litigation, even taking into consideration the BCERP benefits to which Veturis would be entitled if retiring at age 55, he will face significant losses in his total benefits because he must take a Reduced Early Retirement Benefit under the terms of the Hourly West Plan, and he will not be entitled to the Hourly West Plan's ERS.

**4.     Veturis Detrimentally Relied on Defendants' Misrepresentations Regarding Available Benefits.**

326.     When he made the decision to move, Veturis was relying on the false assurances from Defendants described above that his retirement benefits would not take a hit.  Only several years later did he discover he had been repeatedly misled and would face a significant reduction in available benefits under the terms of his retirement plans.

327.     Veturis never would have left Long Beach if he had known that his Early Retirement Benefits would be negatively impacted by the move.  Specifically, had Veturis known that his years of Aggregate Benefit Service would *stop* accruing under the Hourly West Plan once he moved to Auburn and that he would be forced to take a *Reduced* Early Retirement benefit from the Hourly West Plan, *without* an ERS, he would not have moved.

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

328.    Not only has Veturis's ability to retire early with the full level of benefits he was promised and expected to receive based on Defendants' misrepresentations been eliminated, he has uprooted his life, moved to a new city and state, and left family and a home behind in California—all to his further detriment.  As he wrote in his appeal letter, "I would not have accepted this position with the correct information about my retirement.  To now just leave me with half a retirement at age 55 due to the company's error is just not right."

### 5.    Veturis Discovered His Benefits Would be Cut and Filed a Futile Claim and Appeal.

329.    Veturis had been working in Auburn for several years—completely unaware of the adverse benefits consequences of his transfer—when he learned that he had been misled in 2007 when he had visited the pension office in Long Beach.

330.    In November of 2010, Veturis requested an age 55 early retirement benefits estimate.  This estimate showed Veturis for the *first time* that he would only receive *Reduced* Early Retirement benefits under the Hourly West Plan, with no ERS.  When he investigated further and studied the estimate he had received from Boeing, he discovered for the *first time* that the new plan in Washington (the BCERP) is *not* the plan he had been told in 2007 he would join (the Pension Value Plan for Employees of The Boeing Company), and the BCERP is *not* a plan where years of service counted as Aggregate Benefit Service under the Hourly West Plan.

331.    In January of 2011, Veturis disputed the accuracy of the estimate he had recently received.  He wrote a letter to the Employee Benefit Plans Committee, saying he would like to "formally appeal the now denied benefit of early retirement with 30 years of service and age 55 with no reduction in benefits, as I was told by the Company benefits representative in Long Beach Ca."  He wrote: "I WOULD HAVE NOT ACCEPTED THIS POSITION HAD I [BEEN] GIVEN THE CORRECT INFORMATION BY THE COMPANY.  With 27.67 years in Long Beach, I had no fear of lay-off and would have had my 30 years by now."

332.    By this time, Veturis had discovered others in his same predicament—transferees from Long Beach who also had been misled in 2007.

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

333. By letter dated January 25, 2011, Cecilia L. Burian (Employee Benefit Specialist, Pension Operations) wrote Veturis a response, explaining that his years of service under the BCERP in Washington did not count as Aggregate Benefit Service under the Hourly West Plan, and advising him to file a claim if he disagreed with this benefits determination.

334. Thinking he already had filed a claim, Veturis wrote to Burian for clarification and pursued a claim and appeal upon receiving her response.

335. By letter dated April 27, 2011, Ann Bergquist (Employee Benefit Specialist, Boeing Pension Operations) denied Veturis's claim. As with Monper's claim denial, the letter asserted that because the BCERP "is not one of the defined benefit plans that was maintained by McDonnell Douglas Corporation," years of service under that plan could not count toward Aggregate Benefit Service under the Hourly West Plan.

336. On June 24, 2011, Veturis appealed, noting that the Hourly West Plan Summary Plan Description does not mention McDonnell-Douglas-sponsored plans and simply lists "Boeing-sponsored" retirement plans, including the Pension Value Plan for Employees of The Boeing Company, which is the one Veturis had been told in 2007 that he would be joining.

337. As with Monper's appeal, Veturis's appeal languished with Boeing's Employee Benefit Plans Committee for almost a year—months longer than allowed by the plan claim and appeal procedure, despite multiple inquiries from Veturis regarding its status. Though a "claim for benefits" under the terms of the Hourly West Plan cannot provide Veturis with the early retirement benefits he was promised in 2007, Boeing's violation of its own plan claim and appeal rules added insult to injury.

338. Finally, in a document entitled "Memorandum No. 1591" and dated May 7, 2012 (only four days after Monper's appeal was denied), Boeing's Employee Benefit Plans Committee denied Veturis's appeal. The fundamental issue the committee considered was "whether Mr. Veturis is entitled to an unreduced benefit at age 55 under the Hourly West Plan portion of his benefit." The committee found that under the terms of the Hourly West Plan, Veturis's years of

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1  service in the BCERP do not count towards the Aggregate Benefit Service total under the Hourly

2  West Plan.  The Memorandum concludes by noting that the "Committee has a fiduciary

3  responsibility under [ERISA] to administer the Company pension plans in accordance with their

4  written terms consistently applied to all participants."

5       339.  Veturis received a letter dated June 20, 2012 enclosing Memorandum No. 1591.

6       **6.  Because Veturis is Not Entitled to Unreduced Early Retirement Benefits or the ERS Under the Terms of the Hourly West Plan, Equity Demands that He Be Made Whole for Being Misled.**

8       340.  Under the clear terms of the Hourly West Plan, what Boeing and certain Direct

9  Communication Defendants had promised Veturis was not possible.  By the time he was in the

10  claim and appeal process, Veturis had met Monper, and knew of Monper's parallel efforts to

11  seek an equitable solution to this problem.

12       341.  Apart from his communications with Monper, however, Veturis learned long after

13  he moved to Washington that others who transferred from Long Beach had been misled and also

14  had detrimentally relied on Boeing's and certain Direct Communication Defendants' promises

15  regarding their available early retirement benefits.

16       342.   As the Employee Benefit Plans Committee acknowledged in denying Veturis's

17  appeal, fiduciary responsibilities under ERISA are paramount.  What the Committee did not

18  address in the claim and appeal process is the "fiduciary responsibility" not to mislead and

19  misinform participants about future benefits under pension plans governed by ERISA.  When

20  that happens, equity provides a remedy for relief that is unavailable in any claim or appeal

21  process—*i.e.*, outside a "claim for benefits" pursuant to a plan's terms.

## VII.   CAUSES OF ACTION

### Count 1: Equitable Relief Pursuant to
### ERISA Section 502(a)(3), 29 U.S.C. § 1132(a)(3),
### for Inducement to Transfer by Promising Unreduced Early Retirement Benefits

25       343.   Plaintiffs repeat and reallege paragraphs 1-342 as if fully set forth herein.

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

344.     Count 1 is brought against the **"Fiduciary Communication Defendants"**: Defendants The Boeing Company, McDonnell Douglas Corporation, the Committee Defendants (the Employee Benefit Plans Committee, Richard D. Stephens, Bryan H. Baumeister, David A. Dohnalek, R. Paul Kinscherff, J. Michael Luttig, Alan R. May, and Harry S. McGee), Scott Buchanan, and Myra Elliot.

345.     Count 1 is limited against the Committee Defendants to apply to them only to the extent that they retained any undelegated, direct responsibility for the fiduciary conduct at issue here, including with respect to handling benefit appeals and overseeing plan administration. Plaintiffs' understanding is that the day-to-day administration of the Plans was delegated by the Committee to individuals holding two specific titles, and that for the time period of Plaintiffs' recruitments and transfers, such delegees were Defendants Scott Buchanan and Myra Elliot. Plaintiffs reserve all rights as to direct claims for fiduciary breach against the Committee in their undelegated roles that may be supported by evidence developed in discovery.

346.     Each Defendant is either a named fiduciary or a functional fiduciary, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), for the reasons alleged *supra*, and therefore the Fiduciary Communication Defendants are proper Defendants for Count 1.  As fiduciaries, the Fiduciary Communication Defendants were bound by the duties of loyalty, exclusive purpose, and prudence, as described below.  Under this standard, both acts and omissions—*i.e.*, misleading communications and failures to communicate—can be breaches of fiduciary duty.

347.     ERISA Sections 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) & (B), provide, in pertinent part, that a fiduciary shall discharge his or her duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE
RETIREMENT INCOME SECURITY ACT - 107

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

348.     These fiduciary duties under ERISA Sections 404(a)(1)(A) and (B) are referred to as the duties of loyalty, exclusive purpose, and prudence and are customarily referred to as the "highest known to the law." They entail, among other things:

(a)     The duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor; and

(b)     The duty to disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

349.     Communication to plan participants about the future of plan benefits is a fiduciary act that can also confer fiduciary status. A person or entity that is not already a "named fiduciary" can become a fiduciary for the purpose of communications about the future of plan benefits by virtue of *exercising* discretion and inserting her- or himself into these matters of plan management and administration. Further, communications by one who is under the control and/or direction of the employer or plan administrators, about the future of plan benefits as they relate to a change in employment within the company, are exercises of discretion and therefore fiduciary acts.

350.     When an employer or its agents communicates to plan participants about the future of plan benefits, such communication is a fiduciary act. When an employer, its agents, or any other plan fiduciary misrepresents entitlement to future ERISA benefits or misleads participants to their detriment, that is a fiduciary breach actionable under ERISA, because lying is inconsistent with the duty of loyalty owed by all fiduciaries.

351.     ERISA Section 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes individual participants and fiduciaries to seek *appropriate equitable relief* from Defendants for violations of

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE
RETIREMENT INCOME SECURITY ACT - 108

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1  ERISA, including, without limitation, injunctive relief and, as available under applicable law,

2  constructive trust, reformation, surcharge, and equitable restitution.

3      352.    The Fiduciary Communication Defendants breached their fiduciary duties to

4  Plaintiffs by promising (directly or through their agents) Plaintiffs future early retirement

5  benefits that actually would not be available under the terms of their benefits plans.

6      353.    The Fiduciary Communication Defendants knew or should have known the

7  correct identity and terms of the plan into which Plaintiffs would transfer, as well as how

8  benefits under the Hourly West Plan would be calculated in connection with this new plan.

9      354.    The Fiduciary Communication Defendants' false promises misled Plaintiffs.

10      355.    The Fiduciary Communication Defendants' communications to Plaintiffs about

11  available early retirement benefits were materially misleading.

12      356.    The Fiduciary Communication Defendants failed to remedy their breaches or

13  correct misinformation provided to Plaintiffs at a time when Plaintiffs could have avoided the

14  losses caused by Plaintiffs' detrimental reliance on false promises regarding their entitlement to

15  future early retirement benefits.

16      357.    Plaintiffs relied, to their detriment, on the Fiduciary Communication Defendants'

17  misrepresentations about the availability of future benefits.  Plaintiffs were induced to transfer

18  from California to Washington by the Fiduciary Communication Defendants' false promises.

19      358.    Plaintiffs' reliance on the Fiduciary Communication Defendants'

20  misrepresentations was reasonable.  Plaintiffs were approached by and sought out personnel who

21  held themselves out as knowledgeable on the issues about which Plaintiffs inquired and/or were

22  misled.  Those individuals provided answers.  Plaintiffs believed the repeated assurances they

23  each were given about the availability of Unreduced Early Retirement Benefits under the Hourly

24  West Plan in their futures if they transferred from California to Washington.

25      359.    The Fiduciary Communication Defendants' fiduciary breaches have directly and

26  proximately caused harm and measurable losses to Plaintiffs, because Plaintiffs were deprived of

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

the ability to make informed decisions about their futures and how to secure the Unreduced Early Retirement benefits under the Hourly West Plan they were promised.  As a further direct and proximate result of the breaches of fiduciary duties alleged herein, and without the remedy sought herein, Plaintiffs will suffer significant losses to their Early Retirement Benefits.

360.    Plaintiffs cannot obtain the benefits they were promised through a claim for benefits *under the terms* of their plans.  Specifically, the terms of the Hourly West Plan do not allow Plaintiffs to take Unreduced Early Retirement Benefits or the ERS at age 55 because they do not and will not have at least 30 years of Aggregate Benefit Service under the Hourly West Plan.  Therefore, Plaintiffs seek to remedy the Fiduciary Communication Defendants' violations of ERISA in equity, as set forth herein.

361.    Under ERISA and the federal common law, each Defendant is jointly and severally liable for the losses suffered by Plaintiffs in this case.

## Count 2: Co-Fiduciary Liability Pursuant to ERISA Section 405, 29 U.S.C. § 1105

362.    Plaintiffs repeat and reallege paragraphs 1-361 as if fully set forth herein.

363.    Count 2 is brought against all Defendants except those previously dismissed and those noted above as being dismissed by the Second Amended Complaint.

364.    Defendants are fiduciaries within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

365.    ERISA Section 405(a)(1), 29 U.S.C. § 1105(a)(1), imposes liability on a fiduciary, in addition to any liability which he or she may have had under any other provision of ERISA, if he or she knowingly participates in a breach of fiduciary duty of another fiduciary. ERISA Section 405(a)(2), 29 U.S.C. § 1105(a)(2), imposes liability if a fiduciary in the administration of his or her fiduciary responsibilities enables another fiduciary to commit a breach.  ERISA Section 405(a)(3), 29 U.S.C. § 1105(a)(3), imposes liability on a fiduciary, in addition to any liability which he or she may have had under any other provision of ERISA, if he

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE
RETIREMENT INCOME SECURITY ACT - 110

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

or she knows of a breach by another fiduciary and fails to remedy it. Even if a fiduciary merely knows of a breach, a breach he or she had no connection with, he or she must take steps to remedy it.

366. Defendants, each of whom were fiduciaries within the meaning of ERISA, knew of each breach of fiduciary duty alleged herein arising from misinforming Plaintiffs about their benefits and thereby inducing them to transfer from California to Washington, they participated in each other's breaches, enabled each other's breaches, and took no steps to remedy those breaches. As such, each is liable for the breaches of the others pursuant to ERISA Section 405(a)(1), (2), and (3).

367. As a direct and proximate result of the breaches of fiduciary duties alleged herein, Plaintiffs were deprived of the ability to make informed decisions about their futures and how to secure Unreduced Early Retirement benefits under the Hourly West Plan. As a further direct and proximate result of the breaches of fiduciary duties alleged herein, and without the remedy sought herein, Plaintiffs will suffer significant losses to their Early Retirement Benefits.

368. Pursuant to ERISA Section 502(a)(3), 29 U.S.C. § 1132(a)(3), Defendants are liable to provide equitable relief as appropriate.

369. Defendants each are liable for the breaches of the others in which they participated, enabled, and/or failed to remedy pursuant to ERISA Section 405(a)(1), (2), and (3).

370. Under ERISA and the federal common law, each Defendant is jointly and severally liable for the losses suffered by Plaintiffs in this case.

**Count 3: Failure to Monitor Pursuant to**
**ERISA Section 502(a)(3), 29 U.S.C. § 1132(a)(3)**

371. Plaintiffs repeat and reallege paragraphs 1-370 as if fully set forth herein.

372. Count 3 is brought against the Committee Defendants and the Director Defendants, collectively the "**Monitoring Defendants**": Defendants Employee Benefit Plans Committee of the Boeing Company, the Committee Member Defendants (Richard D. Stephens, Bryan H. Baumeister, David A. Dohnalek, R. Paul Kinscherff, J. Michael Luttig, Alan R. May,

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

and Harry S. McGee), The Boeing Company Board of Directors, and the Individual Director

Defendants (John H. Biggs, John E. Bryson, Arthur D. Collins, Jr., Linda Z. Cook, William M.

Daley, Kenneth M. Duberstein, James L. Jones, Edward M. Liddy, John F. McDonnell, W.

James McNerney, Jr., Richard D. Nanula, Rozanne L. Ridgway, and Mike S. Zafirovski).

373.    For the reasons alleged *supra*, the Monitoring Defendants are fiduciaries within

the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).  Thus, they were bound by

the duties of loyalty, exclusive purpose, and prudence.

374.    As Plan Administrator, the Committee Defendants had the authority to delegate

their fiduciary responsibilities to others.  To the extent they delegated their fiduciary

responsibilities and their delegees committed any of the ERISA violations alleged herein, the

Committee Defendants failed to appropriately or adequately monitor their delegees, and thereby

breached their duties under ERISA.  The Committee Defendants also had monitoring

responsibility over all of the other Fiduciary Communication Defendants that engaged in

communications regarding employee benefits.

375.    The Director Defendants had appointment authority over the Employee Benefit

Plans Committee and its members, as well as monitoring responsibility over all of the Fiduciary

Communication Defendants that engaged in or oversaw communications regarding employee

benefits.

376.    In allowing the Fiduciary Communication Defendants to violate ERISA and in

failing to correct such breaches of duty to the Plaintiffs, the Monitoring Defendants committed

additional fiduciary breaches, actionable under ERISA Section 502(a)(3), 29 U.S.C.

§ 1132(a)(3).

377.    Under ERISA and the federal common law, each Defendant is jointly and

severally liable for the losses suffered by Plaintiffs in this case.

**Count 4: Attorneys' Fees and Costs Pursuant to**
**ERISA Section 502(g)(1), 29 U.S.C. § 1132(g)(1)**

378.    Plaintiffs repeat and reallege paragraphs 1-377 as if fully set forth herein.

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

379.    Count 4 is brought against all Defendants except those previously dismissed and those noted above as being dismissed by the Second Amended Complaint.

380.    Pursuant to ERISA Section 502(g)(1), 29 U.S.C. § 1132(g)(1), "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party."

381.    Under ERISA and the federal common law, each Defendant is jointly and severally liable for the losses suffered by Plaintiffs in this case.

## VIII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants in the following manner:

A.    declaring that the Defendants are fiduciaries for the purposes of the communications at issue here;

B.    declaring Plaintiffs entitled to the Unreduced Early Retirement Benefits and ERS they were promised, as would be calculated under the Hourly West Plan if promises regarding these benefits had not been false, or the equivalent value thereof, as a matter of equity;

C.    enjoining Defendants from refusing to pay the value of benefits promised in 2007 when Plaintiffs were induced to transfer from California to Washington;

D.    adopting the measure of losses most advantageous to Plaintiffs to restore Plaintiffs' losses and put them in the position that they would have been in if the fiduciaries of their plans had not breached their duties by misinforming them about future benefit entitlements;

E.    surcharging Defendants for the value of promised benefits, calculated as Unreduced Early Retirement Benefits and the ERS available under the Hourly West Plan to participants who have attained at least 30 years of Aggregate Benefit Service;

F.    declaring Plaintiffs eligible to receive Unreduced Early Retirement Benefits and the ERS under the Hourly West Plan;

G.    enjoining Defendants from enforcing their misrepresentations to deny early retirement benefits promised to Plaintiffs in 2007;

H.    enjoining Defendants from future misleading communications;

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

I.      awarding Plaintiffs their costs and attorney's fees herein;

J.      awarding Plaintiffs such other and further relief as to this Court may seem just and proper, including reformation or other appropriate equitable relief; and

K.      ordering Defendants to pay the foregoing.

DATED:        October 31, 2016.

KELLER ROHRBACK L.L.P.

By: s/ Erin M. Riley
By: s/ Gretchen S. Obrist
Erin M. Riley, WSBA #30401
Gretchen S. Obrist, WSBA #37071
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Telephone: (206) 623-1900
Facsimile: (206) 623-3384
Email: eriley@kellerrohrback.com
Email: gobrist@kellerrohrback.com

By: s/ David S. Preminger
David S. Preminger, *pro hac vice*
1140 Avenue of the Americas, 9th Floor
New York, NY, 10036
Telephone: (646) 380-6690
Email: dpreminger@kellerrohrback.com

***Attorneys for Plaintiffs***

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE
RETIREMENT INCOME SECURITY ACT - 114

LAW OFFICES OF
KELLER ROHRBACK L.L.P.
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON  98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

## CERTIFICATE OF SERVICE

I hereby certify that on October 31, 2016 I electronically filed Plaintiffs' Second Amended Complaint with the Clerk of the Court using the CM/ECF system, which will send notice of such filing to all known counsel of record.

KELLER ROHRBACK L.L.P.

By: s/ Gretchen S. Obrist
    Gretchen S. Obrist, WSBA #37071
    1201 Third Avenue, Suite 3200
    Seattle, WA 98101
    Telephone: (206) 623-1900
    Fax: (206) 623-3384
    E-mail: gobrist@kellerrohrback.com

*Attorneys for Plaintiffs*

LAW OFFICES OF
**KELLER ROHRBACK L.L.P.**
1201 THIRD AVENUE, SUITE 3200
SEATTLE, WASHINGTON 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384